No. 24-3258

IN THE

# United States Court of Appeals
## for the Seventh Circuit

---

**PUBLIC INTEREST LEGAL FOUNDATION**

*Plaintiff-Appellant*

v.

**MEAGAN WOLFE** and **UNITED STATES OF AMERICA**,

*Defendants-Appellees*

---

On Appeal from the United States District Court
for the Western District of Wisconsin, Case No. 3:24-cv-00285-jdp.
The Honorable James D. Peterson Presiding.

---

**BRIEF AND APPENDIX OF PLAINTIFF-APPELLANT**

---

Noel H. Johnson (*Counsel of Record*)
Kaylan Phillips
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street
Suite 700
Alexandria, VA 22314
(703) 745-5870
njohnson@publicinterestlegal.org

February 21, 2025          *Counsel for Plaintiff-Appellant*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3258

Short Caption: Public Interest Legal Foundation v. Wolfe, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Appellant Public Interest Legal Foundation, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kaylan Phillips, Public Interest Legal Foundation (expected)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Noel H. Johnson    Date: 12/20/2024

Attorney's Printed Name:  Noel H. Johnson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address:  107 S. West Street, Ste 700

    Alexandria, VA 22314

Phone Number: (703) 745-5870    Fax Number:

E-Mail Address: njohnson@PublicInterestLegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3258

Short Caption: Public Interest Legal Foundation v. Wolfe, et al.

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  Appellant Public Interest Legal Foundation, Inc.

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Noel Johnson, Public Interest Legal Foundation

  Matthew M. Fernholz, Cramer Multhauf LLP (counsel in district court)

(3)    If the party, amicus or intervenor is a corporation:

  i)    Identify all its parent corporations, if any; and

    None

  ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: /s/ Kaylan Phillips          Date: 12/23/2024

Attorney's Printed Name:  Kaylan Phillips

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]   **No** [✓]

Address:  107 S. West Street, Ste 700

  Alexandria, VA 22314

Phone Number:  (703) 745-5870          Fax Number: _____

E-Mail Address: kphillips@PublicInterestLegal.org

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................ii

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF ISSUES .................................................................................2

STATEMENT OF THE CASE .............................................................................3

    *Introduction* ......................................................................................................3

    *Summary of Legal Background* ......................................................................4

    *Summary of Factual Background* ..................................................................5

    *Procedural History* .......................................................................................10

SUMMARY OF THE ARGUMENT ................................................................11

ARGUMENT ....................................................................................................14

    I.       Standard of Review ............................................................................14

    II.     Introduction and Background ............................................................14

        A.  The Equal State Sovereignty Principle ..........................................16

        B.  The Elections Clause .......................................................................22

        C.  The National Voter Registration Act of 1993 ................................24

           1.  The NVRA's Public Disclosure Provision Is Designed to Protect the Right to Vote by Making Eligibility Determinations Transparent ......24

           2.  The NVRA Exempted Certain States Based on Conditions Existing Thirty Years Ago .......................................................................28

    III.    The District Court Erred When It Held that the Equal State Sovereignty Principle Does Not Apply to the NVRA ............................................................29

        A.  The Alleged "Burden versus Exemption" Distinction Does Not Dispositively Distinguish *Shelby County* ....................................30

i

B. Congress's Elections Clause Powers Are Qualified by the Principle of Equal State Sovereignty ................................................................. 32

C. The "Extraordinary" Nature of the VRA's Preclearance Requirement Does Not Dispositively Distinguish *Shelby County* ................................. 36

D. The States Subject to the NVRA Did Not Choose To be Disparately Burdened ............................................................................................... 39

IV. Wisconsin's Transparency Exemption Violates the Principle of Equal State Sovereignty ......................................................................... 41

A. Wisconsin's Transparency Exemption Is Not Justified Under Current Conditions ............................................................................................. 41

B. The *Shelby County* Standard Requires Evaluation of Facts, Making Dismissal Inappropriate .................................................................... 46

V. The Requested Remedy Is Appropriate and Lawful ......................... 47

A. A "Leveling Down" Remedy Is an Available Remedy for Federalism Claims .................................................................................................... 47

B. Severing the Transparency Exemption is the Appropriate "Leveling Down" Remedy ..................................................................................... 50

VI. Wisconsin's Transparency Exemption Is Inconsistent with *City of Boerne*'s Congruence and Proportionality Requirement .................................. 52

CONCLUSION ................................................................................................. 55

CERTIFICATE OF COMPLIANCE ............................................................... 57

CERTIFICATE OF SERVICE ........................................................................ 58

## TABLE OF AUTHORITIES

*Cases*

*Alexander v. S.C. State Conference of the NAACP,*
    602 U.S. 1 (2024)...........................................................................23

*Andonissamy v. Hewlett-Packard Co.,*
    547 F.3d 841 (7th Cir. 2008) ......................................................14

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
    570 U.S. 1 (2013).........................................11, 22, 25, 33, 35, 53

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015)................................................................23, 33

*Association of Community Organizations for Reform Now v. Edgar,*
    880 F. Supp. 1215 (N.D. Ill. 1995) ..............................................4

*Association of Community Organizations for Reform Now v. Edgar,*
    56 F.3d 791 (7th Cir. 1995) .............................. 22, 25, 34-35, 52

*Barr v. Am. Ass'n of Political Consultants,*
    591 U.S. 610 (2020)................................................................50-52

*Bellitto v. Snipes,*
    No. 16-cv-61474 (S.D. Fla., Mar. 30, 2018)............................28

*Bolln v. Nebraska,*
    176 U.S. 83 (1900).................................................................16-17

*City of Boerne v. Flores,*
    521 U.S. 507 (1997)..................................................3, 15 n.3, 53

*Condon v. Reno,*
    913 F. Supp. 946 (D.S.C. 1995) ......................................25, 52-53

*Cook v. Winfrey,*
    141 F.3d 322 (7th Cir. 1998) ......................................................47

*Coyle v. Smith,*
    221 U.S. 559 (1911)......................................................................21

*Franchise Tax Bd. v. Hyatt,*
578 U.S. 171 (2016)................................................................18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000)................................................................49

*Gillespie v. City of Indianapolis,*
185 F.3d 693 (7th Cir. 1999).................................................49

*Heckler v. Mathews,*
465 U.S. 728 (1984)...........................................................48, 51

*Husted v. A. Philip Randolph Inst.,*
584 U.S. 756 (2018)............................................................24-25

*Iowa-Des Moines National Bank v. Bennett,*
284 U.S. 239 (1931)................................................................48

*Justice v. Town of Cicero,*
577 F.3d 768 (7th Cir. 2009)................................................14

*Katzenbach v. Morgan,*
384 U.S. 641 (1966)............................................................53-54

*Manistee Apartments, LLC v. City of Chi.,*
844 F.3d 630 (7th Cir. 2016)............................................5, 14

*New York v. United States,*
505 U.S. 144 (1992)................................................................49

*New York v. Yellen,*
15 F.4th 569 (2d Cir. 2021).................................................39

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
557 U.S. 193 (2009)........................................................18-19, 21

*Office of the United States Tr. v. John Q. Hammons Fall 2006, LLC,*
602 U.S. 487 (2024)................................................................51

*Ohio v. EPA,*
98 F.4th 288 (D.C. Cir. 2024) ..........................................48-49

iv

*Pollard v. Hagan,*
    44 U.S. (3 How.) 212 (1845) ...................................................................17, 32

*Project Vote/Voting for Am., Inc. v. Long,*
    682 F.3d 331 (4th Cir. 2012) ..................................................... 27-28, 41, 45

*Pub. Int. Legal Found., Inc. v. Bellows,*
    92 F.4th 36 (1st Cir. 2024) ...................................................................27, 44

*Rucho v. Common Cause,*
    588 U.S. 684 (2019)...............................................................................23

*Schooner Exchange v. McFaddon,*
    11 U.S. (7 Cranch) 116 (1812) .................................................................17

*Shelby County v. Holder,*
    570 U.S. 529 (2013)........................................................................ *passim*

*Smiley v. Holm,*
    285 U.S. 355 (1932).........................................................................11, 25

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966).........................................................................18, 37

*Stearns v. Minnesota,*
    179 U.S. 223 (1900) ........................................................................ 17-18

*Strong Cmtys. Found. of Ariz. Inc. v. Richer,*
    No. CV-24-02030-PHX-KML (D. Ariz. Oct. 11, 2024)...................... 38 n.6

*True the Vote v. Hosemann,*
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ........................................................28

*United States v. Louisiana,*
    363 U.S. 1 (1960)..................................................................................19

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)...............................................................................17

### Declaration, Constitutions, Statutes, Regulations, and Rules

The Declaration of Independence, para. 32 (U.S. 1776) ...................................... 16 n.4

v

U.S. Const. Art. I, § 4, cl. 1 ..............................................................2, 22

U.S. Const. Amend. 14, Sec. 5 ..................................................................25

U.S. Const. Amend. 15, Sec. 2 ..................................................................25

28 U.S.C. § 1331 ............................................................................................1

28 U.S.C. § 2403 ..........................................................................................10

52 U.S.C. § 10101 ........................................................................................18

52 U.S.C. § 10302(c) ...................................................................................19

52 U.S.C. § 10303(a)(1) .........................................................................19, 40

52 U.S.C. § 10303(a)(1)(A)-(F) ..................................................................40

52 U.S.C. § 10303(b) ..................................................................................18

52 U.S.C. § 20501(a) .............................................................................26, 44

52 U.S.C. § 20501(a)(3) .............................................................28, 42, 45, 53

52 U.S.C. § 20501(b) ..................................................................................26

52 U.S.C. § 20501(b)(4) .........................................................................28, 45

52 U.S.C. § 20503(b)(1) .......................................................................4, 29, 39

52 U.S.C. § 20503(b)(2) .......................................................................4, 29, 39

52 U.S.C. § 20504(a)(1) .........................................................................26, 29

52 U.S.C. § 20507(a)(4)(A) .........................................................................27

52 U.S.C. § 20507(a)(4)(B) .........................................................................27

52 U.S.C. § 20507(i)(1) ........................................................................ *passim*

52 U.S.C. § 20510(b)...............................................................................1, 9

52 U.S.C. § 20510(b)(2)..............................................................................9

Wis. Stat. § 6.36(1)(a)..................................................................................6

Wis. Stat. § 6.56(3) .....................................................................................45

Wis. Adm. Code, EL 3.50(4) ...........................................................................7

Fed. R. Civ. P. 12(b)(6) .........................................................................3, 5, 14

*Other Authorities*

3 Debates on the Constitution 26 (J. Elliot ed. 1836) (Elliot's Debates) ............24, 35

Anthony J. Bellia Jr. & Bradford R. Clark, <u>Article: The International Law Origins of</u>
<u>American Federalism</u>,
    120 Colum. L. Rev. 835 (2020) .....................................................17, 36, 38

Brater et al., Purges: A Growing Threat to the Right to Vote (2019),
https://www.brennancenter.org/sites/default/files/2019-
08/Report_Purges_Growing_Threat.pdf ....................................................43

Thomas B. Colby, <u>In Defense of the Equal Sovereignty Principle</u>,
    65 Duke L.J. 1087 (2016) ..........................................................................21

H.R. Rep. No. 103-9 (1993) .......................................................... 25-26, 29, 39

"Federal Farmer," *Letters to the Republican* (Nov. 8, 1787), Letter III ......................24

Michael J. Klarman, The Framers' Coup: The Making of the United States
Constitution (2016).............................................................................24, 33, 35

National Conference of State Legislatures, *Same-Day Voter Registration*,
https://www.ncsl.org/elections-and-campaigns/same-day-voter-registration ......46

Palast, ERIC Crow, Jim Crow's liberal twin (July 15, 2020),
https://www.nationofchange.org/2020/07/15/eric-crow-jim-crows-liberal-twin/..42

The Federalist No. 59 (A. Hamilton) (C. Rossiter ed. 1961) .....................................23

The Federalist No. 59 (A. Hamilton) (R. Scigliano, ed. 2000) ..................................23

WEC, Badger Voters – FAQs, "What data is not available?",
https://badgervoters.wi.gov/faq.....................................................................7

WEC, Wisconsin's Commitment to Election Integrity,
https://elections.wi.gov/wisconsins-commitment-election-integrity .....................44

Yale University, Study uncovers flaws in process for maintaining state voter rolls (Feb. 26, 2021), https://phys.org/news/2021-02-uncovers-flaws-state-voter.html ...........43

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Public Interest Legal Foundation, Inc., brought a three-count complaint alleging violations of Section (8)(i) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1). ECF 1.[1]

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, because the action arose under the laws of the United States, and 52 U.S.C. § 20510(b), because the action sought declaratory and injunctive relief under the NVRA.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The Public Interest Legal Foundation seeks this Court's review of the District Court's Opinion and Order, A1,[2] and Judgment, A23, dismissing the underlying action with prejudice.

---

[1] District Court docket numbers are preceded by "ECF."

[2] Appendix citations are preceded by "A."

## <u>STATEMENT OF ISSUES</u>

1.      Did the District Court err when it decided that Congress needs *no justification* when it exercises its Elections Clause authority, U.S. Const. Art. I, § 4, cl. 1, to override the sovereignty of only *some* states?

2.      Did the District Court err when it dismissed the Public Interest Legal Foundation's complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6)?

**STATEMENT OF THE CASE**

*Introduction*

When Congress passed the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501 *et seq.*, it gave a small number of states then-offering voter registration on Election Day an exemption from the entire Act, 52 U.S.C. § 20503(b)(2). This appeal narrowly asks whether Congress's decision to exempt one of those states—Wisconsin— from the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1), is unconstitutional because (1) it deprives other states of equal sovereignty without justification, *Shelby County v. Holder*, 570 U.S. 529, 535 (2013), and (2) there is insufficient "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

The District Court held that the Foundation has Article III standing to pursue its constitutional claims, A7-A8, but that those constitutional claims fail as a matter of law because "the reasoning of *Shelby* and *Boerne* do not apply to the NVRA," A12. The District Court effectively held that unlike the Reconstruction Amendments, Congress needs no justification to treat states differently when it exercises its authority under the Constitution's Elections Clause. *See, e.g.,* A17-18. Consequently, the District Court found Wisconsin's exemption valid and dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6). A16; A23. This appeal seeks review of that ruling.

