No. 24-3258

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

Plaintiff-Appellant

v.

MEAGAN WOLFE, in her official capacity as the Administrator of the
Wisconsin Elections Commission, and UNITED STATES OF AMERICA,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
Case No. 3:24-cv-285
The Honorable Judge James D. Peterson

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

TIMOTHY M. O'SHEA
  United States Attorney



LESLIE K. HERJE
BARBARA L. OSWALD
  Assistant U.S. Attorneys
  United States Attorney's Office
  Western District of Wisconsin
  222 W. Washington Ave.
  Suite 700
  Madison, WI 53703
  (608) 264-5158

HARMEET K. DHILLON
  Assistant Attorney General
MICHAEL E. GATES
  Deputy Assistant Attorney General


ANDREW G. BRANIFF
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES .............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

    A.   Legal Background .................................................................... 2

    B.   The *Shelby County* Decision ..................................................... 8

    C.   Procedural History .................................................................. 9

SUMMARY OF ARGUMENT ................................................................ 11

STANDARD OF REVIEW ................................................................... 15

ARGUMENT

    I.    Even if PILF has suffered an Article III injury, it
             lacks prudential standing to bring an equal-
             sovereignty challenge to Section 4(b)(2). ............................ 15

    II.   *Shelby County*'s equal-sovereignty principle does not
             apply to the NVRA. ............................................................. 22

           A.   The NVRA, including Section 4(b)(2), is a
               valid exercise of Congress's Elections
               Clause authority .............................................................. 23

           B.   *Shelby County*'s equal-sovereignty principle
               does not apply to Article I legislation. .......................... 25

**TABLE OF CONTENTS (continued):**                              **PAGE**

C.   *Shelby County*'s equal-sovereignty principle does not reach Elections Clause legislation like the NVRA. ............................................... 34

    1.   Text.................................................................... 35

    2.   Source of authority........................................... 39

    3.   Ratification history .......................................... 42

    4.   Historical practice ........................................... 48

III.   Section 4(b)(2) of the NVRA raises no equal-sovereignty concerns. ........................................... 54

  A.   The NVRA affords equal treatment to all States..................................................... 55

  B.   Section 4(b)(2) sufficiently relates to the problems the NVRA targets....................................... 56

    1.   Section 4(b)(2) reasonably furthers the NVRA's goals of enhancing voter registration and list maintenance. .................... 57

    2.   The NVRA is not a transparency statute, and Section 4(b)(2) is not a "Transparency Exemption."............................... 59

  C.   Current conditions support Section 4(b)(2)'s continued application to the exempted States. ........... 63

IV.   Though the Court need not consider it here, Congress's authority to enforce the Reconstruction Amendments provides independent authority for enacting Section 4(b)(2)........................................... 69

**TABLE OF CONTENTS (continued):** **PAGE**

CONCLUSION .......................................................................................... 74

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                    **PAGE**

*Allen v. Milligan*, 599 U.S. 1 (2023)........................................................71

*Arizona State Legislature v.*
    *Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) .........51

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013) ...................................................................*passim*

*Arizona v. United States*, 567 U.S. 387 (2012).......................................47

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................69

*Association of Am. Physicians & Surgeons, Inc. v. Koskinen*,
    768 F.3d 640 (7th Cir. 2014) .........................................................22

*Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
    56 F.3d 791 (7th Cir. 1995) ...................................................*passim*

*Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
    880 F. Supp. 1215 (N.D. Ill.), *aff'd as modified*,
    56 F.3d 791 (7th Cir. 1995) .....................................................70, 73

*Association of Cmty. Orgs. for Reform Now v. Miller*,
    129 F.3d 833 (6th Cir. 1997) .................................................*passim*

*Association of Cmty. Orgs. for Reform Now v. Miller*,
    912 F. Supp. 976 (W.D. Mich. 1995),
    *aff'd*, 129 F.3d 833 (6th Cir. 1997) .................................................70

*Black Farmers & Agriculturalists Ass'n v. Vilsack*,
    2014 WL 1378168 (D.C. Cir. Mar. 25, 2014),
    *aff'g* No. 13-cv-759,
    2013 WL 12108646 (D.D.C. Aug. 29, 2013) ...................................28

**CASES (continued):**                                  **PAGE**

*Bond v. United States*, 564 U.S. 211 (2011).......................................17-20

*Branch v. Smith*, 538 U.S. 254 (2003) .....................................................51

*Briscoe v. Bell*, 432 U.S. 404 (1977) .......................................................56

*Carnes v. HMO La., Inc.*, 114 F.4th 927 (7th Cir. 2024) .......................15

*Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356 (2006)............................47

*Chiafalo v. Washington*, 591 U.S. 578 (2020) ........................................48

*City of Boerne v. Flores*, 521 U.S. 507 (1997).............................. 10, 70, 72

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995)............................... 4, 70

*Cook v. Gralike*, 531 U.S. 510 (2001) .................................................41-42

*Coyle v. Smith*, 221 U.S. 559 (1911)................................................. 20, 41

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)............................................59, 69

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) .................21

*Ex parte Clarke*, 100 U.S. 399 (1879)......................................................52

*Ex parte Coy*, 127 U.S. 731 (1888)..........................................................52

*Ex parte Siebold*, 100 U.S. 371 (1880) ...................................24-25, 36, 52

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) .........................59, 64

*Financial Oversight & Mgmt. Bd. v. Aurelius Inv., LLC*,
    590 U.S. 448 (2020) ........................................................................48

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .......................................25

## CASES (continued):                                            **PAGE**

*Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999) .........17-18

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008) ...........................38-39

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) ........69

*Herron v. Governor of Pa.*, 564 F. App'x 647 (3d Cir. 2014) ..................28

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018) ......................59

*Kobach v. EAC*, 772 F.3d 1183 (10th Cir. 2014) ....................................42

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ...........................................16-17

*League of Women Voters of Ind., Inc. v. Sullivan*,
    5 F.4th 714 (7th Cir. 2021) .............................................................25

*Loving v. United States*, 517 U.S. 748 (1996) .........................................30

*MainStreet Org. of Realtors v. Calumet City*,
    505 F.3d 742 (7th Cir. 2007) ..........................................................18

*Massey v. Wheeler*, 221 F.3d 1030 (7th Cir. 2000) .................................17

*Mayhew v. Burwell*, 772 F.3d 80 (1st Cir. 2014) ...........................*passim*

*Moore v. Harper*, 600 U.S. 1 (2023) ...................................................35, 48

*NCAA v. Governor of N.J.*, 730 F.3d 208 (3d Cir. 2013),
    *abrogated on other grounds by Murphy v. NCAA*,
    584 U.S. 453 (2018) ...............................................................*passim*

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) ....................................29

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ....................................................69

**CASES (continued):**                                          **PAGE**

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) .................................................. 67

*Ohio v. EPA*, 98 F.4th 288 (D.C. Cir.),
    *cert. denied*, 145 S. Ct. 994 (2024) ......................................... *passim*

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................. 72

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
    59 U.S. 421 (1855) ................................................................. 31

*Pollard v. Hagan*, 44 U.S. 212 (1845) .................................................... 20

*Powers v. Ohio*, 499 U.S. 400 (1991) ..................................................... 16

*Public Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ..................................................... 60

*Romer v. Evans*, 517 U.S. 620 (1996) ................................................ 53-54

*Ross v. Financial Asset Mgmt. Sys., Inc.*,
    74 F.4th 429 (7th Cir. 2023) .................................................. 69

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ....................................... 45

*Secretary of Agric. v. Central Roig Refin. Co.*,
    338 U.S. 604 (1950) .............................................................. 32

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) .................................... *passim*

*Sherman v. Community Consol. Sch. Dist. 21*,
    980 F.2d 437 (7th Cir. 1992) .................................................. 34

*Siegel v. Fitzgerald*, 596 U.S. 464 (2022) .............................................. 31

*Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023) ................................... 37

## CASES (continued):                                            PAGE

*Smiley v. Holm*, 285 U.S. 355 (1932) .................................................24, 47

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ..................56, 70-71

*Stearns v. Minnesota*, 179 U.S. 223 (1900) .............................................20

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)............................15-16

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) .................................................................40-42

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014).........................28

*United States v. Comstock*, 560 U.S. 126 (2010)....................................31

*United States v. Diggins*, 36 F.4th 302 (1st Cir. 2022)...............26, 28, 34

*United States v. Focia*, No. 2:15-cr-17,
   2015 WL 3672161 (M.D. Ala. June 12, 2015),
   *aff'd*, 869 F.3d 1269 (11th Cir. 2017) .............................................28

*United States v. Gooding*, 25 U.S. 460 (1827)........................................37

*United States v. Hougen*, 76 F.4th 805 (9th Cir. 2023),
   *cert. denied*, 144 S. Ct. 1121 (2024).................................................28

*United States v. Lawson*, 677 F.3d 629 (4th Cir. 2012).........................66

*United States v. Metcalf*, 881 F.3d 641 (8th Cir. 2018) .........................28

*United States v. Ptasynski*, 462 U.S. 74 (1983) ................................31, 47

*United States v. Roof*, 10 F.4th 314 (4th Cir. 2021).........................28, 34

*United States v. Sanders*, 909 F.3d 895 (7th Cir. 2018).........................20

**CASES (continued):**                                              **PAGE**

*United States v. Texas*, 339 U.S. 707 (1950) ............................................ 20

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) ................................ 72

*Voting Rts. Coal. v. Wilson*,
   60 F.3d 1411 (9th Cir. 1995) ....................................... 17, 22, 25, 70

*Whitman v. American Trucking Ass'n*, 531 U.S. 457 (2001) ................. 60

*Young v. Fordice*, 520 U.S. 273 (1997) ................................................. 3, 33

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1 ............................................................. *passim*

U.S. Const. Art. I, § 8, Cl. 1 ..................................................................... 31

U.S. Const. Art. I, § 8, Cl. 4 ..................................................................... 31

U.S. Const. Art. I, § 8, Cl. 18 .................................................................. 30

U.S. Const. Art. I, § 9, Cl. 6 ..................................................................... 31

U.S. Const. Art. II, § 1, Cl. 4 ............................................................. 38, 47

**STATUTES:**

Apportionment Act of 1842, ch. 47, § 2, 5 Stat. 491 ............................. 50

Enforcement Act of 1870, ch. 144, § 22, 16 Stat. 145 ........................... 52

Civil Rights Act of 1960
   52 U.S.C. 20701 .................................................................................. 62
   52 U.S.C. 20703 .................................................................................. 62

**STATUTES (continued):**                                    **PAGE**

Help America Vote Act

    52 U.S.C. 21082(a) ............................................................ 7, 67

    52 U.S.C. 21083(a)(2)(A)(iii) ......................................... 7, 67

    52 U.S.C. 21083(b)(5) ................................................... 7, 67

    Pub. L. No. 107-252, 116 Stat. 1666 (2002) ..................................... 7

National Voter Registration Act

    52 U.S.C. 20501 ................................................................ 59

    52 U.S.C. 20501 note .......................................................... 3

    52 U.S.C. 20501(a) ............................................................ 57

    52 U.S.C. 20501(a)(1)-(2) ..................................................... 72

    52 U.S.C. 20501(a)(3) ......................................................... 71

    52 U.S.C. 20501(b) ......................................................... 2, 58

    52 U.S.C. 20501(b)(1)-(2) ..................................................... 57

    52 U.S.C. 20503(a) ................................................ 3-4, 57, 66

    52 U.S.C. 20503(b) ........................................... 4, 19, 55, 58

    52 U.S.C. 20503(b)(1) ........................................................ 5-6

    52 U.S.C. 20503(b)(2) .................................................... *passim*

    52 U.S.C. 20504-20506 .................................................... 3, 57

    52 U.S.C. 20507 .......................................................... 3, 58

    52 U.S.C. 20507(a)(1) .................................................... 4, 57

    52 U.S.C. 20507(a)(2) ......................................................... 57

    52 U.S.C. 20507(a)(3) ......................................................... 57

    52 U.S.C. 20507(a)(6) ......................................................... 57

    52 U.S.C. 20507(b) ........................................................... 57

    52 U.S.C. 20507(c)(2)(A) ..................................................... 57

    52 U.S.C. 20507(i) ..................................................... *passim*

    52 U.S.C. 20508 .............................................................. 57

    52 U.S.C. 20510(b) ........................................................... 60

    52 U.S.C. 20511(1) ........................................................... 57

    Pub. L. No. 103-31, 107 Stat. 77 (1993) ..................................... 2-4