3

*Summary of Legal Background*

NVRA Section 8(i)—the Public Disclosure Provision—provides, "Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). The only exempt records are those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." *Id*. Courts universally agree that state voter rolls are subject to disclosure under the NVRA's Public Disclosure Provision. *See* ECF 1 ¶ 94. With limited exceptions, courts overwhelmingly agree that the NVRA preempts state-law restrictions that impede the NVRA's transparency goals. *See, e.g., Association of Community Organizations for Reform Now v. Edgar*, 880 F. Supp. 1215, 1222 (N.D. Ill. 1995) (declaring "that all provisions of Illinois law or regulations that conflict with the Act are pre-empted by the Act").

NVRA Section 4(b) provides that the NVRA does not apply to states that, on August 1, 1994, and continuously thereafter, did not have a voter registration requirement, or allowed all voters to register at the polling place on Election Day (hereafter, "Election Day Registration" or "EDR"), 52 U.S.C. § 20503(b)(1)-(2). Wisconsin

4

has offered EDR continuously since at least August 1, 1994, and therefore textually

qualifies for the NVRA exemption under 52 U.S.C. § 20503(b)(2).

Due to its NVRA exemption, Wisconsin is currently not required to comply with

the Public Disclosure Provision, which means Wisconsin is not required to maintain all

voter list maintenance records for at least two years, make all voter list maintenance

records public, nor limit records-production costs to "photocopying at a reasonable

cost." *See* 52 U.S.C. § 20507(i)(1). As a result, Wisconsin charges the public as much as

$12,500 to see the voter roll while concealing registrants' date-of-birth information,

which the public needs to distinguish one registrant from another. This appeal

challenges Wisconsin's exemption from only the Public Disclosure Provision, 52 U.S.C.

§ 20507(i)(1) (hereafter, the "Transparency Exemption").

*Summary of Factual Background*

When reviewing an order dismissing a complaint under Fed. R. Civ. P. 12(b)(6),

this Court "assume[s] all well-pleaded allegations are true[.]" *Manistee Apartments, LLC

v. City of Chi.*, 844 F.3d 630, 633 (7th Cir. 2016). The relevant facts, stated succinctly, are

the following:

1.     The Foundation is a non-profit, non-partisan, 501(c)(3) organization that

specializes in election and voting rights issues. ECF 1 ¶ 5.

2.      For its work, the Foundation relies heavily upon the NVRA's Public Disclosure Provision. ECF 1 ¶ 5.

3.      Among other programming, the Foundation uses records compiled through the NVRA to analyze the programs and activities of state and local election officials to determine whether lawful efforts are being made to keep voter rolls current and accurate, and to determine whether eligible registrants have been improperly removed from voter rolls. ECF 1 ¶ 5.

4.      The Foundation educates the public and government officials about its findings. ECF 1 ¶ 5.

5.      Wisconsin requires voter registration and currently conducts numerous activities designed to keep its voter list current and accurate. ECF 1 ¶¶ 26-42.

6.      Wisconsin law requires the Wisconsin Election Commission ("WEC") to "compile and maintain electronically an official registration list," which includes, for each registrant, data such as name, address, and date of birth. ECF 1 ¶ 84; Wis. Stat. § 6.36(1)(a).

7.      Requestors may purchase a copy of the Official Registration List through WEC's website for a fee, which is established by WEC. ECF 1 ¶ 88; Wis. Stat. § 6.36(6).

8.      The fee WEC charges depends on the number of records requested, plus a base fee per report.

> The charge for reports in electronic format is a $25 base fee per report; plus $5 for the first 1,000 voter registration data records, or up to 1,000 voter registration data records; plus $5 for each additional 1,000 voter registration data records, rounded to the nearest thousand. The maximum charge for an electronic report is $12,500.

ECF 1 ¶ 89; Wis. Adm. Code, EL 3.50(4).

9.     When the Foundation made its Request (January 2024), when the Foundation filed this action (April 2024), and when the Foundation opposed the Motion to Dismiss (June 2024), and the cost of receiving an electronic copy of the Official Registration List was the maximum charge of $12,500. *See* ECF 16 at 8, 8 n.2. At the time this brief was filed, the cost of receiving an electronic copy of the Official Registration List is the maximum charge of $12,500. *See* WEC, February 1, 2025 Voter Registration Statistics, Feb 3, 2025, https://elections.wi.gov/resources/statistics/february-1-2025-voter-registration-statistics (last accessed Feb. 21, 2025) ("The State of Wisconsin had 3,853,433 active registered voters on February 1, 2025.").

10.     Although the Official Registration List contains date-of-birth information, it is exempt from disclosure under Wisconsin law. ECF 1 ¶ 86; Wis. Stat. § 6.36(1)(b)(1)(a). WEC reiterates on its website, "The WEC will never provide date of birth information (including age or age range)[.]" WEC, Badger Voters – FAQs, "What data is not available?", https://badgervoters.wi.gov/faq (last accessed February 20, 2025). In other words, requestors cannot receive even registrants' *years* of birth.

7

11.     On January 24, 2024, pursuant to the NVRA's Public Disclosure Provision, the Foundation requested the following records from WEC:

1.  A current or most updated copy (.CSV or .TXT formats) of the complete Wisconsin Official Registration List as described in Wis. Stat. § 6.36 containing all data fields except for operator's license and/or last-four of Social Security number (Wis. Stat. § 6.36(1)(a)(5)). Please include year of birth as opposed to the full birth date for each registrant (Wis. Stat. § 6.36(1)(a)(2)) ("Official Registration List").

2.  "Deceased Reports" received from ERIC during the years 2020, 2021, 2022, and 2023 ("ERIC Reports").

ECF 1 ¶ 101 ("Request").

12.     The Foundation offered to pay a reproduction fee for the Official Registration List not to exceed cost of reproduction. *See* Wis. Stat. § 6.45(2) (describing fee imposed on candidates). ECF 1 ¶ 102.

13.     On February 13, 2024, WEC responded to the Request through counsel, explaining, that Wisconsin is exempt from the NVRA and that WEC is processing the request under Wisconsin's public records law. ECF 1 ¶ 103 ("Response").

14.     WEC's Response continued, "Wisconsin law requires the Commission to charge a fee for access to voter registration data and makes no exceptions for journalists, non-profits, academics, or any other group. *See* Wis. Stat. § 6.36(6) and Wis. Admin Code § EL 3.50." ECF 1 ¶ 104.

15.     On February 14, 2024, the Foundation notified Appellee Administrator Wolfe (the "Administrator") that she and WEC are in violation of the NVRA for failure to permit inspection and reproduction of voter list maintenance records as required by 52 U.S.C. § 20507(i)(1). ECF 1 ¶ 106 ("Notice Letter").

16.     The Notice Letter notified the Administrator that Wisconsin's Transparency Exemption is no longer valid, ECF 1 ¶ 107, and that WEC must make the Official Registration List, including year-of-birth information, available to the Foundation at the reasonable cost of reproduction, ECF 1 ¶¶ 107-110.

17.     The next day, WEC confirmed that it was denying the Foundation's request under the NVRA because Wisconsin is statutorily exempt from the NVRA. ECF 1 ¶¶ 116-17.

18.     The NVRA ordinarily requires written notice and an opportunity to cure. 52 U.S.C. § 20510(b). In this case, the curative period was 20 days because the violation occurred within 120 days of a federal election in Wisconsin. ECF 1 ¶ 120; ECF 1-3 at 4; 52 U.S.C. § 20510(b)(2).

19.     The Administrator did not cure her violation within 20 days of the Notice Letter, and to date, the Administrator has still not cured her violation. ECF 1 ¶ 123.

9

*Procedural History*

The Foundation filed this action on April 30, 2024. ECF 1. The Administrator moved to dismiss on June 6, 2024. ECF 14-15. The United States intervened under 28 U.S.C. § 2403, ECF 22, and subsequently filed a memorandum defending the constitutionality of the Transparency Exemption, 52 U.S.C § 20503(b)(2), ECF 26.

The District Court granted the Administrator's motion to dismiss on November 26, 2024, A1 (Opinion and Order), and entered judgment in the Administrator's favor on November 27, 2024, A23 (Judgment).

The Foundation timely filed a notice of appeal on December 13, 2024. ECF 33.

## SUMMARY OF THE ARGUMENT

With the Elections Clause, the Founders gave Congress the "authority to provide a complete code for congressional elections[.]" *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Although regulatory authority is vested in the states by "default," Congress may "alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) ("*ITCA*").

The question presented here is not whether the Elections Clause permits Congress to enact the NVRA. It does. The question is not whether the Elections Clause prohibits Congress from treating States differently in all cases. It does not. The question is whether the Elections Clause permits Congress to treat States differently *without justification*, and if not, whether the NVRA's Transparency Exemption is adequately justified under current conditions.

Imagine a constitutional architecture where Congress may wield the Elections Clause's preemptive power to pick and choose winners and losers, to reward allies and scald foes, to favor some states and punish others, or to favor some *voters* and punish others. Imagine if Congress required Georgians to show photo identification to vote but prohibited Florida's legislature from requiring photo identification. Imagine if Congress required Texans to vote on only one day but allowed Californians to adopt elongated mail ballot receipt deadlines after Election Day. Imagine if Congress required Arizonans

to present documentary proof of citizenship to register to vote but allowed New Yorkers merely to check a box to do the same.

Under the District Court's reasoning, Congress needs no justification to impose such outlandish voting regimes. Congress may, the District Court concludes, exercise its Elections Clause authority in a way that treats states differently, and such exercises are not subject to the fundamental principle of equal state sovereignty that the Supreme Court relied upon in *Shelby County. v. Holder*, 570 U.S. 529, 544 (2013). Such exercises need not, in other words, "make[] sense in light of current conditions," *id*. at 553, or "be sufficiently related to the problem that [they] target[],'" *id*. at 551 (citation omitted), or be targeted toward any problem whatsoever. The District Court erred when it so held.

Equal state sovereignty is not a narrowly construed byproduct of select Supreme Court jurisprudence. It does not spring to life only when Congress's actions strike the Court as "extraordinary." Equal state sovereignty is a bedrock principle upon which the nation was founded. Courts should *presume* that it qualifies Congress's power absent explicit evidence to the contrary. None exists here. To be sure, the States surrendered some sovereignty when they ratified the Elections Clause. The historical and legal record defies the conclusion that States surrendered their *equal* sovereignty, much less that the States consented to arbitrary or preferential enforcement schemes that favor some states over others in the administration of elections. In fact, the drafters designed

12

the Elections Clause to preserve the Republic by ensuring *uniformity* in state election regimes. The District Court's reasoning cannot be squared with history or precedent.

When it must be justified under current conditions, Wisconsin's Transparency Exemption cannot withstand scrutiny. In fact, the Transparency Exemption did not make sense when the NVRA took effect. It makes even less sense now, when nearly half the states offer registration and voting on the same day, the circumstance that supposedly justified Wisconsin's exemption. Furthermore, Wisconsin, like nearly all other states, is constantly granting and removing voting rights as part of its statutorily mandated voter list maintenance program. Forty-four states must surrender their sovereignty and comply with the NVRA's transparency mandates while Wisconsin does not. There is no credible justification for such disparate treatment anymore.

# ARGUMENT

## I.     Standard of Review

This Court "review[s] a district court's order granting a motion to dismiss under Rule 12(b)(6) de novo." *Manistee Apartments, LLC v. City of Chi.*, 844 F.3d 630, 633 (7th Cir. 2016) (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008)). This Court "assume[s] all well-pleaded allegations are true and draw[s] all reasonable inferences in the light most favorable to the plaintiff. To survive such a motion, a complaint must 'state a claim to relief that is plausible on its face.'" *Manistee Apartments, LLC*, 844 F.3d at 633 (quoting *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009)).

## II.    Introduction and Background

Thirty years ago, Congress decided that decisions about who is and is not eligible to vote should be transparent and publicly accessible, so that voting rights are not lost to errors and inefficiencies, or worse, discrimination. That decision is embodied in the NVRA's Public Disclosure Provision, which mandates public disclosure and reproduction of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1).

Yet when Congress passed the NVRA, it gave exemptions to Wisconsin and five other states because those states offered voter registration on Election Day (or, in the

14

case of North Dakota, did not require voter registration). Those states were exempt from the entire Act, including its Public Disclosure Provision.

The Foundation's Complaint alleged that Wisconsin's Transparency Exemption is invalid because Congress does not have justification for treating Wisconsin differently from the non-exempt states. *See* ECF 1 ¶ 1. The Foundation relied primarily on "the principle that all States enjoy equal sovereignty," which the Supreme Court reaffirmed in *Shelby County*, 570 U.S. at 535.[3]

The District Court "conclude[d] that *Shelby* does not apply to the NVRA" because (1) *Shelby* is "about unconstitutional burdens on states, not unconstitutional exemptions"; and, (2) "the reasoning of *Shelby* … do[es] not apply to the NVRA." A2, A12. Among those reasons, the District Court explained, are the different relief requested in each case, A12-A16, the "extraordinary" nature of the Voting Rights Act ("VRA"), A18, and what the District Court saw as a determinative difference— Congress's respective power-sources for the NVRA (Elections Clause) and the VRA (Fifteenth Amendment), A17.

The District Court erred when it concluded that the Transparency Exemption is not subject to the principle of equal state sovereignty and the standard applied in *Shelby*

---

[3] The Foundation also alleged that the Transparency Exemption violated the congruence and proportionality requirement articulated in *City of Boerne v. Flores*, 521 U.S. 507 (1997).