    Pub. L. No. 104-91, § 101(a), 110 Stat. 7,

        *as amended* Pub. L. No. 104-99, § 211,

        110 Stat. 37 (1996) ............................................................. 7

**STATUTES (continued):**                                    **PAGE**

Voting Rights Act
    52 U.S.C. 10303(b)..............................................................8
    52 U.S.C. 10304(a)..............................................................8

2 U.S.C. 2a(c) ......................................................................51

2 U.S.C. 5 ............................................................................53

2 U.S.C. 9 ............................................................................52

52 U.S.C. 20103 ..................................................................53

52 U.S.C. 20303(g) ..............................................................53

Act of Mar. 1, 1792, ch. 8, § 1, 1 Stat. 239 ..............................38

Act of July 14, 1862, ch.170, 12 Stat. 572................................50

Act of Feb. 2, 1872, ch. 11, § 2, 17 Stat. 28 ............................50

Act of Feb. 25, 1882, ch. 20, § 3, 22 Stat. 6 ............................50

Act of Feb. 7, 1891, ch. 116, § 4, 26 Stat. 736 ....................50-51

Act of Feb. 14, 1899, ch. 54, 30 Stat. 836................................52

Act of Jan. 16, 1901, ch. 93, § 4, 31 Stat. 734 ........................51

Act of Aug. 8, 1911, ch. 5, § 4, 37 Stat. 14..............................51

Act of Aug. 8, 1911, ch. 5, § 5, 37 Stat. 14..............................53

Act of Nov. 15, 1941, ch. 470, § 1, 55 Stat. 762......................51

Wis. Stat. § 6.36(1)(b)(1) (2023-2024) ....................................62

**STATUTES (continued):** PAGE

Wis. Stat. § 19.35(1) (2023-2024) ........................................................... 62

Act of Mar. 5, 1993, ch. 172, 1993 Wyo. Sess. Laws 396-397 ................ 55

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 9, 103d Cong., 1st Sess. (1993) ................................. *passim*

H.R. Rep. No. 66, 103d Cong., 1st Sess. (1993) ................................. 64-65

S. Rep. No. 6, 103d Cong., 1st Sess. (1993) ..................................... *passim*

1 Annals of Cong. 768 (1789) (Joseph Gales ed., 1834) ......................... 49

1 Annals of Cong. 769 (1789) (Joseph Gales ed., 1834) ......................... 49

41 Annals of Cong. 850-851, 865-866 (1823) ......................................... 49

41 Annals of Cong. 853 (1823) ............................................................... 50

41 Annals of Cong. 866 (1823) ............................................................... 50

139 Cong. Rec. 9632 (1993) ............................................................. 6, 65

141 Cong. Rec. 27,071-27,072 (1995) .................................................. 7, 66

**MISCELLANEOUS:**

Anthony J. Bellia Jr. & Bradford R. Clark,
*The International Law Origins of American Federalism*,
120 Colum. L. Rev. 835 (2020) ................................................... 40-41

FEC, *Implementing the National Voter Registration Act of 1993:
Requirements, Issues, Approaches, and Examples*
(Jan. 1, 1994), https://perma.cc/SGA9-AP8V ................................. 66

## MISCELLANEOUS (continued):                                    PAGE

FEC, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 1995-1996* (1996), https://perma.cc/PRG6-T2RM................5

Pauline Maier, *Ratification* (2010) ..................................................44-45

Samuel Johnson, *Dictionary of the English Language* (6th ed. 1785)............................................36-37

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 2d ed. 1836) ........................................ *passim*

*The Federalist No. 59* (Alexander Hamilton) (Clinton Rossiter ed., 1961)............................................ 44

*The Federalist No. 68* (Alexander Hamilton) (Clinton Rossiter ed., 1961)............................................ 39

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)............................................42-43

Thomas B. Colby, *In Defense of the Equal Sovereignty Principle*, 65 Duke L.J. 1087 (2016) ............................................ 40

U.S. Dep't of Just., *Jurisdictions Previously Covered by Section 5* (May 17, 2023), https://perma.cc/W5M7-6MVU ...........63

U.S. Dep't of Just., *The National Voter Registration Act of 1993 (NVRA)* (Nov. 1, 2024), https://perma.cc/KHZ5-8WQ9...........6

## STATEMENT OF JURISDICTION

Appellant's amended jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

The Public Interest Legal Foundation (PILF) seeks voter-registration records from Wisconsin under the National Voter Registration Act's (NVRA's) public-disclosure provision, 52 U.S.C. 20507(i).  However, Wisconsin is among six States not subject to the NVRA.  Section 4(b)(2) of the Act, 52 U.S.C. 20503(b)(2), exempts certain States, including Wisconsin, that enacted election-day registration at the polling place before the NVRA took effect.  PILF asserts that Section 4(b)(2) violates the principle of equal sovereignty of the States and is not a congruent and proportional provision of law. The issues are:

1.  Whether PILF lacks prudential standing to assert a State's right to equal sovereignty.

2.  Whether Section 4(b)(2) of the NVRA comports with constitutional equal-state-sovereignty principles.

3.  Whether Section 4(b)(2) is congruent and proportional legislation authorized by the Fourteenth Amendment or rational legislation authorized by the Fifteenth Amendment.[1]

## STATEMENT OF THE CASE

### A.    Legal Background

The Elections Clause in Article I of the Constitution addresses the enactment of regulations governing "[t]he Times, Places and Manner of holding Elections for Senators and Representatives."  U.S. Const. Art. I, § 4, Cl. 1.  It provides initially that these regulations "shall be prescribed in each State by the Legislature thereof," while stating that "the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  *Ibid.*

In May 1993, Congress enacted the NVRA.  *See* Pub. L. No. 103-31, 107 Stat. 77 (1993) (52 U.S.C. 20501-20511).  Congress passed the NVRA to increase eligible citizens' voter registration and participation, protect the integrity of the electoral process, and ensure maintenance of accurate and current voter-registration rolls.  52 U.S.C. 20501(b).  The

---

[1]  The United States has unique sovereign interests in defending the constitutionality of a federal statute.  It therefore has filed a separate brief from appellee Meagan Wolfe.

NVRA went into effect for most States on January 1, 1995. *See* NVRA § 13, 107 Stat. 89 (52 U.S.C. 20501 note).

Congress primarily relied on its authority under the Elections Clause to pass the NVRA. *See* S. Rep. No. 6, 103d Cong., 1st Sess. 3 (1993) (Senate Report). This Court has upheld the NVRA as a permissible exercise of Congress's Elections Clause powers. *See Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 (2013).

The NVRA "requires States to provide simplified systems for registering to vote in federal elections" and "imposes requirements about just when, and how, States may remove people from the federal voter rolls." *Young v. Fordice*, 520 U.S. 273, 275-276 (1997) (emphasis omitted). Section 4(a) lists "general" statutory requirements, ordering States to establish various procedures for voter registration for federal office. 52 U.S.C. 20503(a); *see* 52 U.S.C. 20504-20506. Section 8 regulates the maintenance of voter registration lists. *See* 52 U.S.C. 20507. Nestled among Section 8's various provisions, Section 8(i) requires States to make publicly available "all records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," subject to limited exceptions. 52 U.S.C. 20507(i).

In enacting the NVRA, Congress "found that low voter registration turnout in federal elections poses 'potential serious problems in our democratic society.'" *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995) (citation omitted). Congress therefore debated whether to require procedures enabling "registration on the day of election," which was "[t]he most controversial method of registration considered." H.R. Rep. No. 9, 103d Cong., 1st Sess. 4 (1993) (House Report). Congress ultimately required only that States register voters up to 30 days before a federal election. *See* 52 U.S.C. 20503(a), 20507(a)(1).

However, in Section 4(b), entitled "Nonapplicability To Certain States," Congress excluded two sets of States from its new requirements. NVRA § 4(b), 107 Stat. 78 (52 U.S.C. 20503(b)). In Section 4(b)(1), which is not at issue here, Congress excluded from the NVRA any "State in which, under law that is in effect continuously on and after August 1, 1994, there is no voter registration requirement for

any voter in the State with respect to an election for Federal office." 52 U.S.C. 20503(b)(1). Only North Dakota falls within this category. *See* FEC, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 1995-1996*, at 10 (1996) (1996 FEC Report), https://perma.cc/PRG6-T2RM.

Section 4(b)(2), meanwhile, exempts States in which "all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office." 52 U.S.C. 20503(b)(2). To qualify for this exception, a State must have authorized election-day registration at the polling place (Polling-Place Registration) under a law that (1) has been "in effect continuously [since] August 1, 1994," or (2) "was enacted on or prior to August 1, 1994, and by its terms . . . c[a]me into effect upon the enactment of this chapter, so long as that law remains in effect." *Ibid.* Thus, Section 4(b)(2) exempts States that provided for Polling-Place Registration by the time the NVRA went into effect, but those States later can become subject to the NVRA if they eliminate Polling-Place Registration. Wisconsin is covered by Section 4(b)(2)'s exemption, along with Minnesota, Idaho, New Hampshire, and

Wyoming.  *See* U.S. Dep't of Just., *The National Voter Registration Act of 1993 (NVRA)* (Nov. 1, 2024), https://perma.cc/KHZ5-8WQ9.

Congress believed that "States which have implemented one or both of these exceptions have lessened the impediments to registration" in a manner "which goes significantly beyond the requirements of the bill."  Senate Report 22-23; *accord* House Report 6.  This did not mean, however, that Congress wished to incentivize States to adopt Polling-Place Registration once the NVRA became law.  The final version of Section 4(b)(2) was a compromise that recognized the existence of Polling-Place Registration while not encouraging its later adoption. The House version of the NVRA made access to Section 4(b) open-ended, but Senate Republicans insisted on adding a deadline.  *See* 139 Cong. Rec. 9632 (1993) (statement of Sen. McConnell).  They did so to prevent Section 4(b)(2) from providing such a strong incentive to avoid federal regulation that it could become "a backdoor means of forcing States into adopting election day registration," while still "grandfathering in the . . . States that would have qualified for the exemption prior to March 11, 1993," the cutoff date in the original statute.  *Ibid.*

In 1996, Congress retroactively extended Section 4(b)'s deadline to August 1, 1994—a full 15 months after the statute's original date of passage, but five months before its effective date.  Pub. L. No. 104-91, § 101(a), 110 Stat. 7, 10-13 (1996), *as amended* Pub. L. No. 104-99, § 211, 110 Stat. 37-38 (1996) (enacting conference report containing deadline extension).  This allowed Congress to grandfather in two additional States that had implemented Polling-Place Registration after Congress passed the NVRA.  *See* 141 Cong. Rec. 27,071-27,072 (1995) (statement of Sen. Ford) (recounting history of original deadline's adoption in unsuccessful effort to oppose extending the deadline).

In 2002, to further modernize election administration, Congress enacted the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (2002) (52 U.S.C. 20901-21145).  Congress exempted the same States covered by Section 4(b) of the NVRA from certain of HAVA's mandates that drew on the NVRA's existing requirements.  *See* 52 U.S.C. 21082(a), 21083(a)(2)(A)(iii) and (b)(5).  The NVRA and HAVA are only two of many Elections Clause statutes throughout American history that have differentiated between States.  *See* Part II.C.4, *infra.*

### B.     The *Shelby County* Decision

In *Shelby County v. Holder*, 570 U.S. 529 (2013), the Supreme

Court struck down Section 4(b) of the Voting Rights Act (VRA) as

invalid.  Section 5 of the VRA required certain States to preclear all

changes to voting laws through the Attorney General or a three-judge

court in Washington, D.C.  52 U.S.C. 10304(a).  Section 4(b) provided a

coverage formula, based on data from 1972, governing which States

would be subject to that preclearance regime.  52 U.S.C. 10303(b).

*Shelby County* relied on two primary rationales to declare that formula

unconstitutional.