*County*. The equal state sovereignty principle is core to the architecture of our nation's federalist design. It cannot be overridden absent justification. This Court should so hold.

For the foregoing reasons, the Foundation requests that this Court reverse the District Court's judgment and remand this action to determine whether the Transparency Exemption is adequately justified under *Shelby County* and *City of Boerne*.

**A. The Equal State Sovereignty Principle.**

One-hundred and twenty-five years ago, the Supreme Court observed, "[T]he whole Federal system is based upon the fundamental principle of the equality of the States under the Constitution." *Bolln v. Nebraska*, 176 U.S. 83, 89 (1900). The Court continued, "The idea that one State is debarred, while the others are granted, the privilege of amending their organic laws to conform to the wishes of their inhabitants, is so repugnant to the theory of their equality under the Constitution, that it cannot be entertained even if Congress had power to make such discrimination." *Id*.

These emphatic remarks were hardly the initial recognition of the States' equal sovereignty. In the Declaration of Independence, the State's referred to themselves as "Free and Independent States."[4] "Under the law of nations, 'Free and Independent States' were entitled to the 'perfect equality and absolute independence of sovereigns.'"

---

[4] The Declaration of Independence, para. 32 (U.S. 1776).

16

Anthony J. Bellia Jr. & Bradford R. Clark, Article: The International Law Origins of American Federalism, 120 Colum. L. Rev. 835, 937 (2020) (quoting *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812)). "The notion of a 'State' with fewer sovereign rights than another 'State' was unknown to the law of nations." *Id*. at 937-38. Eighty years after *Bolln*, the Supreme Court would reaffirm that the States' "status as coequal sovereigns in a federal system" is "implicit in … the original scheme of the Constitution[.]" *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292-93 (1980).

The States were inherently sovereign. While they surrendered some of their sovereignty to the new federal government, their sovereign equality was not among the rights surrendered. *See* Bellia & Clark, *supra*, at 842 ("Under principles of the law of nations well known to the Founders, the 'States' would have been understood to retain their preexisting sovereign rights unless they clearly and expressly surrendered them.").

The Supreme Court first addressed the States' equal sovereignty in the context of admitting new States to the Union—describing what is often referred to as the "equal footing doctrine." In *Pollard v. Hagan*, 44 U.S. (3 How.) 212, 229 (1845), the Supreme Court recognized that every new State "has been admitted into the union on an equal footing with the original states." In *Stearns v. Minnesota*, 179 U.S. 223, 245 (1900), the Supreme Court again acknowledged that "a State admitted into the Union enters

17

therein in full equality with all the others, and such equality may forbid any agreement or compact limiting or qualifying political rights and obligations[.]"

The "'constitutional equality' among the States," *Franchise Tax Bd. v. Hyatt*, 578 U.S. 171, 179 (2016), requires equal treatment upon admission to the Union, but it also "remains highly pertinent in assessing subsequent disparate treatment of States." *Shelby County*, 570 U.S. at 544 (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("*Northwest Austin*")).

The Supreme Court recently addressed "subsequent disparate treatment of States" related to another federal election statute, the Voting Rights Act. In 1965, Congress passed the VRA, 52 U.S.C. § 10101 *et seq*., to combat racial discrimination in voting. VRA Section 5 required states to obtain federal preclearance before any law related to voting could go into effect. VRA Section 4 applied the preclearance requirement only to some but not all states, those that had used a forbidden test or device in November 1964 and had less than 50 percent voter registration or turnout in the 1964 Presidential election. 52 U.S.C. § 10303(b). In 1966, the Supreme Court upheld Section 4 against a constitutional challenge, explaining that "exceptional conditions can justify legislative measures not otherwise appropriate." *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966).

18

VRA Section 4's coverage formula was elastic. The VRA contained a provision allowing covered states to "bailout" of Section 5's federal preclearance requirement by seeking a declaratory judgment from a three-judge panel in United States District Court for the District of Columbia. *See* 52 U.S.C. § 10303(a)(1). The VRA also contained a provision under which states could be "bailed in" to the federal preclearance requirement for committing violations of the Fourteenth or Fifteenth Amendment. 52 U.S.C. § 10302(c).[5]

In 2009, the Supreme Court of the United States considered an action brought by a Texas municipal utility district seeking relief from Section 5's preclearance requirement under the VRA's "bailout" provision. *Northwest Austin*, 557 U.S. 193. Alternatively, the municipal utility district challenged the constitutionality of VRA Section 5. *Id*. at 197. The Supreme Court observed that in *Katzenbach*, the Court "concluded that 'exceptional conditions' prevailing in certain parts of the country justified extraordinary legislation otherwise unfamiliar to our federal system." *Id*. at 211 (citations omitted). The Court again acknowledged that the VRA "differentiates between the States, despite our historic tradition that all the States enjoy 'equal sovereignty.'" *Id*. at 203 (citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)). While

---

[5] The NVRA has no bailout or bail-in provisions, which made the intrusion into equal state sovereignty particularly constitutionally problematic. *See* Section III.D.

"[d]istinctions can be justified in some cases," the Supreme Court explained, "a

departure from the fundamental principle of equal sovereignty requires a showing that

a statute's disparate geographic coverage is sufficiently related to the problem that it

targets." *Id*. at 203.

The Supreme Court explained further that while the conditions that justified the

VRA had "improved," "[p]ast success alone, however, is not adequate justification to

retain the preclearance requirements." *Id*. at 202. "[T]he Act imposes current burdens

and must be justified by current needs." *Id*. at 203. Ultimately, the Supreme Court held

that the utility district was eligible to seek a "bail out" under the VRA and declined to

resolve the VRA's constitutionality. The ability to bail out of the VRA's disparate

burdens thus had significant import with the Supreme Court.

Four years later, in *Shelby County*, the Supreme Court held that VRA Section 4

was unconstitutional. In doing so, the Court reaffirmed "the principle that all States

enjoy equal sovereignty[.]" 570 U.S. at 535; *see also id*. at 544 ("[T]he constitutional

equality of the States is essential to the harmonious operation of the scheme upon which

the Republic was organized.") (citations and quotations omitted). The Supreme Court

instructed, with respect to a law that treats the States differently, "a statute's 'current

burdens' must be justified by 'current needs,' and any 'disparate geographic coverage'

must be 'sufficiently related to the problem that it targets.'" *Id*. at 550-51. Further,

20

"Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions. It cannot rely simply on the past." *Id*. at 553.

The United States Supreme Court is clear: "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of equal sovereignty' among the States." *Shelby County*, 570 U.S. at 544 (quoting *Northwest Austin*, 557 U.S. at 203). Equal state sovereignty is not just a byproduct of select Supreme Court jurisprudence; it is a bedrock principle upon which the nation was founded. *Shelby County*, 570 U.S. at 544 (citing *Coyle v. Smith*, 221 U.S. 559, 580 (1911)); *see also* Thomas B. Colby, In Defense of the Equal Sovereignty Principle, 65 Duke L.J. 1087, 1137 (2016) ("Sovereign equality of the member states is presumptively an essential, inherent structural feature of federalism itself."). Equal state sovereignty is inherent to our nation's federalist design. It cannot be overridden absent adequate justification. "[E]ven when Congress operates within its legitimate spheres of authority, it cannot limit or remove the sovereignty of some states, but not others." *Id*. at 1121.

Just as "[t]hese basic principles guide[d] [the Supreme Court's] review of the question" presented in *Shelby County*, 570 U.S. at 542, so too do these basic principles guide this Court's review of the questions presented here because these principles lie at

21

the heart of the constitutional architecture of the nation. These constitutional designs are not confined to only the Civil War Amendments.

### B. The Elections Clause.

The Constitution's Elections Clause provides,

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. Art. I, § 4, Cl. 1.

The Elections Clause "is broadly worded and has been broadly interpreted." *Association of Community Organizations for Reform Now v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995) ("*ACORN*"). It "confers on Congress a 'general supervisory power,' under which it may 'supplement … state regulations or may substitute its own.'" *Id*. at 795 (internal citations omitted).

As Judge Richard Posner has prudently acknowledged, "[L]aws frequently outrun their rationales." *ACORN*, 56 F.3d at 794. Indeed, the Founders' vision for the Elections Clause was decidedly narrower than presently understood. In *ITCA*, the Supreme Court would describe the Elections Clause as "the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." 570 U.S. at 8. The historical record amply supports this targeted purpose. For example, Alexander Hamilton, writing in the Federalist Papers, justified

the Elections Clause as the federal government's "means of its own preservation." The Federalist No. 59, at 363 (A. Hamilton) (C. Rossiter ed. 1961). This preservation rationale finds more support in the same writing, where Hamilton describes Congress's supervisory authority as one to be exercised "in the last resort." The Federalist No. 59, at 378 (A. Hamilton) (R. Scigliano, ed. 2000).

Another justification demonstrates a similar concern for behavior that would threaten Congress's ability to function as a representative body. The Supreme Court explains that the Elections Clause was also intended to "act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate." *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015).

Not everyone believed federal supervision over state elections was a good thing. Opponents of ratification described the Elections Clause "as a radical expansion of national power and a grave danger to liberty." *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 50 (2024) (Thomas, J., concurring). Antifederalist fears centered on the potential for misuse of power by those in office, even "predict[ing] that Congress's power under the Elections Clause would allow Congress to make itself 'omnipotent,' setting the 'time' of elections as never or the 'place' in difficult to reach corners of the State." *Rucho v. Common Cause*, 588 U.S. 684, 698 (2019). Whatever the prospect of such

23

abuses, Antifederalists insisted that "[i]t made no sense … to leave 'a door open to improper regulations.'" Michael J. Klarman, The Framers' Coup: The Making of the United States Constitution 342 (2016) (quoting "Federal Farmer," *Letters to the Republican* (Nov. 8, 1787), Letter III).

In addition to Hamilton's preservation rationale, the Federalist defense advanced the notion that "Congress ought to have the power to insist on some uniformity in federal elections." Klarman, The Framers' Coup at 342. Other proponents "championed the Clause as necessary 'for securing to the people their equal rights of election.'" *S.C. State Conference of the NAACP*, 602 U.S. at 51 (quoting 3 Debates on the Constitution 26 (J. Elliot ed. 1836) (Elliot's Debates)).

Divergent views dominated the debate over the Elections Clause. Between the divide, common ground emerged: the fear of unchecked power to set election rules.

### C.  The National Voter Registration Act of 1993.

#### 1.  The NVRA's Public Disclosure Provision Is Designed to Protect the Right to Vote by Making Eligibility Determinations Transparent.

"For many years, Congress left it up to the States to maintain accurate lists of those eligible to vote in federal elections, but in 1993, with the enactment of the National Voter Registration Act (NVRA), Congress intervened." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). The Supreme Court has described the NVRA as "a complex

superstructure of federal regulation atop state voter-registration systems." *ITCA*, 570 U.S. at 5. The NVRA, generally speaking, is a valid exercise of Congress's Elections Clause authority, *see ACORN*, 56 F.3d 791, because Congress's Elections Clause authority encompasses "regulations relating to 'registration.'" *ITCA*, 570 U.S. at 9 (quoting *Smiley*, 285 U.S. at 366). At least one court has acknowledged that Congress also acted under its power to enforce the Civil War Amendments, U.S. Const. Amend. 14, Sec. 5; U.S. Const. Amend. 15, Sec. 2. *Condon v. Reno*, 913 F. Supp. 946, 962 (D.S.C. 1995) ("The legislative history and the text of the NVRA are clear that Congress was utilizing its power to enforce the equal protection guarantees of the Fourteenth Amendment."); *see also id*. at 967 ("Congress had a sound basis on which to conclude that a federal voter registration law was an appropriate means of furthering the protections of the Fourteenth and Fifteenth Amendments.").

"The [NVRA] has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted*, 584 U.S. at 761. And at the same time, "Congress was well aware of the 'long history of … list cleaning mechanisms which have been used to violate the basic rights of citizens' when it enacted the NVRA." *Id*. at 807 (Sotomayor, J., dissenting) (citation omitted). The NVRA's legislative history indicates that Congress intended to "reduce … obstacles to voting to the absolute minimum while maintaining the integrity of the electoral

25

process." H.R. Rep. No. 103-9 at 3 (1993). Congress thus intended to address problems

through the NVRA and the NVRA's findings and purposes reflect this goal.

When Congress passed the NVRA, it found,

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a).

Congress enacted the NVRA for the following purposes:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).

The NVRA imposes various requirements on the States with respect to voter

registration, including the requirement that state driver's license applications serve as

applications for voter registration, 52 U.S.C. § 20504(a)(1), and the requirement that each

state use reasonable efforts to remove the names of registrants who are ineligible due to death or a change in residency, 52 U.S.C. § 20507(a)(4)(A)-(B).

As explained, the NVRA's Public Disclosure Provision requires the States to allow public inspection and reproduction of voter list maintenance records. 52 U.S.C. § 20507(i)(1). The Public Disclosure Provision's goal is transparency, but not only for transparency's sake. Rather, Congress added the Public Disclosure Provision to ensure that the NVRA's other goals were achieved. Multiple courts have recognized this. According to the Fourth Circuit, the Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012) ("*Project Vote*"). The Fourth Circuit further acknowledged,

> It is selfevident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls. State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer.

*Id*. at 339. The First Circuit agrees, finding that the Public Disclosure Provision "evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024). Various United States District Courts accord. *See*,

27

*e.g.*, *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12 (S.D. Fla., Mar. 30, 2018) (citing 52 U.S.C. § 20507(i)) ("To ensure that election officials are fulfilling their list maintenance duties, the NVRA contains public inspection provisions."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 721 (S.D. Miss. 2014) ("The Public Disclosure Provision thus helps 'to ensure that accurate and current voter registration rolls are maintained.'") (citations and quotations omitted).