First, preclearance imposed extraordinary burdens on States by

requiring advance permission from the federal government "to

implement laws that they would otherwise have the right to enact and

execute on their own."  *Shelby Cnty.*, 570 U.S. at 544.  This was "a

drastic departure from basic principles of federalism," *id.* at 535, that

conflicted with the Framers' decision to reject a proposed federal

"authority to 'negative' state laws" before they take effect, *id.* at 542.

Second, preclearance implicated the "'principle of *equal*

sovereignty' among the States."  *Shelby Cnty.*, 570 U.S. at 544 (citation

omitted).  The Court emphasized that Section 5 forced covered States to "wait[] months or years and expend[] funds to implement a validly enacted law" while other States "can typically put the same law into effect immediately."  *Ibid.*; *see id.* at 535-536, 550, 552-553 (reiterating equal-sovereignty concerns).

Combined, these two concerns with the preclearance regime created "serious constitutional questions" that required additional scrutiny.  *Shelby Cnty.*, 570 U.S. at 550 (citation omitted).  The Court determined that the statute's "'current burdens' must be justified by 'current needs,' and any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'"  *Id.* at 550-551 (citation omitted).  The Court thus held that Congress "must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions."  *Id.* at 553.  And it found Congress's justifications for the existing formula "irrational" under the governing rationality test for Fifteenth Amendment legislation.  *Id.* at 550, 556.

## C.    Procedural History

PILF sued Meagan Wolfe, Administrator of the Wisconsin Elections Commission, demanding disclosure of voter-registration

materials at a reasonable cost pursuant to Section 8(i) of the NVRA.

*See* Doc. 1, at 1-2, 25-26; A6.[2]  PILF acknowledged, however, that under

Section 4(b)(2) of the NVRA, 52 U.S.C. 20503(b)(2), the Act does not

apply to Wisconsin.  *See* Doc. 1, at 5.  So PILF sought a declaration that

Section 4(b)(2) is unconstitutional as applied to Section 8(i) in

Wisconsin, to clear the way for Section 8(i) relief against Administrator

Wolfe.  *See id.* at 28-29.  PILF alleged that Section 4(b)(2) is

unconstitutional under the equal-sovereignty principle articulated in

*Shelby County*, *supra*, and that Section 4(b)(2) does not meet the

congruence-and-proportionality requirement for Fourteenth

Amendment legislation discussed in *City of Boerne v. Flores*, 521 U.S.

507 (1997).  *See* Doc. 1, at 10-15.

Administrator Wolfe filed a Motion to Dismiss PILF's Complaint

with prejudice.  Doc. 14.  The United States also intervened to defend

the statute's constitutionality.  Doc. 22.  The district court granted

Administrator Wolfe's Motion to Dismiss.  A3.  It first held that PILF

---

[2]  "Doc. __, at __" refers to the docket and page numbers of
documents filed in the district court, No. 3:24-cv-285 (W.D. Wis.).  "A__"
refers to the page number of Appellant's Required Short Appendix.  "Br.
__" refers to the page number of PILF's opening brief on appeal.

had Article III standing.  A8.  The court deemed it unnecessary to decide whether PILF lacked prudential standing to assert States' equal-sovereignty interests, because the court found that PILF's claim failed on the merits.  A8-A10.

The court determined that *Shelby County* and *City of Boerne* combat congressional encroachments on state authority, and that it would be "inconsistent with" both decisions to use them "to *impose* a burden that Congress removed."  A12; *see* A12-A16.  The court also found that *Shelby County*'s reasoning did not apply to Elections Clause legislation generally, or to the NVRA specifically.  A16-A19.  The court held that *City of Boerne* did not apply to the Elections Clause, and that the court need not consider whether Section 4(b)(2) satisfied that case's congruence-and-proportionality test for Fourteenth Amendment legislation because the NVRA already is valid Elections Clause legislation.  A20-A21.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's dismissal of PILF's Complaint.  PILF asks this Court to be the first to apply *Shelby County*'s equal-sovereignty principle to *increase* federal mandates and

invalidate Elections Clause legislation. This Court should resist that call and uphold the constitutionality of Section 4(b)(2) of the NVRA, for several independent reasons.

1. Although PILF may have Article III standing to contest the denial of public records pursuant to the NVRA's disclosure protocol, PILF lacks prudential standing to bring the equal-sovereignty claim it pursues here. As the district court recognized, PILF cannot meet the traditional test for third-party standing. And PILF is not a State; it has no equal sovereignty interests of its own. Nor has PILF alleged that any federal encroachment on state sovereignty directly restricted PILF's own liberty. PILF cannot invoke States' equal-sovereignty rights to *expand* federal regulation, over Wisconsin's express opposition.

2. In any event, *Shelby County* does not apply to the NVRA, which PILF acknowledges is valid Elections Clause legislation. The equal-sovereignty principle has never been extended beyond *Shelby County*'s limited Fifteenth Amendment context. Several other circuit courts rightly have refused to apply equal-sovereignty analysis to the textually and jurisprudentially different world of Article I legislation. The equal-sovereignty principle certainly does not reach exercises of

Elections Clause authority. Rather, the Elections Clause's text, purpose, ratification history, and longtime application all confirm that Congress may differentiate between States in regulating federal elections. Traditional rational-basis review imposes the only limitation on Congress's Elections Clause authority.

3. Nevertheless, Section 4(b)(2) would meet *Shelby County*'s rational-design test if it applied to Elections Clause legislation. Section 4(b)(2) provided all States that register voters with a time-limited choice between detailed statutory procedures for federal elections and Polling-Place Registration. Preventing application of the NVRA to States that adopted Polling-Place Registration before a statutory deadline rationally serves Congress's nuanced purposes, by ensuring increased voter participation without unduly pressuring States to adopt a controversial election reform. It also avoided placing unnecessary regulations on States that already were taking actions that would essentially moot the NVRA's voter-registration prescriptions. Unable to contest this conclusion, PILF attempts to rebrand the NVRA as a transparency statute—but information requests play only a secondary role in the statutory scheme. Finally, current conditions continue to

make Section 4(b)(2)'s application rational, particularly because the provision eliminates burdens on States and protects their reliance interests.

4. Because Section 4(b)(2) can be sustained under the Elections Clause, the Court need not reach PILF's alternative argument that the statute is not valid Fourteenth Amendment legislation. But that argument fails in any event. *City of Boerne*'s congruence-and-proportionality requirements do not apply to provisions that *exempt* States from federal regulation. Regardless, in passing the NVRA Congress legislated against a long history of racially discriminatory registration practices, which the VRA did not fully eradicate. Section 4(b)(2) also can be sustained under the Fifteenth Amendment's rationality standard for the same reasons. Congress designed an acceptable regime to ensure adequate and nondiscriminatory registration systems, while exempting States whose systems already approached this problem in a different way.

## STANDARD OF REVIEW

This Court reviews a district court's decision to dismiss a complaint, along with the court's "legal determination[s]," de novo. *Carnes v. HMO La., Inc.*, 114 F.4th 927, 930 (7th Cir. 2024).

## ARGUMENT

The district court correctly dismissed PILF's Complaint and upheld the constitutionality of Section 4(b)(2) of the NVRA. PILF's challenge to Section 4(b)(2) based on *Shelby County*'s equal-sovereignty principle fails for multiple independent reasons: PILF lacks prudential standing to assert it; the equal-sovereignty principle does not apply to the NVRA; and Section 4(b)(2) raises no equal-sovereignty concerns.

Because the NVRA is valid Elections Clause legislation, this Court need not decide whether it also is valid Fourteenth and Fifteenth Amendment legislation. If this Court reaches those questions, however, it should uphold Section 4(b)(2) on those independent bases.

## I.   Even if PILF has suffered an Article III injury, it lacks prudential standing to bring an equal-sovereignty challenge to Section 4(b)(2).

PILF alleges an informational injury, and such injuries can give rise to Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S.

413, 441-442 (2021).  The United States has not contested PILF's Article III standing here.

But the standing "inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (citation omitted).  And this case raises prudential concerns.  PILF principally relies on the equal-sovereignty principle for its claim.  In so doing, PILF does not "assert [its] own legal rights and interests."  *Id.* at 129 (citation omitted).  Instead, PILF "rest[s its] claim to relief on the legal rights or interests of third parties":  the equal-sovereignty rights of the States and their subdivisions.  *Ibid.* (citation omitted).  It lacks prudential standing to do so.  *See ibid.*; *Powers v. Ohio*, 499 U.S. 400, 410 (1991).  This is particularly so since PILF seeks to use the equal-sovereignty principle to *increase* federal regulation of Wisconsin against its will.

1.  Plaintiffs can establish third-party standing only if they satisfy two requirements, and neither has been satisfied here.  First, PILF cannot show that it "has a 'close' relationship with the person who possesses the right" being invoked—here, States.  *Kowalski*, 543 U.S. at 130 (citation omitted).  Second, PILF cannot show that "there is a

'hindrance' to the possessor's ability to protect his own interests," *ibid.* (citation omitted)—especially given that States have shown themselves perfectly capable of mounting challenges (albeit losing ones) to the NVRA. *See Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000); *see also, e.g.*, *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1412-1416 (9th Cir. 1995); *Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 792-796 (7th Cir. 1995) (*Edgar II*); *Association of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836-838 (6th Cir. 1997) (*Miller II*). PILF thus lacks prudential standing to assert the equal-sovereignty rights of a third-party State. *See Kowalski*, 543 U.S. at 129-130. Indeed, PILF has never "contend[ed] that it can meet the requirements for third-party standing articulated in *Kowalski*." A9.

2. Before the district court, PILF asserted (A9) that it nevertheless could plead third-party standing under the Supreme Court's decision in *Bond v. United States*, 564 U.S. 211 (2011), and this Court's decision in *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999). But PILF does not allege harm to its own liberty interest, the predicate to third-party standing under *Bond* and *Gillespie*.

*Bond* and *Gillespie* were federalism cases involving the "enforcement" against individual litigants, *Bond*, 564 U.S. at 222, of federal laws that "constrained" the litigants' actions, *Gillespie*, 185 F.3d at 701. In *Bond*, the defendant contested her indictment for violating a federal criminal statute barring the use of chemical weapons. 564 U.S. at 214-215. In *Gillespie*, the plaintiff challenged a federal statute preventing domestic-violence offenders from carrying weapons, costing him his job as a police officer. 185 F.3d at 697. Both litigants claimed that these alleged violations of federalism principles resulted in federal overreach that "deprive[d]" them, *ibid.*, of their "individual liberty," *Bond*, 564 U.S. at 223-224. And both cases held that those litigants had an individual interest in rectifying government overreach that would "direct or control" their conduct. *Id.* at 222; *see Gillespie*, 185 F.3d at 703.

PILF's claim is of different vintage. Unlike the criminal prohibitions against individuals' use of chemical weapons in *Bond*, or against individuals' possession of guns in *Gillespie*, the NVRA "imposes no duties or sanctions on" PILF. *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 746 (7th Cir. 2007). Indeed, Section 4(b)(2) imposes

- 18 -

no duties or sanctions on anyone:  It is, after all, an explicit statutory exemption from regulation.  *See* 52 U.S.C. 20503(b).  But to the extent Section 4(b)(2) can be said to directly regulate anyone, it is the States receiving the exemption, not organizations like PILF.  This case is thus at least one, if not two, steps removed from *Bond* and *Gillespie*, or from the cases on which those decisions rely, in which those suing have been direct targets of the challenged law.  *See Bond*, 564 U.S. at 222-223 (discussing cases).

Instead, PILF claims only that Wisconsin deprived PILF of information it requested—information of a sort that, absent the NVRA, PILF would not be entitled to demand from a State under federal law. Article III standing aside, such an alleged injury cannot imbue PILF with a personal interest in enforcing States' equal-sovereignty rights.

3.  PILF's unusual use of federalism principles (*e.g.*, Br. 12-13) heightens this case's prudential standing concerns.

a.  Ultimately, PILF's complaint is that it was injured by Congress's *failure* to impose burdens on *Wisconsin*—a State in whose sovereignty PILF has pled no interest.  But "the Tenth Amendment" only ensures that "an individual 'can assert injury from governmental

*action* taken in excess of the authority that federalism defines.'" *United States v. Sanders*, 909 F.3d 895, 906 (7th Cir. 2018) (emphasis added) (quoting *Bond*, 564 U.S. at 220).  The federal law being challenged must actually *impose upon* the one challenging it for that person to invoke federalism principles.  *Bond* and *Gillespie* fall within this rule, as already discussed.  PILF's case does not.