In short, the Public Disclosure Provision exists so the public can evaluate the adequacy, effectiveness, and lawfulness of officials' voter list maintenance actions—namely, actions that grant and remove voting rights. For example, the NVRA's transparency allows individuals and advocacy groups like the Foundation to determine whether "accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4), or whether states are imposing "discriminatory and unfair registration laws and procedures," 52 U.S.C. § 20501(a)(3). Such "[p]ublic disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections." *Project Vote*, 682 F.3d at 339-40.

> **2. The NVRA Exempted Certain States Based on Conditions Existing Thirty Years Ago.**

The wholesale exemption to the entire NVRA is grounded in a small portion of the NVRA's requirements. The NVRA's public face was its "motor voter" feature, which required states to offer voter registration opportunities to driver's license

28

applicants. 52 U.S.C. § 20504(a)(1). Congress reasoned that EDR was better than "motor voter," and so states offering the better option would not be burdened with the cost of implementing the "motor voter" requirements. *See* H.R. Rep. No. 103-9 at 6 (1993) ("The Committee believes that states which have implemented one or both of these exceptions have lessened the impediments to registration which goes significantly beyond the requirements of the bill."). Yet Congress did not limit the exemption to "motor voter" requirements. That would have been more congruent, proportional, and related to registration deficit Congress was targeting with the Act's "motor voter" requirements. Instead, Congress exempted states with EDR from the entire NVRA, which includes the Public Disclosure Provision. *See* 52 U.S.C. § 20503(b)(1)-(2).

Wisconsin has offered EDR continuously since at least August 1, 1994, and therefore textual qualifies for the exemption under 52 U.S.C. § 20503(b)(2). Nobody disputes this. Due to the NVRA Exemption, and as a result of the judgment below, Wisconsin is not required to fulfil the Foundation's request on the NVRA's terms.

**III.    The District Court Erred When It Held that the Equal State Sovereignty Principle Does Not Apply to the NVRA.**

The District Court improperly confined equal sovereignty requirements to only the VRA's preclearance requirements. The obligation of equal state sovereignty is the centerpiece of the constitutional architecture. *Shelby County* reaffirmed "the principle that all States enjoy equal sovereignty[.]" 570 U.S. at 535. The Supreme Court also

29

articulated a test to be applied when Congress departs from that principle: "Congress—

if it is to divide the States—must identify those jurisdictions to be singled out on a basis

that makes sense in light of current conditions. It cannot rely simply on the past." *Id*. at

553. In other words, with respect to a law that treats the States differently, "a statute's

'current burdens' must be justified by 'current needs,' and any 'disparate geographic

coverage' must be 'sufficiently related to the problem that it targets.'" *Id*. at 550-51. The

Court spoke broadly and articulated an equal state sovereignty mandate that runs

throughout the Constitution. Incorrectly, the District Court acknowledged *Shelby

County*'s standard, A13, but held that it "does not apply to the NVRA," A2. The District

Court erred. Equal state sovereignty is a bigger and broader constitutional architecture

according to expansive Supreme Court jurisprudence.

### A. The Alleged "Burden versus Exemption" Distinction Does Not Dispositively Distinguish *Shelby County*.

The District Court erred when it held that *Shelby County*'s standard does not

apply here because the *Shelby County* plaintiffs were complaining about additional

burdens rather than an exemption. *See* A12-A13. That is a matter of perspective and

ultimately a distinction without a difference. VRA Section 4 exempted some states from

preclearance and had triggers subjecting others to the VRA's preclearance burdens.

With both the VRA and the NVRA, some states retained more of their sovereignty than

other states. What mattered under *Shelby County*—and more directly, under the equal

state sovereignty principle—is that Congress treated the States differently without proper justification. With the Transparency Exemption, Congress has done that again. And this time, the justification may be non-existent.

The District Court's error stems primarily from its focus on the identity of the challenger and the requested remedy, rather than the unequal treatment of the States. If this action was filed by a group of states complaining about the *burdens* imposed on them but not on Wisconsin, it may appear to look more like the challenge in *Shelby County*. Appearances, of course, can be deceiving. In that hypothetical and in this real case, the issue posed is identical: some states are burdened by the Public Disclosure Provision, and some are exempt from it.

To be sure, state challengers might seek to remove those burdens rather than impose them on Wisconsin, but that is a *remedy* question, not something that determines whether Congress may treat the states unequally. As explained *infra*, the requested remedy here is appropriate and preferred, and no barrier to relief.

*Shelby County* speaks in terms of the unequal treatment of the States, generally. And this makes sense, because the equal state sovereignty principle applies not only in situations where Congress means to impose additional burdens, as in *Shelby County*, but also in situations where Congress intends to elevate and favor certain states. Indeed, long ago, the Supreme Court held that "no compact" can "diminish or *enlarge*" a State's

31

sovereignty upon entry to the Union. *Pollard*, 44 U.S. at 229 (emphasis added). Equal state sovereignty "negatives any implied, special limitation of any of the paramount powers of the United States *in favor of a State*." *United States v. Texas*, 339 U.S. 707, 717 (1950) (emphasis added). The logic of these equal footing doctrine cases applies with equal force in this action. Indeed, it would be illogical to require Congress to treat States equally upon their admission, but later authorize Congress to discriminate without reason, and *Shelby County* forecloses such an absurd result.

 *Shelby County* did not invent the principle of equal state sovereignty. Nor did it limit its application only to situations arising out of the VRA or even the Civil War Amendments. Most importantly, it did not confine its skepticism of unequal treatment of states only to situations where the challenger's complaint is focused on a statute's burden. Rather, *Shelby County* drew from a "historic tradition," 570 U.S. at 540, and affirmed a much broader rule. It cataloged a core constitutional architecture—equal state sovereignty, period. The District Court erred by confining its import.

### B.  Congress's Elections Clause Powers Are Qualified by the Principle of Equal State Sovereignty.

 The District Court also improperly relied on a distinction in Congress's respective power-sources for the NVRA (Elections Clause) and the VRA's preclearance requirement (Fifteenth Amendment). A17. In the District Court's opinion, Congress's Fifteenth Amendment powers are qualified by the principle of equal state sovereignty,

but Congress's Elections Clause powers are not. This distinction conflicts with the Supreme Court's articulation of a much more comprehensive constitutional architecture.

The States were sovereign equals when they formed this nation. The historical and legal record contains no evidence that the sovereign states surrendered their equality when they ratified the Elections Clause. To the contrary, the record indicates that both proponents and opponents of the Elections Clause were concerned about giving government unchecked power to set elections rules. Furthermore, proponents— who ultimately got their way—intended the Elections Clause to establish *uniformity* and secure the peoples' *equal* rights of election. The Transparency Exemption does the exact opposite.

The Elections Clause was designed to preserve the Federal Congress. *ITCA*, 570 U.S. at 8. Relatedly, proponents also saw the Clause as a safeguard that would prevent "manipulation of electoral rules" by state officials intent on entrenching themselves by elevating their own interests above the people's interests. *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 815. Opponents feared something similar: *Congress's* abuse of its power to override state law. *See* Section II.B. Some opponents feared merely leaving the "'door open to improper regulations.'" Klarman, *supra*, at 342 (citations omitted).

33

This Court validated the Founders' concerns when it upheld the NVRA thirty years ago. Writing for the panel, Judge Posner remarked, "Any law that, like the 'motor voter' law, tinkers with the ground rules for elections is worrisome. It creates a danger of entrenchment—a danger that a temporary majority may make the repeal of the law exceptionally difficult by altering the composition of the electorate in its favor." *ACORN*, 56 F.3d at 795. This Court reminded us that it was not deciding such a challenge nor suggesting how one would be resolved. *See id*. ("The state does not attack the 'motor voter' law on that ground, however; nor do we suggest that such an attack would succeed.").

This Court is now hearing a challenge that asks whether Congress may enforce its Elections Clause power to set different "ground rules for elections" in different states *without justification*. By ruling that *Shelby County* does not apply to the NVRA, the District Court effectively decided that Congress needs no justification to treat the States differently when exercising its Elections Clause powers. If not reversed, the District Court's reasoning invites the harm the Founders feared most: unchecked power to manipulate electoral rules.

That is not all we have; we also have actual unequal treatment of States and voters. Some States are burdened with NVRA compliance and must be transparent

34

when they grant and remove voting rights. Other States, like Wisconsin, have no such burden and may choose to conceal such activities.

Disparate treatment, generally speaking, is not consistent with the original understanding of the Elections Clause. Opponents believed Congress should have the power to "insist on some uniformity in federal elections." Klarman, *supra*, at 342. Other proponents "championed the Clause as necessary 'for securing to the people their equal rights of election.'" *S.C. State Conference of the NAACP*, 602 U.S. at 51 (quoting 3 Debates on the Constitution 26 (J. Elliot ed. 1836) (Elliot's Debates)). There is nothing uniform or equal about the Transparency Exemption.

The District Court's observation that "federalism concerns are necessarily diminished when Congress acts pursuant to the Elections Clause," A17-18 (citing *ITCA*, 570 U.S. at 13-15), misses the mark. As does the District Court's recognition that, "[e]ncroachment on state sovereignty is part of the design of the Elections Clause[.]" A17 (citing *ACORN*, 56 F.3d at 795).

The relevant question is not whether the States surrendered some sovereignty when they ratified the Elections Clause. They did. The question is whether the States surrendered their *equal* sovereignty, such that Congress may treat States differently *without justification*. They did not. Constitutional scholars have summarized the inquiry in the following way:

35

> At the Founding, a 'State' possessed all of the rights and powers recognized by the law of nations minus only those it expressly surrendered. For this reason, the rights and powers of the American States were not conferred by, but predated, the Constitution. Thus, the relevant constitutional question is not whether the text expressly grants sovereign rights, powers, and immunities to the States, but whether it expressly takes them away.

Bellia & Clark, *supra*, at 896; *see also id*. at 842 ("[C]onstitutional silence on a question of federalism ordinarily signifies retention—rather than surrender—of the States' preexisting sovereignty."). The Elections Clause does not expressly take away the States equal sovereignty. Such an extreme action requires some justification. *Shelby County* confirms that and provides a workable standard by which to judge the appropriateness of Congress's departure from basic federalism principles.

### C. The "Extraordinary" Nature of the VRA's Preclearance Requirement Does Not Dispositively Distinguish *Shelby County*.

The District Court incorrectly found the VRA preclearance requirement was a more extreme species of unequal sovereignty than the challenged disparity here. The District Court has it backwards, the unequal treatment in the NVRA is more severe and supported with even less justification than the VRA.

The District Court reasoned that Congress's disparate treatment of the States under the NVRA is not inappropriate because it "bear[s] no resemblance to the 'extraordinary' intrusion at issue at in *Shelby*." A18; *see also id*. ("The NVRA is nothing like the preclearance provision.").

36

To be sure, the VRA's preclearance requirement was an "extraordinary departure" from federalism norms. *Shelby County*, 570 U.S. at 557. The Supreme Court did not, however, establish an extraordinary-intrusion standard in *Shelby County*, nor should one be extracted from it. Intrusion is the wrong inquiry. Unequal treatment without justification is the proper inquiry.

Recall, the VRA's preclearance requirement was upheld against a constitutional challenge approximately forty-seven (47) years before *Shelby County*. *Katzenbach*, 383 U.S. at 334. The VRA was considered an "uncommon exercise of congressional power" from the very beginning. *Id*. It nevertheless survived challenge because it was justified by the "exceptional conditions" then existing—namely, the need to remedy racial discrimination in voting. *Id*.; *see also Shelby County*, 570 U.S. at 555 ("*Katzenbach* indicated that the Act was 'uncommon' and 'not otherwise appropriate,' but was justified by 'exceptional' and 'unique' conditions.'"). In other words, the VRA's preclearance requirement survived a Supreme Court-imposed balancing test.

From an intrusion standpoint, the VRA's preclearance requirement did not become any more "extraordinary" over time. It was not struck down in *Shelby County* because the degree of intrusion suddenly shocked the Supreme Court's conscience. What changed is the conditions in the covered states. *See Shelby County*, 570 U.S. at 535 ("[T]he conditions that originally justified these measures no longer characterize voting

37

in the covered jurisdictions."); *see also id*. at 547, 551-53. The preclearance requirement was based on a formula that did not reflect present circumstances. In other words, the preclearance requirement no longer satisfied the Supreme Court's balancing test.

*Shelby County* did not establish an intrusion threshold, short of which the States do not enjoy equal sovereignty and Congress need not justify its actions under current conditions. *Shelby County* reaffirmed that all states enjoy equal sovereignty, and that Congress must adequately justify its actions, with evidence, when it intrudes on that equality. A standard that looks only at the degree of intrusion and ignores the justification is not a workable standard. In fact, one might reasonably say that it is *always* "extraordinary" when Congress intrudes on the sovereignty or some states and not others. *See* Bellia & Clark, *supra*, at 937-38 ("The notion of a 'State' with fewer sovereign rights than another 'State' was unknown to the law of nations."). What is workable, and what is required by *Shelby County*, is a standard that asks whether Congress's disparate treatment of the states is justified under current conditions.[6]

---

[6] An "extraordinary" feature of the VRA's preclearance requirement was its application to laws governing state and local elections. *See Shelby County*, 570 U.S. at 545. This feature finds *de facto* presence in the NVRA as well. While the NVRA's requirements textually apply only to *federal* elections, this limitation is often meaningless because nearly all states administer federal, state, and local elections together. For example, when a person registers to vote, she gains voting rights in all elections. Almost every state, including Wisconsin, maintains one voter roll for all elections. By regulating voter registration for federal elections, the NVRA thus intrudes into state and local elections. A state can escape this intrusion only by bearing the cost of bifurcating federal and state election administration. To the Foundation's knowledge, only Arizona has chosen to do this. *See Strong Cmtys. Found. of Ariz. Inc. v. Richer*, No. CV-24-02030-PHX-KML,

### D.  The States Subject to the NVRA Did Not Choose To be Disparately Burdened.

Additionally, the District Court declined to uphold the States' equal sovereignty because it believed "the difference in treatment was the direct result of [each] state's own choice[]" to not implement EDR by August 1, 1994. A19; *see also* A3 ("The NVRA gave all states the opportunity to qualify for an exemption by offering same-day voter registration. So *Shelby* bears no resemblance to this case."). It is true that Congress exempted States that offered EDR (or had no registration requirement) on August 1, 1994. 52 U.S.C. § 20503(b)(1)-(2). What Congress offered was not a true "choice," nor does it change the result here even if it is was.