PILF's claim also defies the equal-sovereignty principle itself, which the Supreme Court has only ever relied upon to *remove* congressional burdens that restrict some States but not others.  *See, e.g.*, *Shelby Cnty. v. Holder*, 570 U.S. 529, 544-545 (2013); *Coyle v. Smith*, 221 U.S. 559, 567, 570, 579-580 (1911); *Pollard v. Hagan*, 44 U.S. 212, 223-224 (1845); *see also Stearns v. Minnesota*, 179 U.S. 223, 245 (1900) (stating that equal footing doctrine "may forbid any agreement or compact *limiting or qualifying* political rights and obligations" (emphasis added)).[3]

---

[3] *United States v. Texas*, 339 U.S. 707 (1950), upon which PILF relies (Br. 32), holds that the equal footing doctrine prohibits limiting the *federal government's* "paramount powers" over any one State, 339 U.S. at 717.

PILF is not directly regulated by Section 4(b)(2), has suffered no restriction on its liberty because of Section 4(b)(2), and yet asks this Court to impose *more* federal regulations on a State.  It is thus particularly poorly positioned to invoke equal sovereignty, a constitutional principle that is designed to *protect* the States.[4]

b.  Magnifying these prudential standing concerns, "[t]he interests of the affected persons in this case are in many respects antagonistic." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004).  PILF challenges Wisconsin's exemption from the NVRA's requirements under Section 4(b)(2).  But Wisconsin, whose equal-sovereignty rights are most directly at issue, opposes PILF's suit (through Wolfe) and successfully moved to dismiss it.  A2-A3.  No State has supported PILF here, and, indeed, States have only ever sought to free themselves from the

---

[4]  PILF notes (Br. 48) that the D.C. Circuit has found Article III standing for States to bring an equal sovereignty claim that would lead to increased regulation for another State exempted from the challenged statute, rather than regulatory relief for the plaintiff States.  *See Ohio v. EPA*, 98 F.4th 288, 307 (D.C. Cir.), *cert. denied*, 145 S. Ct. 994 (2024).  But there, the States properly asserted that the exemption "violate[d] *their* constitutionally protected interest in equal sovereignty."  *Id.* at 307 (emphasis added).  The court did not address whether a *non-State* party who is *not* directly regulated could establish *prudential* standing.

NVRA's requirements, not to impose those requirements upon others. *See, e.g.*, *Voting Rts. Coal.*, 60 F.3d at 1412-1416; *Edgar II*, 56 F.3d at 792-796; *Miller II*, 129 F.3d at 836-838.

Significantly, this Court has denied prudential standing to plaintiffs whose aims are at cross-purposes with the entities on whose legal interests their claims rely. *See, e.g.*, *Association of Am. Physicians & Surgeons, Inc. v. Koskinen*, 768 F.3d 640, 641-642 (7th Cir. 2014) (denying prudential standing to physicians' association that did "not accept insured patients" and "want[ed] to reduce rather than increase the number of persons who carry health insurance," who yet sought to "champion" claim that IRS failed to pursue statutory goal of universal health insurance). Because PILF likewise seeks to burden Wisconsin's sovereignty against its wishes, and does not act on behalf of or in the interests of any other State, PILF lacks third-party standing to raise a claim premised on States' right to equal sovereignty. This Court can and should affirm on third-party standing alone.

## II. *Shelby County*'s equal-sovereignty principle does not apply to the NVRA.

Even if PILF has prudential standing to press its equal-sovereignty challenge, this Court should reject it on the merits. As

PILF acknowledges, the NVRA is proper Elections Clause legislation, passed under Congress's Article I authority.  As several other circuits have recognized, the equal-sovereignty principle recognized in *Shelby County* was applied solely to an "unprecedented" provision of a statute passed to enforce the Fifteenth Amendment, 570 U.S. at 535, and for textual reasons does not extend to legislation enacted to effectuate Article I duties and obligations.  It certainly does not apply to the Elections Clause, whose text, purpose, and history all confirm that Congress may treat States differently when regulating federal elections.

### A.   The NVRA, including Section 4(b)(2), is a valid exercise of Congress's Elections Clause authority.

The NVRA is a valid exercise of Congress's plenary authority under the Elections Clause, U.S. Const. Art. I, § 4, Cl. 1.  *See Edgar II*, 56 F.3d at 792-796; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-8 (2013) (*ITCA*).  PILF concedes this.  Br. 11, 25, 52.

The Elections Clause grants Congress authority to "make or alter" regulations of "[t]he Times, Places and Manner of holding Elections for Senators and Representatives."  U.S. Const. Art. I, § 4, Cl. 1; *see ITCA*, 570 U.S. at 8; *see also Edgar II*, 56 F.3d at 793 (noting that Congress has "coextensive" "power over Presidential elections").  The Clause's

"comprehensive words embrace authority to provide a complete code for congressional elections," including on the very topics the NVRA addresses:  "registration" and "prevention of fraud and corrupt practices."  *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see, e.g.*, *ITCA*, 570 U.S. at 8-9 (acknowledging that "Times, Places, and Manner" includes "registration"); *Ex parte Siebold*, 100 U.S. 371, 379-380, 383-384 (1880) (upholding statute providing for federal supervision of State's voter-registration process as proper exercise of "[T]imes, [P]laces and [M]anner" authority).

When Congress exercises its authority to "make" or "alter" state regulations of federal elections, that authority "is paramount, and may be exercised at any time, and to any extent which it deems expedient." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 392). Elections Clause legislation triggers weaker "federalism concerns" than typical preemption under the Supremacy Clause, *id.* at 14, because the Elections Clause "invests the States with responsibility . . . only so far as Congress declines to preempt state legislative choices," *id.* at 9 (citation omitted).  Elections Clause legislation also does not require a presumption against preemption, because such legislation "*necessarily*

displaces some element of a pre-existing legal regime erected by the States." *Id.* at 13-14; *see also, e.g.*, *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021); *Fish v. Kobach*, 840 F.3d 710, 731-732 (10th Cir. 2016).

Congress's preeminent power under the Elections Clause authorizes Section 4(b)(2).  Courts, including this one, have unanimously held that the NVRA's general procedures governing registration to vote in elections for federal office fall within Congress's Elections Clause authority.  *See Edgar II*, 56 F.3d at 792-796; *Voting Rts. Coal.*, 60 F.3d at 1412-1416; *Miller II*, 129 F.3d at 836-838.  Section 4(b)(2) simply allowed States to avoid the specific mandates of the NVRA by adopting and maintaining Polling-Place Registration.  *See* 52 U.S.C. 20503(b)(2).  Thus, in passing Section 4(b)(2), Congress exercised its Elections Clause authority to "supersede" state regulations to the "extent which it deem[ed] expedient."  *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 392).

## B.    *Shelby County*'s equal-sovereignty principle does not apply to Article I legislation.

The Supreme Court in *Shelby County* articulated an equal-sovereignty principle, which limited Congress's authority to enforce the

Fifteenth Amendment through the VRA's preclearance provisions. The Court did not "pronounce on how or whether this standard might apply to different exercises of legislative authority under the Fourteenth and Fifteenth Amendments, much less announce a test applicable to" other constitutional provisions. *United States v. Diggins*, 36 F.4th 302, 315-316 (1st Cir. 2022). Text, context, and federalism principles underscore that *Shelby County* does not affect Article I legislation.

1. The *Shelby County* Court found the VRA's preclearance coverage formula unconstitutional in part because the equal-sovereignty principle acted as a limit on Congress's Fifteenth Amendment authority to restrict state election procedures. 570 U.S. at 555-557. Congress, using its Fifteenth Amendment power to enforce the Amendment's guarantee of the right to vote "by appropriate legislation," had enacted VRA preclearance provisions that required a small subset of States and sub-jurisdictions to obtain federal permission before changing voting laws. *Id.* at 536-537. This meant that some States suffered the burden of waiting "months or years and expend[ing] funds to implement a validly enacted law," while other States could implement the same law immediately upon passage. *Id.* at 544-545.

The Supreme Court repeatedly noted that the VRA was "extraordinary legislation otherwise unfamiliar to our federal system." *Shelby Cnty.*, 570 U.S. at 545 (citation omitted); *see id.* at 546, 549, 552, 555. Its preclearance requirements intruded "into [a] sensitive area[] of state and local policymaking"—the regulation of state and local elections—that traditionally had been the States' exclusive province. *Id.* at 545. Congress also expanded Section 5's standards in 2006, "exacerbat[ing] the substantial federalism costs" of preclearance. *Id.* at 549 (citation omitted); *contra* Br. 37 (asserting VRA's intrusiveness did not increase over time). In this unprecedented context, the Court noted that a "principle of equal sovereignty" was relevant in assessing "subsequent disparate treatment of States." *Shelby Cnty.*, 570 U.S. at 544. Ultimately, the Court held that the VRA's preclearance coverage formula was unconstitutional because its "current burdens" were not justified by "current needs" and its "disparate geographic coverage" was not "sufficiently related to the problem that it target[ed]." *Id.* at 550-551 (citation omitted).

Given *Shelby County*'s narrow scope and unique context, it is unsurprising that courts have expressly declined to expand the

principle to new areas.  For instance, several circuits have refused calls to extend *Shelby County* to Thirteenth Amendment legislation and upend that amendment's existing standard of review.  *See United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) (holding that *Shelby County* did not "address[] Congress's power to legislate under the Thirteenth Amendment"); *United States v. Hougen*, 76 F.4th 805, 815 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1121 (2024); *Diggins*, 36 F.4th at 315-316; *United States v. Roof*, 10 F.4th 314, 394-395 (4th Cir. 2021); *United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014).

Courts also have declined to use *Shelby County* to abrogate or alter Fourteenth Amendment equal-protection precedents, *see Herron v. Governor of Pa.*, 564 F. App'x 647, 649 (3d Cir. 2014); *Black Farmers & Agriculturalists Ass'n v. Vilsack*, No. 13-5304, 2014 WL 1378168, at *1 (D.C. Cir. Mar. 25, 2014), *aff'g* No. 13-cv-759, 2013 WL 12108646, at *2 (D.D.C. Aug. 29, 2013), and have refused to import *Shelby County* into Second Amendment analysis, *see United States v. Focia*, No. 2:15-cr-17, 2015 WL 3672161, at *6 (M.D. Ala. June 12, 2015), *aff'd*, 869 F.3d 1269 (11th Cir. 2017).

2.  Congress's Article I powers fall even further afield from *Shelby County*'s reasoning.  And as the D.C. Circuit recently remarked, "neither the Supreme Court nor any other court has ever applied th[e] [equal-sovereignty] principle as a limit on . . . Article I powers."  *Ohio v. EPA*, 98 F.4th 288, 308 (D.C. Cir.), *cert. denied*, 145 S. Ct. 994 (2024).  To the contrary, appeals courts have uniformly rejected attempts to extend *Shelby County* to Article I.

The Third Circuit first declined to apply the equal-sovereignty principle to a single-State exception to an anti-gambling statute passed under Congress's Commerce Clause power.  *NCAA v. Governor of N.J.*, 730 F.3d 208, 238-239 (3d Cir. 2013), *abrogated on other grounds by Murphy v. NCAA*, 584 U.S. 453 (2018).  Next, the First Circuit refused to apply *Shelby County* to the maintenance-of-effort provision of the Affordable Care Act, passed under Congress's Spending Clause powers.  *Mayhew v. Burwell*, 772 F.3d 80, 93-97 (1st Cir. 2014).  The Second Circuit then deemed the equal-sovereignty principle inapplicable to a tax-deduction cap enacted under Congress's Taxing Clause power.  *New York v. Yellen*, 15 F.4th 569, 584 (2d Cir. 2021).  And most recently, the D.C. Circuit rejected the equal-sovereignty principle's application to a

grandfather clause in the Clean Air Act—another Commerce Clause statute—that exempted only California from federal tailpipe-emissions standards. *Ohio*, 98 F.4th at 308-314. The Supreme Court has denied certiorari in each of these cases, with only Justice Thomas indicating his desire to hear one of them. *See Ohio*, 145 S. Ct. 994.