When the NVRA became law, each State was given a short window to change its laws to enact EDR—what Congress considered "[t]he most controversial method of registration," H.R. Rep. No. 103-9 at 4 (1993)—or be subject to extensive and costly federal legislation for all time. At best, this was a choice between a loss of sovereignty—by enacting Congress's preference for polling place EDR—or a loss of sovereignty—by subjecting itself to the entire NVRA. In neither instance could a state retain its sovereignty. *See, e.g., New York v. Yellen*, 15 F.4th 569, 584 (2d Cir. 2021) ("'Congress may

---

2024 U.S. Dist. LEXIS 185909, at *8 (D. Ariz. Oct. 11, 2024) ("Arizona's system of voter registration is bifurcated such that some voters are only eligible to vote in federal elections and not state or local ones.").

use its spending power to create incentives for States to act in accordance with federal policies,' as long as 'pressure [does not] turn[] into compulsion.'") (citations omitted). In other words, the States were offered a Hobson's Choice, *i.e.*, one that is no choice at all.

Even if the NVRA offered States a true choice, it does not change the result. The VRA also offered States a choice. The VRA contained a provision allowing covered states to "bailout" of the VRA's federal preclearance requirement by seeking a declaratory judgment from a three-judge panel in United States District Court for the District of Columbia. *See* 52 U.S.C. § 10303(a)(1). To be eligible for a "bailout," States needed to choose to eliminate racial discrimination in elections for a period of ten years. *See* 52 U.S.C. § 10303(a)(1)(A)-(F) (describing eligibility requirements for "bailout").

*Shelby County* was decided four decades after the VRA's enactment. *Shelby County*, 570 U.S. 529. By then, every covered jurisdiction had adequate time (multiple times over) to make choices to qualify for a "bailout." In the District Court's phrasing, the "[VRA] gave all states the opportunity to qualify for an exemption by [eliminating racial discrimination]." *See* A3. Yet the Supreme Court still struck down VRA's preclearance requirement in *Shelby County*. The availability of that escape valve did not save the VRA.

Unlike the VRA, the NVRA has no escape valve. There is no statutory mechanism that allows it to adapt to current conditions. In the NVRA, it is 1994 forever.

The NVRA has no bail-in or bailout feature. Non-exempt States cannot regain their sovereignty by choosing EDR in 2025. Even those States that have now chosen EDR are still burdened by the NVRA. And the States that are currently exempt can lose their sovereignty by just momentarily eliminating EDR. The NVRA is even more inflexible than the VRA, and in light of *Shelby County*, cannot be upheld based on a phantom choice offered more than thirty (30) years ago.

## IV.  Wisconsin's Transparency Exemption Violates the Principle of Equal State Sovereignty.

### A.  Wisconsin's Transparency Exemption Is Not Justified Under Current Conditions.

The Foundation's Complaint plausibly alleges that the Transparency Exemption departs from the principle of equal state sovereignty because it treats six states—including Wisconsin—differently than other states without adequate justification.

For starters, the NVRA's "disparate geographic coverage" is not "sufficiently related to the problem that it targets." *Shelby County*, 570 U.S. at 551 (citation omitted). The Public Disclosure Provision is designed to make the voter list maintenance process transparent. *See Project Vote*, 682 F.3d at 339 ("State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer."). In

other words, the "problem" is the need for transparency and oversight in the process that determines who is eligible to vote. That "problem" or need exists equally in Wisconsin; there is no reason Wisconsin should have a lesser transparency obligation imposed on it than any other state.

Wisconsin, like 48 other states, currently requires voter registration. *See* ECF 1 ¶¶ 26-27. Wisconsin also currently conducts a robust and multi-faceted voter list maintenance program, which is designed to grant, preserve, and remove voting rights. *Id*. ¶¶ 28-42. One of these practices—the work performed by the Electronic Registration Information Center ("ERIC")—has been criticized as inaccurate and discriminatory, *see id*. ¶¶ 43-49—two problems at which the NVRA takes aim, *see* 52 U.S.C. § 20501(a)(3), (b)(4). Barbara Arnwine, the former executive director of the Lawyers' Committee for Civil Rights Under Law, stated, "ERIC should be called ERROR because it's that erroneous and that full of flaws." Palast, ERIC Crow, Jim Crow's liberal twin (July 15, 2020), https://www.nationofchange.org/2020/07/15/eric-crow-jim-crows-liberal-twin/ (last accessed Feb. 20, 2025). This criticism is not generic. It is specific to Wisconsin. The Brennan Center for Justice reported the following in a 2019 report:

> Wisconsin … reported that although ERIC was helpful in updating more than 25,000 registration addresses in 2017 and 2018, it also resulted in more than 1,300 voters signing 'supplemental poll lists' at a spring 2018 election, indicating that they had not in fact moved and were wrongly flagged.

42

ECF 1 ¶ 45 (citing Brater et al., Purges: A Growing Threat to the Right to Vote at 9

(2019), https://www.brennancenter.org/sites/default/files/2019-

08/Report_Purges_Growing_Threat.pdf (last accessed Feb. 20, 2025)). A Yale

University-led study of ERIC in Wisconsin "found that at least 4% of people listed as

suspected 'movers' cast ballots in 2018 elections using addresses that were wrongly

flagged as out of date. Minority voters were twice as likely as white voters to cast their

ballot with their original address of registration after the state marked them as having

moved, the study showed." ECF 1 ¶ 47 (citing Yale University, Study uncovers flaws in

process for maintaining state voter rolls (Feb. 26, 2021), https://phys.org/news/2021-02-

uncovers-flaws-state-voter.html (last accessed Feb. 20, 2025)). The study's lead author,

political scientist Gregory A. Huber, stated,

> **The process of maintaining states' voter-registration files cries out for greater transparency[.]** … Our work shows that significant numbers of people are at risk of being disenfranchised, particularly those from minority groups. Unfortunately, we don't know enough about the process used to prune voter rolls nationwide to understand why mistakes occur and how to prevent them.

ECF 1 ¶ 48 (citing Yale University, *supra*) (emphasis added).

Put another way, Wisconsin might suffer from the very voting discrimination the

NVRA was designed to combat, but we will never know. Unless reversed, there is no

NVRA transparency in Wisconsin. The NVRA exempts a state where the "problem" is

equally pervasive, and the "disparate geographic coverage" is not "sufficiently related

to the problem that [the NVRA] targets." *Shelby County*, 570 U.S. at 551 (citation omitted).

The NVRA's "current burdens" are not justified by "current needs," and Wisconsin is a great example. *Shelby County*, 570 U.S. at 550 (citation omitted). Forty-four states are burdened by a loss of sovereignty and by compliance with the Public Disclosure Provision. Wisconsin is not. Do "current needs" justify those disparate burdens? No.

Congress also identified the other problems it was targeting when it passed the NVRA. *See* 52 U.S.C. § 20501(a)-(b) (NVRA findings and purposes). The Act's purposes include eliminating discriminatory registration practices, increasing registration rates, and maintaining election integrity. These goals are currently of equal importance and relevance in Wisconsin compared to other states. *See* WEC, Wisconsin's Commitment to Election Integrity, https://elections.wi.gov/wisconsins-commitment-election-integrity (last accessed Feb. 20, 2025) ("The Wisconsin Elections Commission takes any allegation of election misconduct seriously, whether it is by candidates, voters, political parties, or other groups seeking to influence the outcome of elections."). As many courts have found, the Public Disclosure Provision is a means to achieve these other purposes through oversight and accountability. *See Bellows*, 92 F.4th at 54. For example, the NVRA's transparency mandate allows individuals and advocacy groups like the

44

Foundation to determine whether "accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4), or whether states are imposing "discriminatory and unfair registration laws and procedures," 52 U.S.C. § 20501(a)(3). An improper cancellation of a voter's registration, for example, cannot be understood, remedied, or prevented absent transparency. The NVRA's other objectives are equally relevant in Wisconsin. Yet Wisconsin is exempt from the transparency mandate meant to achieve those objectives. The NVRA's "disparate geographic coverage" is thus again not "sufficiently related to the problem that [the NVRA] targets." *Shelby County*, 570 U.S. at 551 (citation omitted).

Wisconsin's offering EDR does not affect the outcome. In fact, EDR is a voter list maintenance activity and Wisconsin has enacted specific procedures to govern EDR. ECF 1 ¶ 71; Wis. Stat. § 6.56(3). EDR registrants who fail address verification are made ineligible to vote and are referred to the district attorney. *Id*. The EDR process is not immune from discriminatory application, inefficiency, error, or mistake. *See Project Vote*, 682 F.3d at 339. Like all mechanisms that grant and remove voting rights, the EDR process needs the NVRA's transparency. *See id*. at 339-40 ("Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections."). And notwithstanding its EDR process, Wisconsin has the need and desire to do the very same things Congress

designed the NVRA to do: protect the fundamental right to vote, remove unfair

registration laws, protect the integrity of the electoral process, and maintain accurate

voter rolls. Transparency in the EDR process is an important means to achieve these

goals.

Furthermore, EDR—the original and sole condition for the NVRA's exemption—

is no longer unique to the exempt states. Nineteen other states and the District of

Columbia have implemented EDR. *See* National Conference of State Legislatures, *Same-*

*Day Voter Registration*, https://www.ncsl.org/elections-and-campaigns/same-day-voter-

registration (last accessed Feb. 20, 2025). The majority of those nineteen states and the

District of Columbia are subject to the NVRA's Public Disclosure Provision, while

Wisconsin and five other states are not. Put differently, it makes no sense that

Wisconsin should be exempted from the Public Disclosure Provision, while Illinois is

not. Under "current conditions," the NVRA's disparate treatment does not "make[]

sense." *Shelby County*, 570 U.S. at 553. Even if the Transparency Exemption was justified

in 1994, it cannot be sustained under "current conditions."

**B. The *Shelby County* Standard Requires Evaluation of Facts, Making**
   **Dismissal Inappropriate.**

At worst, the District Court should be reversed to allow for a searching inquiry

into the current justifications for the unequal treatment of the States. The *Shelby County*

standard requires actual evidence to justify disparate treatment of the States. Indeed,

"Congress compiled thousands of pages of evidence before reauthorizing the Voting Rights Act" in 2006. *Shelby County*, 570 U.S. at 553. That evidence was held inadequate to justify the preclearance requirement under current conditions. *Id*. at 554 ("Congress did not use the record it compiled to shape a coverage formula grounded in current conditions."). The Supreme Court gave Congress the option of compiling evidence of current conditions and drafting a new preclearance coverage formula. *See id*. at 557 ("Congress may draft another formula based on current conditions."). The lesson of *Shelby County* is unmistakable: unequal intrusions into state sovereignty must be justified by actual evidence.

Whether the Transparency Exemption is justified under current conditions "is a factual question that is not appropriately resolved on a motion to dismiss the complaint." *Cook v. Winfrey*, 141 F.3d 322, 331 (7th Cir. 1998). The Foundation has plausible alleged a violation of the equal state sovereignty principle. *See* Section IV.A. Whatever factual defenses the Administrator plans to raise should not be debated in this Court but should be heard for the first time after discovery.

V.    **The Requested Remedy Is Appropriate and Lawful.**

A.  **A "Leveling Down" Remedy Is an Available Remedy for Federalism Claims.**

The District Court held a violation of the equal state sovereignty principle cannot be remedied by making all States subject to the challenged law. A15. To the contrary,

47

the Supreme Court has approved of so-called "leveling down" remedies. "[W]hen the 'right invoked is that to equal treatment,' the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (emphasis in original) (quoting *Iowa-Des Moines National Bank v. Bennett*, 284 U.S. 239, 247 (1931)).

In *Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024), the D.C. Circuit reasoned that a "leveling-down" remedy could apply in equal state sovereignty cases. There, the EPA argued that redressability was lacking where states did "not ask th[e] court to increase their own sovereign authority over motor vehicle emissions," but instead sought "to reduce California's authority." *Id*. at 307. The D.C. Circuit explained,

> Respondents have not identified—and we do not perceive—any material reason to treat the right to equal sovereignty claimed here any differently for standing purposes. And under the logic of the Equal Protection cases, holding Section 209(b) unconstitutional and vacating the waiver would redress the claimed constitutional injury by leaving all states equally positioned, in that none could regulate vehicle emissions.

*Id*. at 307-08. Similarly, the Foundation's injury will be remedied if Wisconsin is subject to the Public Disclosure Provision and required to produce the requested records on the NVRA's terms.

The District Court found *Heckler* and *Ohio* distinguishable because their discussions of permissible remedies were made in the context of standing. A15-16. The

context makes no difference. If a remedy is sufficient to support standing, it is an appropriate remedy for a meritorious claim. Stated differently, if a remedy is *unavailable* to a plaintiff as a matter of law, it cannot support standing because the standing inquiry asks whether "the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). To decide that a remedy is available in the standing context, is to decide that a remedy is available in the merits context (though not necessarily that the plaintiff is entitled to such a remedy).