As these cases recognize, three aspects of the *Shelby County* decision do not map onto most Article I legislation. First and foremost, the textual basis for the *Shelby County* ruling does not apply to Article I. "[T]he central debate in *Shelby County* was the scope of Congress's power to enforce the Fifteenth Amendment 'by appropriate legislation,'" and "[t]he Court used equal sovereignty as a background principle in applying that phrase." *Ohio*, 98 F.4th at 309 (citation omitted).

Article I does not use that phrase. The Constitution instead gives Congress "plenary" authority to enact laws under its enumerated "Article I powers." *Loving v. United States*, 517 U.S. 748, 767 (1996). Article I then grants Congress additional authority to pass legislation "necessary and proper" to executing those enumerated powers. U.S. Const. Art. I, § 8, Cl. 18. Laws fall within that authority whenever they "constitute[] a means that is rationally related to the implementation of

a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010).

Second, context confirms that most Article I powers, including the Elections Clause, do not incorporate an equal-sovereignty principle because the Founders opted against explicitly including this concept in most Article I clauses. "[T]he Constitution does impose certain equality-based limitations on [some] Article I powers." *Ohio*, 98 F.4th at 312. The Constitution requires "uniform" laws related to particular subjects: "Duties, Imposts, and Excises," U.S. Const. Art. I, § 8, Cl. 1, "Bankruptcies," *id.* Art. I, § 8, Cl. 4, and "Naturalization," *ibid.* The Constitution also forbids Congress from giving any "Preference" in "any Regulation of Commerce or Revenue to the Ports of one State over those of another." *Id.* Art. I, § 9, Cl. 6.[5]

---

[5] Even when exercising these powers, Congress may make geographic distinctions when relevant to the problem the legislation seeks to solve, if it does not arbitrarily discriminate by geography or between States. *See, e.g.*, *Siegel v. Fitzgerald*, 596 U.S. 464, 478 (2022) (bankruptcy); *United States v. Ptasynski*, 462 U.S. 74, 84-85 (1983) (duties); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 435 (1855) (ports).

This language shows that "the Founders plainly knew how to include equality-based protections for states in Article I when they wished to." *Ohio*, 98 F.4th at 312. "The fact that some constitutional clauses explicitly contain an equality-based guarantee therefore supports a negative inference" that other clauses, including the Elections Clause, do not contain a "broad equal sovereignty principle." *Ibid.* The Supreme Court itself has recognized as much. In *Secretary of Agriculture v. Central Roig Refining Co.*, for instance, the Court compared the Commerce Clause with the Bankruptcy and Naturalization Clauses in noting that the former does not "impose requirements of geographic uniformity." 338 U.S. 604, 616 (1950).

Third, the federalism implications of Congress's actions are lessened in the Article I context. In *Shelby County*, "[t]he Court repeatedly emphasized" that the VRA's preclearance regime imposed an extreme veto power over state laws and "intruded into a realm (regulation of state and local elections) that has traditionally been the exclusive province of the states." *Mayhew*, 772 F.3d at 95; *accord Ohio*, 98 F.4th at 309; *Governor of N.J.*, 730 F.3d at 238. Typical exercises of Article I powers do not intrude on state power in this way. *See Ohio*, 98

F.4th at 310; *Governor of N.J.*, 730 F.3d at 238; *Mayhew*, 772 F.3d at 95. The NVRA certainly does not, as it places no limitations on the registration processes or reporting requirements States may impose, or fail to impose, on purely state or local elections. *See, e.g.*, *ITCA*, 570 U.S. at 12; *Young v. Fordice*, 520 U.S. 273, 290 (1997). Exercises of Congress's power to regulate elections for federal offices that the Constitution itself created simply do not fall under *Shelby County*'s purview. *See* Part II.C, *infra*.

PILF ignores these textual and doctrinal distinctions, as well as the many decisions by other circuits refusing to extend *Shelby County* beyond its moorings. Throughout its opening brief, PILF instead paints an expansive vision of the equal-sovereignty principle that bears little resemblance to *Shelby County*'s unique ruling. PILF asserts (Br. 12) that equal sovereignty "is a bedrock principle" that courts must presume applies to all exercises of congressional power. But the Supreme Court itself has never said as much. It has only applied this principle in two discrete contexts: the admission of new States to the Union and the VRA's preclearance regime. *See Shelby Cnty.*, 570 U.S. at 544-545. The Court has never extended equal-sovereignty analysis

beyond those contexts, much less suggested that it overrides prior case law setting out standards for reviewing Article I legislation. *See, e.g.*, *Diggins*, 36 F.4th at 315-316; *Roof*, 10 F.4th at 394-395. Courts must "respect what the [Supreme Court's] majority says rather than read between the lines." *Sherman v. Community Consol. Sch. Dist. 21*, 980 F.2d 437, 448 (7th Cir. 1992). The many distinctions between the unique circumstances of *Shelby County* and this Article I case counsel against the unprecedented, boundless extension of the equal-sovereignty principle that PILF advocates.

### C.    *Shelby County*'s equal-sovereignty principle does not reach Elections Clause legislation like the NVRA.

Although *Shelby County* does not extend to Article I legislation at all, this Court need not reach that broader question here. Because, of all powers to which the equal-sovereignty principle should *not* apply, it is Congress's Elections Clause authority. The Clause's text, the uniquely federal nature of its subject, its ratification history, and subsequent practice all indicate that Congress may distinguish between the States when regulating federal elections. The only limitation on that authority is the same limit applicable to all Elections Clause legislation:  traditional rational-basis review.

### 1.  Text

The Elections Clause's text contemplates that States may adopt divergent regulations of federal elections, and that Congress may override or draft anew any State's law on the subject.  Just as the States themselves may legislate differently, so too may Congress legislate differently among the States.

a.  The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. Art. I, § 4, Cl. 1.  The Clause initially "'imposes' on state legislatures the 'duty' to prescribe rules governing federal elections."  *Moore v. Harper*, 600 U.S. 1, 10 (2023) (quoting *ITCA*, 570 U.S. at 8).  That duty is placed separately and individually upon "each State," acting through "the Legislature thereof."  U.S. Const. Art. I, § 4, Cl. 1.  Because each State must regulate federal elections, but may do so as it wishes, the text contemplates geographic divergence in fulfilling its mandate.

The Elections Clause then authorizes Congress to "make or alter such Regulations."  U.S. Const. Art. I, § 4, Cl. 1.  Two aspects of this language affirm Congress's power to differentiate between States.  First, the verbs:  "make or alter."  *Ibid.*  As contemporaneous dictionary definitions suggest, these words indicate that Congress may force a State's regulation to, in some way, "become otherwise than it was," 1 Samuel Johnson, *Dictionary of the English Language* 135 (6th ed. 1785) (defining "alter"), or else may "create" a regulation for a State from scratch, *see* 2 *id.* at 81 (defining "make").

The Supreme Court adopted this "plain meaning" of the phrase "make or alter" in *Ex parte Siebold*, 100 U.S. at 383.  The "necessary implication" of those words, the Court explained, is that Congress may "interfere . . . either wholly or partially" with a State's regulations of federal elections.  *Ibid.*  The Court posited a hypothetical:  What if a state constitution gave the first sitting legislature the power to create election regulations while future legislatures could "make or alter" them?  *Id.* at 384.  The later legislature "could alter or modify, add or subtract, in its discretion."  *Ibid.*  Congress thus has a similar level of discretion in deciding how it may modify or replace States' laws.

Second, the Clause grants Congress power to make or alter "such Regulations." U.S. Const. Art. I, § 4, Cl. 1. "The word 'such' usually refers to something that has already been 'described' or that is 'implied or intelligible from the context or circumstances.'" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (citations omitted); *see United States v. Gooding*, 25 U.S. 460, 477 (1827) (stating that "the word 'such'" refers back to a thing "previously spoken of"); 2 Johnson 771 (defining "such" as "[o]f that kind; of the like kind"). The phrase "such Regulations," then, refers back to the regulations "prescribed in each State by the Legislature thereof." U.S. Const. Art. I, § 4, Cl. 1.

Putting the whole text together, the Elections Clause requires States to regulate federal elections, but "upon Congress it confers the power to alter those regulations or supplant them altogether." *ITCA*, 570 U.S. at 8. Congress may alter the individual time, place, and manner laws of "each State," or it may make new laws for a State that does not have them. U.S. Const. Art. I, § 4, Cl. 1. The constitutional text treats Congress's authority as precisely parallel to that of the States, and in fact contemplates that Congress will step into the shoes of the various state legislatures. For instance, "[i]f Congress determines

that the voting requirements established by a state do not sufficiently protect the right to vote, it may force the state to alter its regulations." *Miller II*, 129 F.3d at 837.  In short, the Elections Clause "gave Congress plenary authority over federal elections," "allowing it to define the boundaries of state transgressions and to remedy any wrongdoing." *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008).  Congress may redraft or adjust different States' laws differently, just as the Clause allows state legislatures themselves to do.

b.  Compare Congress's Elections Clause authority to how the Framers treated presidential elections under the Electors Clause.  That clause provides that "Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; *which Day shall be the same throughout the United States*."  U.S. Const. Art. II, § 1, Cl. 4 (emphasis added).  Thus, while Congress could allow States to select presidential electors on different dates, *see, e.g.*, Act of Mar. 1, 1792, ch. 8, § 1, 1 Stat. 239 (setting 34-day window for States to choose electors), the Electors Clause requires Congress to name the same date in every State for those electors to cast their votes.

Congress included this same-date requirement "for the sake of regularity and uniformity." 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 105 (Jonathan Elliot ed., 2d ed. 1836) (statement of Mr. Spaight). The Framers believed that "the election being on the same day in all the states, would prevent a combination between the electors." *Ibid.*; *see The Federalist No. 68*, at 413 (Alexander Hamilton) (Clinton Rossiter ed., 1961). But just as the Elections Clause lacks the uniformity requirements found in various other Article I provisions, *see* Part II.B, *supra*, so too does it lack any uniformity requirement like the one the Framers included in the parallel provision regulating presidential elections. "One cannot read the Elections Clause as treating implicitly what these other constitutional provisions regulate explicitly." *ITCA*, 570 U.S. at 16. Based on text alone, *Shelby County* does not extend to Elections Clause legislation.

### 2.    Source of authority

The equal-sovereignty principle also is a theoretical mismatch with the Elections Clause. Equal sovereignty has been justified as "an inherent structural principle of the federalist system set out in the

American Constitution," in which "the states retain genuine sovereignty" that cannot be unequally reduced. Thomas B. Colby, *In Defense of the Equal Sovereignty Principle*, 65 Duke L.J. 1087, 1138 (2016); *see* Anthony J. Bellia Jr. & Bradford R. Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. 835, 937-938 (2020); *Shelby Cnty.*, 570 U.S. at 544. But unlike other congressional powers, the power to regulate elections of federal offices never could intrude on States' established sovereignty, because the power to regulate federal elections was wholly new. There was "no original prerogative of state power to appoint a representative, a senator, or president for the union," as these positions did not previously exist. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 803-804 (1995) (citation omitted). This is quite distinct from the state and local elections that the provision at issue in *Shelby County* reached, which predated the Constitution and power over which "the Framers of the Constitution intended the States to keep for themselves." *Shelby Cnty.*, 570 U.S. at 543 (citation omitted).

Therefore, PILF is wrong to suggest (Br. 12, 33, 35) that the States had preexisting "sovereignty" in this area, only some of which

was "surrendered" to Congress. Quite the contrary—"any state authority to regulate election to [federal] offices could not precede their very creation by the Constitution." *Cook v. Gralike*, 531 U.S. 510, 522 (2001). Thus, it was "the Framers' understanding that powers over the election of federal officers had to be *delegated to*, rather than reserved by, the States." *U.S. Term Limits*, 514 U.S. at 804 (emphasis added); *see Cook*, 531 U.S. at 522. And because the Framers feared that the States might abuse this delegated authority, *see* Part II.C.3, *infra*, they granted Congress a coterminous power to override any or all state regulation of federal elections. This means that Elections Clause legislation simply does not pose the same "federalism concerns" as other exercises of federal authority. *ITCA*, 570 U.S. at 14-15.