The District Court also found *Ohio* unpersuasive because the court "did not consider the fundamental difference between a claim under the Equal Protection Clause and a federalism claim[.]" A16. That "difference" makes no difference. In *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), this Court acknowledged that "the Tenth Amendment, although nominally protecting state sovereignty, ultimately secures the rights of individuals." *Id*. at 703 (citing *New York v. United States*, 505 U.S. 144 (1992)). Remedies for equal protection violations and remedies for federalism violations, both ultimately protect the rights of individuals. The D.C. Circuit was therefore correct when it reasoned that a "leveling-down" remedy is available for federalism claims "under the logic of the Equal Protection cases[.]" *Ohio*, 98 F.4th at 307-08. The District Court erred when it held that such a remedy is unavailable here as a matter of law.

49

**B. Severing the Transparency Exemption Is the Appropriate "Leveling Down" Remedy.**

Severing an unlawful exemption is the appropriate and preferred "leveling down" remedy in equal-treatment cases. *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610 (2020) is instructive in this regard. There, the Supreme Court heard a First Amendment challenge to the Telephone Consumer Protection Act of 1991 ("TPCA"). *Id.* at 613. The TPCA "generally prohibits robocalls to cell phones and home phones," but with a 2015 amendment, Congress exempted "robocalls that are made to collect debts owed to or guaranteed by the Federal Government." *Id.* The plaintiffs—political and nonprofit organizations who wanted to make political robocalls—sued under the First Amendment, claiming that "the 2015 government-debt exception unconstitutionally favors debt-collection speech over political and other speech." *Id.* at 613-14. For relief, the plaintiffs asked the Court "to invalidate the entire 1991 robocall restriction, rather than simply invalidating the 2015 government-debt exception." *Id.* at 614.

Six Justices concluded that "Congress has impermissibly favored debt-collection speech over political and other speech, in violation of the First Amendment." *Id.* at 614. Seven Justices concluded that the proper remedy was not invalidating the entire TPCA, but rather severing and invalidating the 2015 government-debt exception. *Id.* Entities making government-debt calls were thus leveled down and made equal with the

50

plaintiffs. The result: "plaintiffs still may not make political robocalls to cell phones, but their speech is now treated equally with debt-collection speech." *Id*.

The Supreme Court acknowledged that "equal-treatment cases can sometimes pose complicated severability questions." *Id*. at 632. The Court therefore offered guidance, explaining, "When the constitutional violation is unequal treatment … a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all." *Id*. (citing *Heckler*, 465 U.S. at 740). In such cases, the Supreme Court has a "preference for extension" of burdens or benefits. *See id*. at 632-33 (collecting cases). Consequently, in *Barr*, "the correct result … [was] to sever the 2015 government-debt exception and leave in place the longstanding robocall restriction." *Id*. at 634.

*Barr* also reveals the error in the District Court belief that "[u]nder the foundation's view of the law, the proper remedy in *Shelby* would have been to subject all states to preclearance so that all states were equally burdened." A13. In *Barr*, the Supreme Court took care to craft a remedy that "does not raise any other constitutional problems," *Barr*, 591 U.S. at 633, adhering to the principle that courts "cannot remedy an old constitutional problem by creating a new one," *Office of the United States Tr. v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 504 (2024). Subjecting all states to VRA's preclearance requirement was not a proper remedy in *Shelby County* because such a

remedy would not have been a constitutionally valid exercise of Congress's enforcement power under the Fifteenth Amendment.

For similar reasons, the District Court erred when it reasoned, "If *Shelby* were to apply to the NVRA, it would mean that the entire statute is unconstitutional because it unduly interferes with the sovereignty of some states." A2. *Barr* demonstrates that courts can remedy equal-treatment problems by severing and invaliding statutory exemptions. Such a remedy is appropriate here and "does not raise any other constitutional problems," *Barr*, 591 U.S. at 633. Indeed, this Court has already held that the NVRA is valid, *ACORN*, 56 F.3d 791, and so no constitutional issues will arise by merely adding Wisconsin as the forty-sixth (46th) covered jurisdiction.

## VI.    Wisconsin's Transparency Exemption Is Inconsistent with *City of Boerne's* Congruence and Proportionality Requirement.

The District Court concluded that *City of Boerne* "has no bearing on this case" because "[i]t did not address Congress's power under the Elections Clause, it was not about a statute that applied differently to different states, and it did not discuss the concept of 'equal sovereignty.'" A20-A21. *City of Boerne* nevertheless remains relevant because the NVRA is also an exercise of Congress's authority to enforce the Fourteenth Amendment. *See Condon*, 913 F. Supp. at 967 ("Congress had a sound basis on which to conclude that a federal voter registration law was an appropriate means of furthering the protections of the Fourteenth and Fifteenth Amendments.").

52

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that when Congress enforces the Fourteenth Amendment through legislation, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id*. at 520. The Foundation's Complaint alleges that Wisconsin's Transparency Exemption lacks the required "congruence and proportionality." *See* ECF 1 ¶ 82. This allegation is plausible because the ends Congress sought through the NVRA are equally relevant in Wisconsin. *See* ECF 1 ¶¶ 76-83.

To be sure, the NVRA is Elections Clause legislation. *See ITCA*, 570 U.S. at 7-9, 13-15. Congress was also enforcing the Fourteenth and Fifteenth Amendments. *Reno*, 913 F. Supp. at 967. This makes sense because the NVRA was designed, in part, to reduce "discriminatory and unfair registration laws and procedures" which Congress found "can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

*City of Boerne*, was, of course, not the first time the Supreme Court considered whether an act of Congress was "appropriate" under Section 5 of the Fourteenth Amendment. For example, in *Katzenbach v. Morgan*, 384 U.S. 641, 643 (1966), the Supreme Court reviewed a portion of Section 4(e) of the Voting Rights Act of 1965. The Court, in framing the inquiry, stated:

> We therefore proceed to the consideration whether § 4 (e) is "appropriate legislation" to enforce the Equal Protection Clause, that is, under the *McCulloch v. Maryland* standard, whether § 4 (e) may be regarded as an enactment to enforce the Equal Protection Clause, whether it is "plainly adapted to that end" and whether it is not prohibited by but is consistent with "the letter and spirit of the constitution."

*Morgan*, 384 U.S. at 651 (citations omitted). Importantly, the majority also countered the suggestion by the dissenting justices that the Court's opinion was authorizing Congress to enact "statutes so as in effect to dilute equal protection and due process decisions of this Court." *Morgan*, 384 U.S. at 651 n.10. The Supreme Court was clear: "Congress' power under § 5 is limited to adopting measures to enforce the guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees." *Id*. (emphasis added).

The Public Disclosure Provision was designed, in part, to shed light on activities that might deny the right to vote or discriminate on the basis of race. Yet those protections are not afforded to the citizens of Wisconsin. Congress has "no power" to "dilute" the Fourteenth Amendment's equal protection guarantees in this way. *Morgan*, 384 U.S. at 651 n.10. A law premised on equal protection, but which does not protect equally, cannot be considered "consistent with the letter and spirit of the constitution." *Morgan*, 384 U.S. at 651 (citations and quotations omitted).

It is no more "appropriate" for Congress to "enforce" the Fourteenth Amendment in a way that treats States and their citizens unequally, than it is for

54

Congress to exceed its authority by enacting substantive legislation, as in *City of Boerne*. The congruence and proportionality test is an appropriate and useful check on the former situation, as much as the latter, because it helps ensure Congress is acting within its limited authority. The Transparency Exemption lacks congruence and proportionality—and is therefore not "appropriate legislation" under Section 5— because it exempts states like Wisconsin, where the injuries Congress sought to remedy are equally prevalent and Congress's transparency and oversight objectives are equally relevant. ECF 1 ¶ 82.

## CONCLUSION

The historical and legal record support the conclusion that Congress's Elections Clause powers are qualified by the principle of equal state sovereignty. If Congress treats the States differently, it must adequately justify its actions. The District Court erred when it concluded otherwise and dismissed the complaint. For the foregoing reasons, the Foundation respectfully asks this Court to reverse the District Court's judgment and remand this action with instructions to test the Transparency Exemption under the standards articulated in *Shelby County* and *City of Boerne.*

Dated: February 21, 2025.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:


   /s/ Noel H. Johnson         
Noel H. Johnson (*Counsel of Record*)
Kaylan Phillips
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street
Suite 700
Alexandria, VA 22314
(703) 745-5870
njohnson@publicinterestlegal.org
kphillips@publicinterestlegal.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. Rule

32(a)(7)(B)(i) and Circuit Rule 32(c)because, excluding the parts of the brief exempted

by Rule 32(f), this brief contains 12,280 words.

This brief also complies with the typeface requirements Fed. R. App. P.

32(a)(5)(A) and Circuit Rule 32(b) because this brief has been prepared in a

proportionally spaced type face using Microsoft Word in 12-point Palatino Linotype

font.

  /s/ Noel H. Johnson
Noel H. Johnson
Counsel for Public Interest Legal Foundation

Dated: February 21, 2025.

57

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, I electronically filed the foregoing

using the Court's ECF system, which will serve notice on all parties.


 /s/ Noel H. Johnson_____
Noel H. Johnson
Counsel for Public Interest Legal Foundation

**REQUIRED SHORT APPENDIX OF PLAINTIFF-APPELLANT**

## <u>INDEX OF REQUIRED SHORT APPENDIX</u>

Memorandum Opinion and Order
    (Nov. 26, 2024) (Dkt No. 31) ........................................................................ A1

Judgment
    (Nov. 27, 2024) (Dkt No. 32) ...................................................................... A23

Certificate of Rule 30(d) Compliance  ................................................................ A24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

                    Plaintiff,

        v.                                          OPINION and ORDER

MEAGAN WOLFE, in her official capacity as the                24-cv-285-jdp
Administrator for the Wisconsin Elections Commission,
and THE UNITED STATES,

                    Defendants.

---

Plaintiff Public Interest Legal Foundation, Inc. is a nonprofit organization that describes its purpose as "promot[ing] the integrity of the electoral process nationwide." Dkt. 1, ¶ 5. One of the ways it does this is to "determine whether lawful efforts are being made to keep voter rolls current and accurate." *Id.*[1]

The foundation is suing the administrator of the Wisconsin Elections Commission, contending that she is violating the National Voter Registration Act of 1993 (NVRA) by refusing to provide Wisconsin's official voter registration list at a reasonable cost and by excluding from its list the year of each voter's birth. The foundation acknowledges that states like Wisconsin that have allowed same-day registration at the polls since the NVRA was passed are exempt from the disclosure requirements in the statute. *See* 42 U.S.C. § 20503(b)(2). But the foundation says that the exemption is unconstitutional, so the court should require the

---

[1] The foundation provides an example on its website: "We have compiled the voter rolls from across the country into a database that allows us to know who is voting twice or from beyond the grave. We've used this data to sue states for failing to do effective list maintenance such as not removing deceased registrants, duplicate voter registrations, and voters who move to another state." https://publicinterestlegal.org/issues/voter-roll-error-map/.

administrator to comply with the disclosure requirements that apply to other states. The administrator moves to dismiss on multiple grounds. Dkt. 14. The United States has intervened under 28 U.S.C. § 2403 to defend the constitutionality of § 20503(b)(2). Dkt. 22.

The foundation's claim is a novel one. The foundation identifies no case in which a court granted a party's request to invalidate one provision of a statute so that it can enforce another provision of the same statute.[2] The court concludes that the claim fails as a matter of law.

The foundation relies primarily on the principle of the states' "equal sovereignty" that the Supreme Court discussed in *Shelby County, Alabama v. Holder*, 570 U.S. 529, 553 (2013), and it contends that the exemption granted to Wisconsin violates that principle because Congress does not have adequate justification for treating Wisconsin differently from other states. But *Shelby* was about unwarranted *burdens* on states in violation of the Tenth Amendment. *Shelby* did not invalidate a state *exemption*, which is what the foundation is seeking. If *Shelby* were to apply to the NVRA, it would mean that the entire statute is unconstitutional because it unduly interferes with the sovereignty of some states. But the foundation is seeking the opposite of that: it wants to expand the scope of the NVRA to cover more states. The foundation cites no example of a court that relied on federalism principles to impose new burdens on a state in the name of "equal sovereignty."

Even if the principle of "equal sovereignty" could invalidate a state exemption, the court concludes that *Shelby* does not apply to the NVRA. *Shelby* involved an unusually burdensome

---

[2] The parties discuss one other case in which the foundation is asserting the same claim in Minnesota that it is asserting in this case. *See Public Interest Legal Foundation, Inc. v. Simon*, No. 24-cv-1561 (D. Minn. filed Apr. 30, 2024). The defendant's motion to dismiss that case is pending.

statute that severely intruded into traditional areas of state sovereignty and stigmatized a subset of states by implying that they could not be trusted to refrain from discriminating on the basis of race without federal supervision. In contrast, the NVRA imposes modest requirements related to the time, place, and manner of holding federal elections, something that Congress controls under the Elections Clause. The NVRA gave all states the opportunity to qualify for an exemption by offering same-day voter registration. So *Shelby* bears no resemblance to this case. The NVRA is no different from "countless federal laws whose benefits and burdens are unevenly distributed across the country and among the several States." *New York v. Yellen*, 15 F.4th 569, 584 (2d Cir. 2021).

The foundation stretches *Shelby* well past the breaking point. It identifies no other court that has interpreted *Shelby* in the matter it proposes. The foundation's claim is not supported by law or logic, so the court will grant the administrator's motion to dismiss.

## BACKGROUND

The Constitution directs the states to set "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. Art. I § 4, cl. 1. But the same provision gives Congress the authority to "make or alter such Regulations." *Id.* A different clause gives Congress the same authority over Presidential elections. U.S. Const. Art. II, § 1; *Association of Community Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995). Pursuant to that authority, Congress enacted the NVRA. *ACORN*, 56 F.3d at 793; *Common Cause Indiana v. Lawson*, 937 F.3d 944, 947 (7th Cir. 2019). The law imposes various requirements on the states regarding voter registration in elections for federal office. *Arizona v.*

*Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 5 (2013); *Young v. Fordice*, 520 U.S. 273, 275–76 (1997). Some of these requirements include the following:

- allowing voter registration at motor vehicle agencies, at government offices, and through the mail, 52 U.S.C. §§ 20503–20506;

- allowing registration within 30 days of an election, *id.* § 20507(a)(1); and

- making reasonable efforts to remove ineligible voters from registration lists, and restricting when voters can be removed from those lists, *id.* § 20507(a)(4),(d).