Assertions of equal sovereignty lack purchase in this context. The equal-sovereignty principle rests upon the notion that the States are "each competent to exert that residuum of sovereignty *not delegated to the United States by the Constitution itself*." *Coyle*, 221 U.S. at 567 (emphasis added); *see* Bellia & Clark, 120 Colum. L. Rev. at 937-938. But "any state power" over the time, place, and manner of federal elections "must derive not from the reserved powers of state

sovereignty, but rather from the delegated powers of national sovereignty." *U.S. Term Limits*, 514 U.S. at 805; *see Cook*, 531 U.S. at 522-523. And as the *Shelby County* Court itself recognized, the Elections Clause *does* delegate to the federal government "significant control over federal elections." 570 U.S. at 543. The NVRA is a valid exercise of Congress's plenary authority under the Elections Clause—a power that never has been reserved to the States. Hence, "*Shelby County* does not cast doubt on the NVRA's constitutionality." *Kobach v. EAC*, 772 F.3d 1183, 1198 (10th Cir. 2014).

### 3. Ratification history

The Elections Clause's ratification history confirms that the equal-sovereignty principle has no place in this field.

a. The delegates at the Constitutional Convention defeated a motion to remove the portion of the Elections Clause that authorizes Congress to alter state regulations of federal elections. 2 *The Records of the Federal Convention of 1787*, at 240-241 (Max Farrand ed., 1911). Those who spoke against the motion cited the need for congressional authority to override abuses by recalcitrant States. James Madison, for instance, posited that "[w]henever the State Legislatures had a favorite

measure to carry, they would take care so to mould their regulations as to favor the candidates they wished to succeed." *Ibid.* And Gouvernor Morris fretted that, absent congressional control, "States might make false returns and then make no provisions for new elections." *Id.* at 241.

The Convention not only rejected the motion to eliminate congressional Elections Clause authority; it then voted to *expand* that authority by granting Congress power to "make" as well as alter States' laws for federal elections. 2 Farrand 242. This change "was meant to give the Natl. Legislature a power not only to alter the provisions of the States, but to make regulations in case the States should fail or refuse altogether." *Ibid.* Congress, then, would have power to craft laws for, or alter the regulations of, wayward States without having to override all other States' election laws.

In the ratifying conventions, Federalists defended Congress's Elections Clause power on two principal bases: first, again, as a means of preventing States from refusing to send representatives to Congress; and second, as a way of preventing any State from manipulating election laws in ways that deny voters equal rights. *See, e.g.*, 2 Elliot

24-27, 35, 49-51, 326, 440-441, 510; 3 *id.* at 10-11, 366-367; 4 *id.* at 53-54, 59-60, 65-67, 303; Pauline Maier, *Ratification* 174, 178, 210, 281, 413, 448 (2010).  Both arguments contemplated that Congress would exercise its Elections Clause authority to override or direct actions by *some* States, rather than solely to pass uniform standards for *all* States.

When making the first, governmental self-preservation argument, Federalists insisted that Congress must have power to legislate for individual States.  If it did not, they asserted, any State could undermine the national government "by neglecting to provide for the choice of persons to administer its affairs."  *The Federalist No. 59*, at 363 (Alexander Hamilton).  Many convention delegates pointed to Rhode Island, which had refused to send delegates to the Confederation Congress, *see, e.g.*, 2 Elliot 23, 29; 4 *id.* at 59-60, 65-66, and argued that Congress must "possess constitutional power to give the people an opportunity of electing representatives, if the states neglect or refuse to do it," 4 *id.* at 66 (statement of Mr. Davie); *see* 2 *id.* at 24.

Other delegates mentioned the need for Congress to provide for elections in an individual State if it were invaded and thus prevented from choosing members of Congress, as had occurred during the

Revolutionary War. *See, e.g.*, 2 Elliot 32, 35; 4 *id.* at 53-54, 57; *see also* 3 *id.* at 403 (describing Federalists' arguments); 4 *id.* at 56 (same).

Anti-Federalists, for their part, consistently raised the prospect that Congress would use its authority to force all voters in a particular State to vote in an inconvenient place, to prevent disfavored voters in that State from participating. *E.g.*, 2 Elliot 22, 32, 136; 3 *id.* at 60, 403-404; 4 *id.* at 211; *see Rucho v. Common Cause*, 588 U.S. 684, 698 (2019). Federalists did not deny that Congress would have the power to specify particular—and thus different—places of election in different States. Rather, they asserted that members of Congress would not abuse their power in this manner, and that voters would not tolerate them doing so. *E.g.*, 2 Elliot 29, 32-34, 441; 3 *id.* at 9-10, 408; 4 *id.* at 66-67, 69, 71.

On the second, anti-manipulation argument, delegates singled out particular States' "flawed systems of representation," arguing that congressional authority was needed to override any State's attempts to adopt similarly flawed systems for electing national representatives. Maier 178; *see* 2 Elliot 49-51; 3 *id.* at 367. The Elections Clause was designed to "provide[] a remedy, a controlling power in a legislature . . . who will hear impartially, and preserve and restore to the people their

equal and sacred rights of election." 2 *id.* at 27 (statement of Mr. Parsons). Charles Cotesworth Pinkney argued in the South Carolina convention that "if any state should attempt to fix a very inconvenient time for the election," or only name one place in the State at which all must vote, the Elections Clause enabled the people to "petition the general government to redress this inconvenience, and to fix times and places of election of representatives *in the state* in a more convenient manner." 4 Elliot 303 (emphasis added); *see also* 2 *id.* at 441. Congress need not, then, regulate all States at once in the same manner.

b. PILF insists (Br. 24, 33) that the Elections Clause incorporated equal sovereignty because the Framers passed the Clause to maintain "uniformity" and to secure equal voting rights. PILF's preferred result does not flow from its premise. As already seen, concerns about equality focused on the possibility that individual States would manipulate voting rights and the need to grant Congress power to provide state-specific remedies. As for uniformity: Some members of state ratifying conventions did express a preference for nationally uniform election laws, and touted Congress's power to ensure such uniformity. *See* 2 Elliot 535; 3 *id.* at 10-11, 367; 4 *id.* at 60. But no

delegate suggested that the Elections Clause granted Congress power to impose *only* the same standards on all States.

Federal elections were far from the only context in which the Convention faced concerns about state parochialism. Yet significantly, it responded by imposing explicit uniformity requirements for some of Congress's enumerated powers. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 395 (2012) (naturalization); *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 366-369 (2006) (bankruptcy); *United States v. Ptasynski*, 462 U.S. 74, 80-81 & n.10 (1983) (duties and port preferences); *see also* U.S. Const. Art. II, § 1, Cl. 4 (requiring uniform date for presidential electors to cast votes). By contrast, the Convention never even considered including such language in the Elections Clause.

The Founding generation understood the Elections Clause's text to ensure that, whatever regulations a given State might (or might not) adopt, "Congress may supplement these state regulations or may substitute its own." *Smiley*, 285 U.S. at 366-367. Because threats or abuses might come only from certain States, Congress had to have power to "make or alter" the regulations of fewer than all the States. U.S. Const. Art. I, § 4, Cl. 1. In fact, Framer James Wilson envisioned

this as the Clause's primary purpose, telling the Pennsylvania ratifying convention that "when the power of regulating the time, place, or manner of holding elections, is exercised by the Congress, it will be to correct the improper regulations of a particular state."  2 Elliot 510.

### 4.    **Historical practice**

If any doubt remained, historical practice confirms that the Elections Clause does not require geographic uniformity.  "'Long settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'"  *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) (citation omitted).  Such "historical practice" is "particularly pertinent when it comes to the Elections and Electors Clauses."  *Moore*, 600 U.S. at 32.  And here, that practice tells a consistent story:  Congress may treat States differently under the Elections Clause.

The evidence starts with the debates of the First Congress, whose practices provide "strong evidence of the original meaning of the Constitution."  *Financial Oversight & Mgmt. Bd. v. Aurelius Inv., LLC*, 590 U.S. 448, 462 (2020).  Taking a cue from the ratification debates, one representative proposed an amendment restricting Congress's

Elections Clause powers to circumstances in which "any State shall refuse or neglect, or be unable, by invasion or rebellion, to make such election." 1 Annals of Cong. 768 (1789) (Joseph Gales ed., 1834). Crucially, this proposal recognized that Congress already had authority to differentiate between States by making or altering one State's laws, and it sought to *limit* Congress to a small portion of that authority.

Elbridge Gerry, in supporting the amendment, also resurrected the fear that Congress otherwise might "order[]" elections "at remote places where their friends alone will attend"—which would require different "place" regulations for each State. 1 Annals of Cong. 769. But Federalists supported Congress's original, broader Elections Clause powers for the same reasons as in the Constitutional Convention and state ratifying conventions, and Congress rejected the amendment. *See id.* at 768-773.

Likewise, in 1823, the House rejected a constitutional amendment that would have required all House members to be elected in single-member districts. *See* 41 Annals of Cong. 850-851, 865-866 (1823). The committee proposing the amendment warned that Congress otherwise could pass legislation providing for at-large elections in States

"favorable" to the political faction running Congress while splitting politically unfriendly States into gerrymandered House districts. *Id.* at 853. But the House sent the proposed amendment to die in committee, *id.* at 866, leaving intact Congress's recognized power to impose non-uniform election regulations.

Indeed, some of Congress's earliest Elections Clause legislation differentiated between States. The Apportionment Act of 1842 mandated that "in every case where a State is entitled to more than one Representative," those representatives would be required to be elected from contiguous, single-member districts, eliminating those States' option to elect members at-large as in single-member States. Apportionment Act of 1842, ch. 47, § 2, 5 Stat. 491. Later apportionment statutes differentiated further, temporarily exempting certain States—sometimes by name—from the single-member districting requirement.[6]

---

[6] *See, e.g.*, Act of July 14, 1862, ch.170, 12 Stat. 572 (exempting California for 38th Congress, and allowing Illinois' new additional House member to be elected at-large unless Illinois provided otherwise); *see also, e.g.*, Act of Feb. 2, 1872, ch. 11, § 2, 17 Stat. 28; Act of Feb. 25, 1882, ch. 20, § 3, 22 Stat. 6; Act of Feb. 7, 1891, ch. 116, § 4, 26 Stat.

In 1941, Congress made these distinctions a recurring phenomenon.  It set different federal rules for redistricting based on whether the State had gained or lost representatives (or neither), which would govern "[u]ntil a State is redistricted in the manner provided by the law thereof after any apportionment."  Act of Nov. 15, 1941, ch. 470, § 1, 55 Stat. 762 (2 U.S.C. 2a(c)).  The Supreme Court's one-person, one-vote cases rendered most of Section 2a(c)'s provisions independently unconstitutional, as they contemplated using the prior decade's malapportioned maps.  *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 811-812 (2015).  But the Court never questioned Congress's authority to make these State-by-State distinctions under the Elections Clause, and it left intact a provision requiring States that lose representatives after a reapportionment to elect all their representatives at-large until the State redistricts.  *See Branch v. Smith*, 538 U.S. 254, 273 (2003) (plurality opinion).

Another set of Elections Clause statutes distinguished between States by incorporating each State's own election laws into federal law.

---

736; Act of Jan. 16, 1901, ch. 93, § 4, 31 Stat. 734; Act of Aug. 8, 1911, ch. 5, § 4, 37 Stat. 14.

*See, e.g.*, Enforcement Act of 1870, ch. 144, § 22, 16 Stat. 145-146
(making it a federal crime for an election officer to "neglect or refuse to
perform any duty in regard to such election required of him by any law
of the United States, *or of any State or Territory thereof*; or violate any
duty so imposed" (emphasis added)).  The Supreme Court blessed
Congress's right to protect federal elections by applying federal
sanctions in this manner, even though it meant that some conduct could
be a crime under federal election law in one State but perfectly legal in
another.  *See Ex parte Coy*, 127 U.S. 731, 752 (1888); *Ex parte Clarke*,
100 U.S. 399, 404 (1879); *Ex parte Siebold*, 100 U.S. at 391.