Relevant to this case, the NVRA also requires states to maintain public access of their voter registration list:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

*Id.* § 20507(i)(1).

These requirements reflect two main purposes of the NVRA: to increase voter registration and to maintain accurate registration lists. *See Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 761–62 (2018) (citing 52 U.S.C. § 20501(b)). Any person who is aggrieved by a violation of the NVRA may sue the state's chief election official if the official does not correct the violation after receiving notice of it. 52 U.S.C. § 20510(b).

There are important exceptions to the NVRA's requirements. For example, a state need not comply with the NVRA if that state allows a voter to register at the polling place on election day, so long as the state has allowed that continuously since the NVRA went into effect in 1994. *Id.* § 20503(b)(2). Committees in the Senate and House of Representatives concluded

4

that states allowing same-day registration "have lessened the impediments to registration which goes significantly beyond the requirements of the bill," so an exemption is appropriate. S. Rep. No. 103-6 (1993); H.R. Rep. 103-9 (1993).[3] The parties agree that Wisconsin has allowed same-day registration continuously since 1994, so it qualifies for the exemption. Wis. Stat. § 6.55 (allowing for same-day voter registration). Five other states also qualify for an exemption: North Dakota, Minnesota, Wyoming, Idaho, and New Hampshire. Brief for the United States, Dkt. 26, at 14.

In January 2024, the foundation asked the Wisconsin Election Commission for the most recent copy of Wisconsin's official voter registration list, including each voter's year of birth. Dkt. 1-1. The foundation offered to "pay a reproduction fee not to exceed the cost of reproduction," and it cited the NVRA as the basis for its request. *Id.* In February 2024, the commission informed the foundation that it was exempt from the NVRA, so it was treating the foundation's letter as an open records request under state law. Dkt. 1-2. The commission directed the foundation to an online portal, https://badgervoters.wi.gov, where the foundation could obtain Wisconsin voter data for a fee of $5 for every 1,000 voters, with a cap of $12,500. *Id.*; Wis. Admin. Code § EL 3.50(4). In a follow-up letter, the foundation accused the commission of violating the NVRA because the cost of obtaining information through the portal was not tied to reproduction costs and because each voter's year of birth was not included in the information that could be obtained through the portal. Dkt. 1-3. The foundation contended that Wisconsin's exemption was "ineffective" under Supreme Court precedent, and

---

[3] According to Senator Mitch McConnell, the exemption did not apply to states who allowed same-day registration after 1994 because of a concern that the exemption would be a "backdoor means of forcing states into adopting election day registration." 139 Cong. Rec. 9632 (1993).

it threatened a lawsuit if the commission did not comply. *Id.* In response, the commission again informed the foundation that it was exempt from the NVRA. Dkt. 1-4.

The foundation filed this lawsuit in April 2024.

## ANALYSIS

### A. Overview of the claims and defenses

The foundation contends that the administrator has violated the NVRA in three ways: (1) she has failed to provide an electronic copy of Wisconsin's official voter registration list; (2) she has not provided "year of birth information" for each voter on the list; and (3) she is charging the foundation $12,500 for the list, which is unreasonable because it exceeds the cost of reproduction. The foundation cites § 20507(i)(1), which requires states to make their voter registration lists available to the public "at a reasonable cost." The foundation asks for a declaration that the administrator is violating the NVRA and an injunction requiring her to produce the requested the information "without first playing costs the NVRA does not authorize." Dkt. 1, 28–29.

The foundation acknowledges a significant roadblock in its path: by its own terms, the NVRA does not apply to Wisconsin. *See* 52 U.S.C. § 20503(b)(2). To get around this problem, the foundation contends that the exemption is unconstitutional under the principles articulated in *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997). Specifically, the foundation contends that the exemption violates the "equal sovereignty" principle articulated in *Shelby* because it treats states differently without adequate justification, and it is not a valid exercise of congressional authority because it violates the "congruence and proportionality" principle articulated in *Boerne.* If the exemption is

6

unenforceable, the argument goes, then the requirements in the NVRA apply to Wisconsin, and the court must compel the administrator to comply.

Neither the administrator nor the government contend that the online portal offered by Wisconsin satisfies the requirements of the NVRA. But both parties raise other challenges to the foundation's claims that can be grouped into three categories: (1) the foundation does not have standing to sue; (2) neither *Shelby* nor *Boerne* apply to this case; and (3) the NVRA is valid under *Shelby* and *Boerne.*

On a motion to dismiss, the question is whether the complaint includes plausible allegations showing that the plaintiff is entitled to relief. *See* Fed. R. Civ. 8; *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). A similar standard applies to the question of standing. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015).

The court concludes that the foundation has standing but that neither *Shelby* nor *Boerne* apply to this case. So the court need not decide whether the NVRA satisfies the tests in *Shelby* and *Boerne* as the foundation understands them. The court will begin with the question of standing.

**B. Standing**

A party has standing to sue under Article III of the U.S. Constitution if the party has suffered or will likely suffer an injury that is concrete and particularized, fairly traceable to the challenged conduct of the defendant, and likely to be redressed if the lawsuit is resolved in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In this case, the foundation's asserted injury is that the administrator is withholding information. A failure to obtain information required to be disclosed under law is a concrete and particularized injury. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998); *Carello v. Aurora Policemen Credit Union*,

930 F.3d 830, 835 (7th Cir. 2019). The foundation's injury is fairly traceable to the administrator because she is refusing to provide the information under the foundation's requested terms. If the foundation prevailed in this lawsuit, it would be entitled to the information it is seeking, so the injury is redressable.

Only the administrator contends that the foundation lacks Article III standing, and only in her reply brief. She says that the foundation did not suffer an informational injury because the NVRA does not require Wisconsin to disclose any information. The administrator raises a fair point. The foundation points to no other instance in which a party was able to satisfy the injury requirement by trying to invalidate a portion of the same statute that it contends the defendant is violating. But when the court evaluates standing, the court "must . . . assume that on the merits the plaintiffs would be successful in their claims." *Sierra Club v. U.S. E.P.A.*, 774 F.3d 383, 389 (7th Cir. 2014) (internal quotation marks omitted). If the foundation were successful in eliminating the exemption, the NVRA would require the administrator to disclose information to the foundation. So the court concludes that the foundation has standing under Article III.

The government asserts an argument about *prudential* standing, though it does not use that term. Specifically, the government invokes the prudential limitation regarding "third-party standing": a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotation marks omitted). The government says that the foundation's challenge to the constitutionality of the exemption provision is based on an assertion that the provision treats some *states* differently from others, so that contention should be raised by a state, not a private litigant. The government acknowledges that the Supreme

8

Court recognizes third-party standing when "the party asserting the right has a 'close' relationship with the person who possesses the right," and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130. But the government says that the foundation cannot meet either of these requirements.

The foundation does not contend that it can meet the requirements for third-party standing articulated in *Kowalski*. Instead, it contends that it is entitled to assert its constitutional challenge under *Bond v. United States*, 564 U.S. 211 (2011), and *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999). Those cases involved individuals contending that a federal criminal statute violated the federalism principles embodied in the Tenth Amendment, which states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. const. amend. X.

In both *Bond* and *Gillespie*, the government litigants argued that states, not individuals, must raise federalism arguments, and, in both cases, the courts rejected the argument. In *Bond*, the Court stated that "[a]n individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." 564 U.S. at 222. In *Gillespie*, the court made a similar observation that the Tenth Amendment "ultimately secures the rights of individuals," so the plaintiff could rely on the amendment to challenge a federal statute, so long as he was suffering from a concrete injury that could be traced to the challenged statute and would be redressed if the statute was invalidated. 185 F.3d at 703. In neither case did the court consider the limitations for third-party standing identified in *Kowalski*; rather, the courts in both cases appeared to assume that the individual does not need a "close" relationship

9

with the state because an individual being harmed by an unconstitutional statute is not really a third-party but instead is asserting her own interests.

As the government points out, this case does not involve a criminal penalty like *Bond* and *Gillespie* did. But neither *Bond* nor *Gillespie* stated that their holdings were limited to the criminal context. Rather, the principle in both cases appears to be that an individual may challenge a statute on federalism principles, so long as they have standing under Article III. This court has concluded that the foundation has Article III standing, so it follows that the foundation may challenge the exemption provision on federalism grounds. In any event, third-party standing is not jurisdictional. *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688-89 (7th Cir. 2015). The court concludes that the foundation's claims fail on other grounds, so it is not necessary to decide whether there are prudential reasons for declining to consider the foundation's claim.

## C.  *Shelby* and *Boerne*

The foundation's argument that the exemption provision is unconstitutional rests on two cases, *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997). *Shelby* involved the preclearance provision in the Voting Rights Act, which required some states and counties to obtain permission from the federal government before enacting any laws related to voting. 570 U.S. at 534–35. Those jurisdictions were required to prove that any proposed change "had neither the purpose nor the effect of denying or abridging the right to vote on account of race or color." *Id.* at 537 (internal quotation marks omitted).

The question before the Court was whether the preclearance provision was justified under the Fifteenth Amendment, which prohibits discrimination in voting because of race and

gives Congress the authority to "enforce" the amendment. The Court had previously upheld the preclearance provision multiple times as a valid exercise of power under the Fifteenth Amendment. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301 (1966); *City of Rome v. U.S.*, 446 U.S. 156 (1980). But in *Shelby*, the Court concluded that the original justification for the provision—combatting racial discrimination in voting in jurisdictions with a long history of such discrimination—was no longer adequate because now there was little difference between Black and White rates of voter registration and turnout in the covered states. *Shelby*, 570 U.S. at 547–48, 551. In the Court's view, the "current burdens" imposed on some states were not justified by "current needs," so the preclearance provision was unconstitutional. *Id.* at 550–51, 553, 557. In reaching this conclusion, the Court repeatedly emphasized the "extraordinary" nature of the preclearance provision, in terms of the intrusion on state sovereignty and the burdens imposed on the covered states. *Id.* at 534, 544, 545, 549, 552, 555.

*Boerne* was about the constitutionality of the Religious Freedom Restoration Act (RFRA) as applied to the states. RFRA made it unlawful for the states to impose a substantial burden on religious exercise unless that burden was the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1. Congress's asserted authority for enacting the statute was the Fourteenth Amendment, which authorizes Congress to "enforce" the Fourteenth Amendment with "appropriate" legislation. U.S. Const. amend XIV, § 5. The Fourteenth Amendment includes the Due Process Clause, which incorporates the protections of the First Amendment, including the Free Exercise Clause. *Boerne*, 521 U.S. at 519. But the Supreme Court had previously held that neutral, generally applicable laws do not violate the Free Exercise Clause, regardless of the burden they impose on free exercise. *Employment Division v. Smith*, 494 U.S. 872 (1990). The Court concluded in *Boerne* that RFRA went far beyond

11

enforcement of the Fourteenth Amendment because the burdens on states imposed by the statute were not "congruent" and "proportional" to the evidence of past constitutional violations by state actors. 521 U.S. at 532. In other words, RFRA could not be justified as an appropriate exercise of congressional authority under the Fourteenth Amendment because "[t]he substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause." *Id.* at 534.

As the court will explain below, the foundation's reliance on *Shelby* and *Boerne* is misplaced for two reasons: (1) both cases are about unconstitutional burdens on states, not unconstitutional exemptions; and (2) the reasoning of *Shelby* and *Boerne* do not apply to the NVRA.

### 1. Burdens versus exemptions

The fundamental problem with the foundation's constitutional challenge is not the identity of the litigant but rather the nature of the claim. *Shelby* and *Boerne* are about constitutional limitations on Congress's ability to encroach on a state's sovereignty. But the foundation is not asking this court to *remove* a burden that Congress has imposed on Wisconsin. Rather, the foundation is asking the court to *impose* a burden that Congress removed. This is inconsistent with both *Shelby* and *Boerne*.

The parties who challenged the constitutionality of the statutes at issue in *Shelby* and *Boerne* were both complaining about federal requirements imposed on states. Likewise, the Supreme Court's discussion of federalism issues in *Shelby* and *Boerne* was about unwarranted intrusion by the federal government into areas of traditional state concern. In both cases, the

12

A12

Court concluded that the burden was unjustified. In this case, the foundation seeks to turn *Shelby* and *Boerne* on their head by using them, not to remove a burden, but to *expand* the scope of a statute and impose *additional* burdens on a state by requiring Wisconsin to comply with the NVRA.

It is true, as the foundation observes, that the Supreme Court stated in *Shelby* that "all States enjoy equal sovereignty" and that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." 570 U.S. at 535, 542. But those statements were in the context of the Court's concern that the preclearance provision's "current burdens" were not justified by "current needs." *See id.* at 542. The problem was that Congress was regulating some states too much, not too little. *See id.* at 544–45. Under the foundation's view of the law, the proper remedy in *Shelby* would have been to subject *all* states to preclearance so that all states were equally burdened. But the Court did not suggest that expanding the preclearance provision would be appropriate, only that burdens imposed on the covered states were not justified.

The foundation's reliance on *Boerne* is also misplaced. That case had nothing to do with unequal treatment among the states. The reference to "congruence and proportionality" was about the relationship between the burden imposed on the states with the states' history of unconstitutional conduct.