Most similarly to the NVRA, Congress has often given States the
choice between following a federal standard or a state-law alternative
spelled out in the statute.  In 1899, for instance, Congress provided that
"[a]ll votes for Representatives in Congress must be by written or
printed ballot, or voting machine the use of which has been duly
authorized by the State law."  Act of Feb. 14, 1899, ch. 54, 30 Stat. 836
(2 U.S.C. 9).  Then, as part of the 1911 apportionment statute, Congress
provided that "[c]andidates for Representative or Representatives to be
elected at large in any State shall be nominated in the same manner as

candidates for governor, unless otherwise provided by the laws of such State." Act of Aug. 8, 1911, ch. 5, § 5, 37 Stat. 14 (2 U.S.C. 5). In both instances, Congress set a federal default rule with the option for States to pick an alternative—thereby dividing the States into two regulatory regimes based on their own choices. More recent statutes have followed this well-worn path. *See, e.g.*, 52 U.S.C. 20103, 20303(g).

* * *

The NVRA, then, follows a two-century-long consensus: When wielding its Elections Clause authority, Congress may regulate some States differently from others as it chooses. *Shelby County* has no relevance to Elections Clause legislation.

Contrary to PILF's exhortations (Br. 11-12, 23-24, 33-34), this fact does not grant Congress "unchecked power" to "reward allies and scald foes" or to distinguish between States "*without justification*." Like other Article I legislation, Elections Clause legislation still "is subject to traditional rational basis review" regardless of whether equal-sovereignty principles apply. *Ohio*, 98 F.4th at 308. And "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 634

(1996) (alteration in original; citation omitted). But because PILF acknowledges that the NVRA is valid Elections Clause legislation (Br. 11, 25, 52) and does not assert that Section 4(b)(2) would fail traditional rational-basis scrutiny under the Elections Clause, the district court rightly dismissed its Complaint.

## III.  Section 4(b)(2) of the NVRA raises no equal-sovereignty concerns.

Even if *Shelby County*'s equal-sovereignty principle applied to Elections Clause legislation, Section 4(b)(2) would easily pass *Shelby County*'s legal test. The NVRA properly gave States a choice of regulatory regime:  Polling-Place Registration or a new federal regime. The statute's nonapplicability to States that adopted Polling-Place Registration is reasonably related to Congress's desire to increase voter registration and ensure that registration lists are properly maintained, without (1) coercing States into adopting a registration method that was still controversial or (2) imposing unnecessary requirements on States with adequate opportunities for registration. It is these goals, not PILF's chosen frame of transparency, that matters for equal-sovereignty purposes. And Section 4(b)(2)'s geographic distinctions remain tethered to those goals today.

## A.    The NVRA affords equal treatment to all States.

Unlike the VRA's preclearance provisions, the NVRA does not "target[] only some parts of the country." *Shelby Cnty.*, 570 U.S. at 537. Rather, the NVRA allowed States that register voters to either follow prescribed procedures for registration to vote in federal elections or authorize Polling-Place Registration during a limited window. *See* 52 U.S.C. 20503(b); pp. 3-7, *supra*. States were able to follow the debate in Congress and adopt Polling-Place Registration before the NVRA's deadline. Wyoming, for instance, adopted Polling-Place Registration mere days before the original NVRA deadline, and expressly tied its adoption of Polling-Place Registration to enactment of the NVRA. *See* Act of Mar. 5, 1993, ch. 172, 1993 Wyo. Sess. Laws 396-397. Thus, each State retained equal sovereignty, subject to a uniform preemptive framework. *See, e.g.*, *Mayhew*, 772 F.3d at 94 (holding that statute does not "result[] in 'disparate treatment' of states" under *Shelby County* because it "applies the same" choice "to each state").

The contrast between the NVRA and *Shelby County* is stark. The VRA's preclearance formula had been "reverse-engineered" to cover identified jurisdictions based on historical criteria. *Shelby Cnty.*, 570

U.S. at 551. This resulted in intentional distinctions between the States and the potential to "bring within its sweep governmental units not guilty of any unlawful discriminatory voting practices." *Briscoe v. Bell*, 432 U.S. 404, 411 (1977). The NVRA did not pick and choose in the same manner; each State ultimately chose its regulatory regime. As the district court recognized: "There was no singling out. The [S]tates had notice of exactly what they needed to do to avoid federal regulation." A19.

## B.  Section 4(b)(2) sufficiently relates to the problems the NVRA targets.

Section 4(b)(2) meets the targeting requirements for legislation subject to *Shelby County*. Where it applies, *Shelby County* demands only that a statute's "disparate geographic coverage is sufficiently related to the problem that it targets." 570 U.S. at 542 (citation omitted). This test merely requires a rational connection between triggering conditions and targeted ills. *See id.* at 544; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966) (upholding the original coverage formula as "rational in both practice and theory"). And here, Congress engaged in reasoned lawmaking by limiting the

NVRA's applicability in States that adopted Polling-Place Registration prior to implementation.

### 1. Section 4(b)(2) reasonably furthers the NVRA's goals of enhancing voter registration and list maintenance.

Congress rationally chose to apply the NVRA only to those States that had not already "enhance[d] the participation of eligible citizens as voters in elections for Federal office," 52 U.S.C. 20501(b)(2), through Polling-Place Registration, *see* 52 U.S.C. 20503(b)(2). Congress's concerns about increasing voter registration and participation suffuse the NVRA. *See Edgar II*, 56 F.3d at 792. Congress made those concerns the focus of its official findings, 52 U.S.C. 20501(a), and of the first two purposes codified in the statute, 52 U.S.C. 20501(b)(1)-(2). They also dominate the statutory recitation of the Act's general provisions. 52 U.S.C. 20503(a). And they drive the vast majority of the NVRA's specific requirements. *See* 52 U.S.C. 20504-20506, 20507(a)(1)-(3), (a)(6), (b), and (c)(2)(A), 20508, 20511(1).

Congress determined, however, that federal intervention to ease voter-registration procedures was unwarranted where States already authorized Polling-Place Registration statewide. *See* House Report 6;

Senate Report 22-23.  That form of registration necessarily liberalizes the registration process—indeed, some Senators expressed concerns about its effect on election security.  *See* Senate Report 52 (Minority Views of Sen. Stevens et al.).  Congress recognized that Polling-Place Registration "lessened the impediments to registration" to a degree "beyond the requirements of the" NVRA.  House Report 6; Senate Report 23.  Section 4(b)(2) is thus tightly related to the problem the NVRA targets.

Congress also determined that, where federal legislation dictates procedures for voter registration, federal law also should establish rules governing maintenance of voter-registration lists.  *See* 52 U.S.C. 20507; House Report 5; Senate Report 18; *see also* 52 U.S.C. 20501(b) (including list-maintenance-focused statutory purposes alongside registration-focused purposes).  But where Congress determined that federal regulation of the voter-registration process was unnecessary, it rationally determined that federal regulation of the registration-list-maintenance process was unnecessary as well.  *See* 52 U.S.C. 20503(b).  Reasonable minds may debate the wisdom of this decision, since proper registration-list-maintenance ensures that States "remov[e] ineligible

persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). Yet that does not make Congress's decision irrational. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Congress was not obligated to "limit" Section 4(b)(2)'s nonapplicability rule "to 'motor voter' requirements." Br. 29. "Judicial deference to" Congress's choice of means is, after all, "but a corollary to the grant to Congress of any Article I power." *Eldred v. Ashcroft*, 537 U.S. 186, 218 (2003) (citation omitted).

### 2. The NVRA is not a transparency statute, and Section 4(b)(2) is not a "Transparency Exemption."

Unable to attack Section 4(b)(2) as it exists, PILF conjures up an alternative NVRA that functions chiefly as a transparency statute. *See* Br. 13, 27-28, 41-46. But the NVRA's statutory findings and purposes say nothing about transparency. *See* 52 U.S.C. 20501. As PILF concedes, transparency is only a "means to achieve" the Act's real statutory purposes. Br. 44. The concept of public disclosure does not even make any appearance until the ninth subsection of the eighth section of the Act. *See* 52 U.S.C. 20507(i). The Section 8(i) tail cannot

wag the NVRA dog. *See Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001).

PILF's creative branding aside, then, Section 4(b)(2) is not a "Transparency Exemption." *Contra, e.g.*, Br. 5, 13, 41. Rather, for States that chose to adopt and maintain Polling-Place Registration, Section 4(b)(2) renders inapplicable a complete regulatory regime that is focused on voter-registration and registration-list-maintenance procedures. *See* 52 U.S.C. 20503(b)(2). The NVRA's disclosure provision, 52 U.S.C. 20507(i), exists to allow for evaluation of compliance with that regulatory regime, working hand-in-hand with the express cause of action Congress granted to private parties to challenge NVRA violations, 52 U.S.C. 20510(b). *See Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024). In States whose registration procedures Congress rationally determined already fulfilled the statute's purposes, such that NVRA compliance was not required, the disclosure provision lacks its animating purpose. *Cf. id.* at 54 (holding state-law disclosure restrictions preempted by Section 8(i) because they interfered with efforts to "evaluate and enforce compliance with the NVRA" or to "exercis[e] the[] private right of action under the NVRA").

Instead, the thrust of PILF's claim is a policy argument for increased disclosure to aid in monitoring state voter-list maintenance. *See* Br. 41-46. PILF's calls for greater transparency are reasonable. *See* Senate Report 52 (Minority Views of Sen. Stevens et al.) (noting Department of Justice's view in 1991 letter that Polling-Place Registration could "preclude meaningful verification of voter eligibility" before voting (citation omitted)). And PILF's views may one day convince Congress. But they do not control the constitutional question before this Court. Courts cannot hive off the NVRA's disclosure provision and scrutinize whether Section 4(b)(2)'s application to disclosure alone is reasonably justified, without considering Section 4(b)(2)'s overall function and Congress's rationale for it. Placed in its proper context, Congress's decision about where the NVRA's regulations would not apply is tethered to the problems that the NVRA targets. *See Shelby Cnty.*, 570 U.S. at 550-551.

Nor do these policy arguments consider the various avenues for transparency beyond the NVRA itself. For instance, the Civil Rights Act of 1960 independently requires election officials in all States to "retain and preserve" "all records and papers" related to "act[s] requisite

to voting in [an] election" "for a period of twenty-two months from the date of any" federal election—only two months less than under the NVRA.  52 U.S.C. 20701.  The Attorney General then may demand such records from state election officials.  52 U.S.C. 20703.  And Wisconsin itself makes voting lists and other records "open to public inspection," just like the NVRA.  Wis. Stat. § 6.36(1)(b)(1) (2023-2024); *see id.* § 19.35(1).  The only delta between what PILF wants and what Wisconsin offered was (1) the difference between what Wisconsin law charges for the records and what a court would consider a "reasonable cost" under the NVRA, 52 U.S.C. 20507(i), and (2) voters' birth years.  Those differences are not inconsiderable, but much transparency remains over registration and list-maintenance records.

*Shelby County* addressed only whether "disparate geographic coverage is sufficiently related to the problem that it targets."  570 U.S. at 542 (citation omitted).  Congress identified the need to increase voting access and voter participation; Section 4(b)(2) is appropriately targeted to solving those problems.  *Shelby County* does not require Congress to address an additional "need for transparency" that Congress did not view as an independent legislative problem.  Br. 42.

### C.   Current conditions support Section 4(b)(2)'s continued application to the exempted States.

Section 4(b)(2) of the NVRA also continues to reflect current conditions in the States.

In *Shelby County*, the Supreme Court said that the VRA imposed "current burdens" that had to be "justified by 'current needs.'"  570 U.S. at 550 (citation omitted).  The Court required ongoing scrutiny of the VRA's preclearance formula because preclearance "authorizes federal intrusion into sensitive areas of state and local policymaking, and represents an extraordinary departure from the traditional course of relations between the States and the Federal Government."  *Id.* at 545 (internal citations and quotation marks omitted).