Providing a state with an exemption to an otherwise generally applicable rule does not intrude on that state's sovereignty, so there is no federalism concern. If there is a claim that the NVRA violates federalism principles, that claim would not be about the exemption provided to Wisconsin and several other states; it would be about the requirements imposed

13

on all the other states. Such a claim would almost certainly fail: the court of appeals has already

held that the NVRA is a valid exercise of Congress's authority under the Elections Clause.

*ACORN*, 56 F.3d at 793–95. Regardless, that is not the foundation's claim. If it were, the claim

would be self-defeating: it would result in striking down the statute that is the basis for the

foundation's requested relief.

The foundation cites no case in which the Supreme Court or any other court invalidated

a state exemption because it violated federalism principles. The foundation cites *Heckler v.*

*Mathews*, 465 U.S. 728 (1984), and *Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024), to support its

theory, but neither case is instructive. *Heckler* involved an equal protection challenge to a

government benefit that applied differently to men and women. The plaintiff was a man who

was denied benefits under the statute. The defendant argued that the plaintiff lacked standing

because the statute contained a severability clause stating that the benefit would be withdrawn

for both men and women if the benefit for women were held invalid, so the plaintiff's injury

could not be redressed even if he won. The Court rejected this argument, concluding that the

relevant injury in the context of an equal protection claim is unequal treatment, and that injury

could be redressed by eliminating the benefit for the favored class *or* extending the benefit to

the disfavored class. *Heckler*, 465 U.S. at 740.

The foundation contends that *Heckler* shows that discriminatory treatment can be

remedied by "leveling up" the disfavored party *or* by "leveling down" the favored party, and

this court could remedy the alleged "equal sovereignty" violation by requiring all states to

comply with the NVRA. But *Heckler* differs from this case in two related and important respects.

First, the issue in *Heckler* was about standing. In this case, the foundation is not contending

that it has standing because it was denied equal treatment. Rather, this court has already

14

determined that the foundation's injury is the denial of information and that the injury is redressable because the court could order the administrator to produce that information if the foundation were to succeed on the merits. A case addressing a different theory of standing is not instructive.

Second, the foundation is not asserting a claim under the Equal Protection Clause. As the Court explained in *Heckler*, the injury for an equal protection claim is the discriminatory treatment itself. For that reason, it does not matter whether the discrimination is remedied by granting a benefit to a disfavored class or removing a benefit from a favored class. In the context of a claim under the Tenth Amendment or other principle of federalism, the injury is the intrusion on state sovereignty. That injury cannot be remedied by *extending* an intrusion on state sovereignty. In *Shelby*, the fact that the intrusion was imposed only on a small set of states added insult to injury. But the Court did not hold or imply that the injury could be remedied by imposing the preclearance provision on all states. Even in *Heckler*, the question was whether the Court could withdraw a government benefit from a class of people to remedy unequal treatment; the foundation identifies no case in which a court imposed a new burden to remedy a constitutional violation.

*Ohio v. EPA* did involve an "equal sovereignty" claim. The plaintiffs were states that contended that a waiver the EPA granted to California for certain requirements under the Clear Air Act harmed them in various ways, including that the EPA was giving California preferential treatment in violation of *Shelby*'s "equal sovereignty" principle. The court concluded that the disfavored states had standing to sue under that theory, and the court relied in part on *Heckler* to support that conclusion, but the court then concluded that the claim failed on the merits. *Ohio*, 98 F.4th at 307–09.

15

The court in *Ohio* did not consider the fundamental difference between a claim under the Equal Protection Clause and a federalism claim, which limits any persuasive value it may have. Regardless, the case is distinguishable. Again, the only issue *Ohio* decided in the plaintiffs' favor was standing, and this court has resolved that issue in the foundation's favor as well. Further, the plaintiffs in *Ohio* were disfavored states challenging California's preferential treatment, so their situation was more similar to *Heckler*.

Neither *Heckler* nor *Ohio* supports a decision in the foundation's favor. The court concludes that the foundation has failed to state a claim upon which relief may be granted because Congress did not violate the Tenth Amendment or any other principle of federalism by making Wisconsin and several other states exempt from the NVRA.

### 2.  Applicability of *Shelby* and *Boerne* to the NVRA

Even if *Shelby* or *Boerne* could be read to support a claim that an exemption could violate the Tenth Amendment or federalism principles, the foundation's constitutional challenge still fails under both cases. As for *Shelby*, there are multiple reasons why the Supreme Court's discussion about "equal sovereignty" does not suggest that the NVRA exemption is invalid.

As an initial matter, the Court did not hold that the principle of "equal sovereignty" is an independent basis for striking down a statute under any circumstance. The Court stated that the principle was "highly pertinent" when "assessing" the "disparate treatment" of states. 570 U.S. at 544. But the Court provided no test or metric for holding that a statute was invalid as a violation of "equal sovereignty." Rather, the Court acknowledged that it had previously "rejected the notion that the principle operated as a bar on differential treatment outside th[e] context" of a state's admission into the union, and the Court did not overrule that holding. *Id.*

16

But even if the principle of "equal sovereignty" could provide a basis for declaring a federal statute unconstitutional, there are three reasons why the NVRA is not such a statute. First, *Shelby* addressed the limits of congressional authority under the Fifteenth Amendment, which is limited to "enforcement" of the amendment's prohibition on racial discrimination in voting. In other words, the Fifteenth Amendment does not give Congress authority to impose any requirements or restrictions it wishes to protect voting rights. Rather, Congress must show that past racial discrimination by the states justifies the burdens imposed on the states by the federal statutes. *Shelby*, 570 at 553; *Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009). The limited nature of Congress's power under the Fifteenth Amendment was a key part of the Court's analysis in *Shelby*. *See Ohio*, 98 F.4th at 309.

In contrast, Congress enacted the NVRA under the Elections Clause, as recognized by both the Supreme Court and the court of appeals. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013); *ACORN*, 56 F.3d at 793–94. The Elections Clause is fundamentally different from the Fifteenth Amendment because the Elections Clause gives Congress plenary authority over the time, place, and manner of voting—including voting registration—in federal elections. *ACORN*, 56 F.3d at 795 ("The Elections Clause confers on Congress a general supervisory power, under which it may supplement state regulations or may substitute its own.") (internal quotation marks, citations, and alterations removed). The Elections Clause expressly contemplates that Congress may direct the states how to run their federal elections: "Congress can . . . regulate federal elections and force the state to bear the expense of the regulation." *Id.* at 794. So any federalism concerns are necessarily diminished when Congress acts pursuant to the Elections Clause. *See Inter Tribal Council,* 570 U.S. at 13–

17

15. Encroachment on state sovereignty is part of the design of the Elections Clause, not an unfortunate side effect to be cabined and scrutinized. *See ACORN*, 56 F.3d at 795.

Second, the Court in *Shelby* repeatedly emphasized that the Voting Rights Act was extraordinary, if not unique, in how far it departed from federalism norms and intruded into state sovereignty. *See Ohio,* 98 F.4th at 309–10. The statute suspended "all changes to state election law—however innocuous" until the federal government approved them, requiring states to "beseech the Federal Government for permission to implement laws that they would otherwise have the right to enact and execute on their own." *Shelby*, 570 U.S. at 544. This was a "federal intrusion into sensitive areas of state and local policymaking, and represent[ed] an extraordinary departure from the traditional course of relations between the States and the Federal Government." *Id.* at 545.[4]

The NVRA is nothing like the preclearance provision. The NVRA does not usurp broad areas of state authority or impose federal supervision on the legislative process. Rather, the requirements in the NVRA are simply about expanding methods of voter registration and maintaining accurate registration lists. The provision at issue in this case is about making certain records available to the public. These modest requirements bear no resemblance to the "extraordinary" intrusion at issue at in *Shelby*.

Third, the preclearance provision "singled out" states in "a fundamental way," *id.* at 553, 556, in that the list of covered states was "'reverse-engineered': Congress identified the

---

[4] *See also Shelby*, 570 U.S. at 544 ("The Voting Rights Act sharply departs from . . . basic [federalism] principles."); *id.* at 545 (preclearance provision is "stringent," "potent," and "an uncommon exercise of congressional power"); *id.* ("the Act constitutes extraordinary legislation otherwise unfamiliar to our federal system"); *id.* at 549 (preclearance provision is "extraordinary and unprecedented"); *id.* at 555 ("Multiple decisions . . . have reaffirmed the Act's extraordinary nature.").

jurisdictions to be covered and then came up with criteria to describe them." *Id.* at 551. Any state on that list was assumed to be engaging in racial discrimination until it could prove otherwise, which was an afront to the state's "dignity." *See id.* at 544. In this case, the difference in treatment was the direct result of the state's own choices. Any state that either did not require voter registration or allowed registration at the polls could receive an exemption from the NVRA, based on a belief that more liberal registration requirements alleviated the need for the types of regulations included in the NVRA. *See* S. Rep. No. 103-6 (1993); H.R. Rep. 103-9 (1993). There was no singling out. The states had notice of exactly what they needed to do to avoid federal regulation.

*Shelby* was a unique case involving an unusual statute that invaded traditional state functions and stigmatized a small set of states. Throughout its opinion, the Supreme Court emphasized how extraordinary the circumstances were in that case. The Court did not purport to be setting out a broadly applicable standard that is triggered any time a federal law does not treat states identically.

Other courts share this view and have declined to extend *Shelby*'s "equal sovereignty" analysis to new situations. The court has already discussed *Ohio v. EPA*, which relied on the reasons discussed above to reject a challenge to a statute that waived certain requirements of the Clean Air Act if a state met certain conditions. 98 F.4th at 306–14.

In *Mayhew v. Burwell*, Maine challenged a statute that required states to freeze their Medicaid eligibility standards for approximately ten years. 772 F.3d 80 (1st Cir. 2014). Maine contended that the statute violated "equal sovereignty" because it resulted in different requirements being imposed on different states. The court concluded that *Shelby* was distinguishable because the Medicaid statute did not single out states the way that *Shelby* did,

19

and it did not involve a federal intrusion into "a sensitive area of state or local policymaking." *Id.* at 93.

In *National Collegiate Athletic Ass'n v. Governor of New Jersey*, the plaintiff challenged a federal statute that prohibited sports gambling in all states except Nevada. 730 F.3d 208 (3d Cir. 2013). The court concluded that *Shelby* was not controlling for multiple reasons, including that the gambling statute was authorized under Commerce Clause rather than the Fifteenth Amendment, and it did not intrude on "sensitive areas of state and local policymaking" like the preclearance provision did. *Id.* at 238–39.

In *In re Border Infrastructure Environmental Litigation*, the court rejected a challenge to a federal law that preempted state environmental regulations on certain construction projects near the U.S. border. 284 F. Supp. 3d 1092, 1102 (S.D. Cal. 2018). California contended that the federal statute interfered with its ability to enforce its own laws, and it violated "equal sovereignty" because it applied only to border states. But the court concluded that *Shelby* was not on point because the federal government has broad authority on issues related to border security and immigration, and the federal law did not "single out a particular state in imposing requirements on state powers in a discriminatory manner as the VRA in *Shelby*." *Id.* at 1145.

The foundation cites no cases in which any court relied on the "equal sovereignty" principle from *Shelby* to invalidate a statute or other government action. Even if that principle could apply in new contexts, this is not one of them, for the reasons discussed.

*Boerne* also provides no support for the foundation's claim. As already discussed, *Boerne* was about the scope of Congress's power under the Fourteenth Amendment. It did not address Congress's power under the Elections Clause, it was not about a statute that applied differently

20

to different states, and it did not discuss the concept of "equal sovereignty." So it has no bearing on this case.

The foundation cites *Condon v. Reno*, 913 F. Supp. 946, 962 (D.S.C. 1995), for the proposition that Congress relied on the Fourteenth Amendment to enact the NVRA, but even if that is correct, it does not matter. The court of appeals has already held that the NVRA was a valid exercise of Congress's authority under the Elections Clause. *ACORN*, 56 F.3d at 793–94. Even if the foundation is correct that the NVRA does not satisfy *Boerne*'s test for laws enacted under the Fourteenth Amendment, a statute does not need to be supported by more than one congressional power. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561, 574–75 (2012) (concluding that Affordable Care Act was a not a valid exercise of the commerce power, but it was a valid exercise of the taxing power).

The bottom line is that the foundation's claim is based on a fundamental misunderstanding of the case law it relies on. Neither *Shelby* nor *Boerne* provide any support for the view that Wisconsin's exemption under the NVRA is unconstitutional. The foundation's claim under the NVRA rests on a view that Wisconsin is not exempt, so its claim fails as a matter of law. The foundation cannot fix that basic defect by amending its complaint, so the court will dismiss the complaint with prejudice and direct the clerk of court to enter judgment.

ORDER

IT IS ORDERED that the motion to dismiss filed by Meagan Wolfe, Dkt. 14, is
GRANTED, and this case is DISMISSED with prejudice. The clerk of court is directed to enter
judgment in favor of Wolfe and close this case.

Entered November 26, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PUBLIC INTEREST LEGAL
FOUNDATION, INC.,

       Plaintiff,

    v.

MEAGAN WOLFE, in her official capacity
as the Administrator for the Wisconsin
Elections Commission, and THE UNITED
STATES,

       Defendants.

Case No.  24-cv-285-jdp

---

## JUDGMENT IN A CIVIL CASE

---

      IT IS ORDERED AND ADJUDGED that judgment is entered in favor of
defendant Meagan Wolf against plaintiff Public Interest Legal Foundation, Inc.
dismissing this case with prejudice.

          s/ Deputy Clerk                  11/27/2024

      Joel Turner, Clerk of Court            Date

A23

## CERTIFICATE OF RULE 30(d) COMPLIANCE

Pursuant to Circuit Rule 30(d), I, Noel H. Johnson, an attorney, certify that all

materials required by Circuit Rule 30(a) and 30(b) are included in Plaintiff-Appellant's

Required Short Appendix.


February 21, 2025                      /s/ Noel H. Johnson
                                       *Counsel for Plaintiff-Appellant*