Section 4(b)(2), though, is not an example of federal intrusion; it reflects federal restraint.  The NVRA establishes nationwide procedures for federal elections, from which Section 4(b)(2) exempts five States.  *Contra* U.S. Dep't of Just., *Jurisdictions Previously Covered by Section 5* (May 17, 2023), https://perma.cc/W5M7-6MVU  (noting that Section 5 imposed federal regulation on only nine States and scattered sub-jurisdictions).  Yet PILF argues that "current needs" compel federal courts—not Congress—to subject more States (not fewer) to federal

regulation.  Nothing in *Shelby County* suggests that Congress must meet a current-conditions requirement to justify an *exemption* from federal regulation.

Even if its current-conditions requirement did apply under these circumstances, *Shelby County* merely required a "logical relation" between the basis for coverage and the present day.  570 U.S. at 554; *see also id.* at 556 (striking down preclearance formula as "irrational"). "[T]hose attacking the rationality of [a] legislative classification have the burden to negative every conceivable basis which might support it." *Beach Commc'ns, Inc.*, 508 U.S. at 315 (internal citation and quotation marks omitted).  Congress rationally limited Section 4(b)(2) to States that adopted Polling-Place Registration by a statutory deadline.  And Section 4(b)(2) remains sufficiently dynamic to maintain a rational fit between "current conditions" and the NVRA's application.

First, Section 4(b)(2) continues to serve the purpose that drove the Senate to insist upon a statutory deadline for States to adopt Polling-Place Registration or become subject to NVRA regulation.  The original House version of the NVRA set no deadline for States to render the NVRA nonapplicable by adopting Polling-Place Registration.  H.R. Rep.

No. 66, 103d Cong., 1st Sess. 16 (1993) (Conference Report).  But Senate

Republicans grew concerned that States would eventually feel coerced

into choosing between federal regulation and a controversial new

registration method.  *See, e.g.*, 139 Cong. Rec. 9632 (1993) (statement of

Sen. McConnell).  The Senate version, therefore, placed a temporal limit

on access to Section 4(b)(2)'s exemption, and the conferees adopted that

modification.  Conference Report 16.

The August 1, 1994, cutoff continues to ensure that States that did

not already permit Polling-Place Registration prior to the NVRA's

enactment do not feel compelled to adopt Polling-Place Registration as a

means of avoiding costs associated with NVRA compliance—even if they

choose to adopt the practice for other reasons.  *Contra* Br. 46.[7]  Trying

"to accommodate principles of federalism . . . unquestionably is a

---

[7]  PILF continues to assert, as it did before the district court, that
"nineteen other states and the District of Columbia" have adopted
Election Day registration.  Br. 46.  However, as the United States
already explained before the district court, Section 4(b)(2) only applies
to Election Day registration *at the polling place*, *see* 52 U.S.C.
20503(b)(2)—and only 13 states and the District of Columbia currently
allow *Polling-Place* Registration.  *See* Doc. 26, at 25 n.14.

legitimate governmental interest," *United States v. Lawson*, 677 F.3d 629, 638 (4th Cir. 2012), and it remains so here.

Second, Section 4(b)(2) and its 1994 deadline prohibit States that have implemented the NVRA from later terminating the forms of registration that the NVRA requires them to maintain.  The NVRA's mandates called for greater opportunities to register in advance of elections, *see* 52 U.S.C. 20503(a), but they were not easy to implement, *see generally* FEC, *Implementing the National Voter Registration Act of 1993:  Requirements, Issues, Approaches, and Examples* (Jan. 1, 1994), https://perma.cc/SGA9-AP8V (describing complexity of implementation). Congress also reasonably concluded that a State's decision to authorize Polling-Place Registration after the NVRA went into effect would not justify eliminating the NVRA's additional forms of registration and related list-maintenance procedures once they already were in place. *See* 141 Cong. Rec. 27,071-27,072 (1995) (statement of Sen. Ford). States that never were subject to the NVRA because of prior implementation of Polling-Place Registration are thus differently situated from States that adopted Polling-Place Registration after having implemented the NVRA's requirements.  Distinguishing

between the two sets of States is not "irrational." *Shelby Cnty.*, 570 U.S. at 556.

Third, Section 4(b)(2) rationally protects the reliance interests of States that authorized Polling-Place Registration before the NVRA went into effect. Congress recognized that Polling-Place Registration advanced one goal of the NVRA—increasing voter registration—to a greater extent than did the Act's requirements. *See* Senate Report 22-23. Excluding those States from NVRA requirements preserved their interest in maintaining the system they already had authorized. Congress then increased those reliance interests when it chose to exempt States subject to Section 4(b)(2) from certain mandates of the Help America Vote Act of 2002, particularly those built upon the NVRA's existing requirements. *See* 52 U.S.C. 21082(a), 21083(a)(2)(A)(iii) and (b)(5). "The protection of reasonable reliance interests is not only a legitimate governmental objective: it provides an exceedingly persuasive justification." *Nordlinger v. Hahn*, 505 U.S. 1, 13 (1992) (citation omitted).

Finally, Congress designed in the NVRA an exemption system sufficiently dynamic to pass muster if *Shelby County* applied. To be

clear, providing a post-enactment exemption mechanism is not necessary to survive an equal-sovereignty challenge.  Courts consistently have rejected equal-sovereignty attacks on statutes that lack post-enactment opt-ins or opt-outs.  *See, e.g.*, *NCAA*, 730 F.3d at 215-216, 237-239; *Mayhew*, 772 F.3d at 83, 93-97; *see also Ohio*, 98 F.4th at 308-314 (upholding targeted statutory waiver provision without opt-in).  But, contrary to PILF's assertion otherwise (*see* Br. 40-41), the NVRA *does* have a provision to trigger new coverage.  Because Section 4(b)(2) exempts only States that allow Polling-Place Registration "*continuously* on and after August 1, 1994," 52 U.S.C. 20503(b)(2) (emphasis added), any State that eliminates Polling-Place Registration becomes subject to the NVRA.  Section 4(b)(2)'s coverage is not set in stone.

Ultimately, Congress has established a "logical relation" between NVRA coverage and the present day, a basis that "makes sense" and "speaks to current conditions."  *Shelby Cnty.*, 570 U.S. at 553-554, 557.  *Shelby County* requires nothing more.[8]

---

[8]  PILF now argues (Br. 46-47) that its claim requires factual development following the motion-to-dismiss stage.  But PILF raised

**IV.  Though the Court need not consider it here, Congress's authority to enforce the Reconstruction Amendments provides independent authority for enacting Section 4(b)(2).**

The Elections Clause empowered Congress to enact the NVRA generally and Section 4(b)(2) specifically.  *See* Part II.A, *supra*.  PILF also challenges Section 4(b)(2) as an invalid exercise of Congress's constitutional authority to enforce the Fourteenth Amendment.  *See* Br. 52-55.  But Congress requires only one source of constitutional authority to enact legislation.  *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 561, 574-575 (2012) (opinion of Roberts, C.J.); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964).  And the congruence-and-proportionality standard "does not hold sway for judicial review of legislation enacted . . . pursuant to Article I authorization."  *Eldred*, 537 U.S. at 218.  So this Court need not address whether the Fourteenth Amendment provides further authority for Congress to enact the

---

this argument in only conclusory fashion below (Doc. 16, at 20), and the district court did not address it (*see* A10-A21).  So the argument is waived on appeal.  *See Ross v. Financial Asset Mgmt. Sys., Inc.*, 74 F.4th 429, 434 (7th Cir. 2023).  Regardless, the United States here demonstrates that Section 4(b)(2) is constitutional on legal grounds, and "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

NVRA.  *See Edgar II*, 56 F.3d at 793-796 (upholding NVRA without addressing Reconstruction Amendments); *Miller II*, 129 F.3d at 836; *Voting Rts. Coal.*, 60 F.3d at 1412-1416.

Nevertheless, the NVRA also is a proper exercise of Congress's authority to enforce the Fourteenth Amendment's general prohibition on discrimination, as well as the Fifteenth Amendment's prohibition on discriminatory denial or abridgment of the franchise.[9]  *See Association of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 880 F. Supp. 1215, 1221-1222 (N.D. Ill. 1995) (*Edgar I*), *aff'd as modified*, 56 F.3d 791; *Association of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 984 (W.D. Mich. 1995), *aff'd*, 129 F.3d 833; *Condon v. Reno*, 913 F. Supp. 946, 967 (D.S.C. 1995); Senate Report 3-4; House Report 2-3. Section 4(b)(2), in particular, passes muster both under the test articulated in *City of Boerne v. Flores*, 521 U.S. 507 (1997), for Fourteenth Amendment legislation, and the more lenient rationality test applicable to Fifteenth Amendment legislation, *see Katzenbach*, 383

---

[9]  Although PILF acknowledges that the NVRA was also enacted under the Fifteenth Amendment (Br. 53), it does not contend that the statute is invalid Fifteenth Amendment legislation (Br. 52-55).

U.S. at 330; *see also Allen v. Milligan*, 599 U.S. 1, 41 (2023) (upholding Section 2 of the VRA as "appropriate" Fifteenth Amendment legislation relying on cases applying rationality standard).

The NVRA fits comfortably within Congress's power to "outlaw voting practices that are discriminatory in effect." *Milligan*, 599 U.S. at 41 (citation omitted). The Act's text explains that "discriminatory and unfair registration laws and procedures" had "disproportionately harm[ed] voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3). And the Act's legislative history includes ample evidence to support that finding.

As the House Report on the NVRA emphasized, "[r]estrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth centuries to keep certain groups of [minority] citizens from voting." House Report 2. Although "the Voting Rights Act of 1965 eliminated the more obvious impediments to registration," it left "a complicated maze of local laws and procedures, in some cases as restrictive as the outlawed practices." *Id.* at 3. The Fourteenth and Fifteenth Amendments empower Congress to adopt uniform federal voter-registration procedures to

address those racial disparities. *See, e.g.*, *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970) (opinion of Black, J.) (upholding ban on literacy tests); *Vote.Org v. Callanen*, 89 F.4th 459, 486-487 (5th Cir. 2023).

The history of abusive registration practices highlighted in the House Report confirms that the NVRA is congruent and proportional to the objective of "promot[ing] the exercise" of the "fundamental right" "to vote." 52 U.S.C. 20501(a)(1)-(2). If the NVRA's burdens would be congruent and proportional if applied to every State, as PILF appears to concede (Br. 54-55), then it is hard to see how the imposition of a *lower* burden on some States possibly could remove the "congruence and proportionality" otherwise observed "between the injury to be prevented or remedied and the means adopted," *City of Boerne*, 521 U.S. at 520.

Even if it were possible to violate *City of Boerne* via an *exemption* from regulation, Section 4(b)(2) falls within Congress's "wide latitude" to determine how to balance the NVRA's goals of encouraging voter registration and ensuring election integrity with due regard for States' sovereignty. *City of Boerne*, 521 U.S. at 520. Section 4(b)(2) exempts States that adopted Polling-Place Registration prior to a statutory deadline. Such a scheme *enhances* the NVRA's congruence and

proportionality, by refraining from regulating States that had adopted an acceptable alternative means of meeting the NVRA's goals. *See Edgar I*, 880 F. Supp. at 1222 (describing Section 4(b) as a "rational classification" under the Fourteenth and Fifteenth Amendments).[10]

---

[10] PILF's arguments (Br. 46-52) about the appropriate remedy are premature. This case arises from a grant of a motion to dismiss (A3); as PILF itself acknowledges (Br. 46-47, 55), then, reversal would mean only reinstating PILF's complaint, not granting judgment to PILF. Remedial questions would be best left to determine at the summary judgment or trial stage, after briefing from the parties to the district court, if PILF ultimately prevailed on the merits.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment.

Respectfully submitted,

TIMOTHY M. O'SHEA
  United States Attorney

HARMEET K. DHILLON
  Assistant Attorney General
MICHAEL E. GATES
  Deputy Assistant Attorney General

s/ Noah B. Bokat-Lindell

LESLIE K. HERJE
BARBARA L. OSWALD
  Assistant U.S. Attorneys
  United States Attorney's Office
  Western District of Wisconsin
  222 W. Washington Ave.
  Suite 700
  Madison, WI 53703
  (608) 264-5158

ANDREW G. BRANIFF
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Seventh Circuit Rule 32(c) because it contains 13,834 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Seventh Circuit Rule 32(b) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  April 23, 2025