No. 24-3258

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

PUBLIC INTEREST LEGAL
FOUNDATION,

      Plaintiff-Appellant,

  v.

MEAGAN WOLFE and UNITED STATES
OF AMERICA,

      Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN, NO. 24-CV-285-JDP, THE
HONORABLE JAMES D. PETERSON PRESIDING

**BRIEF OF DEFENDANT-APPELLEE MEAGAN WOLFE**

JOSHUA L. KAUL
Attorney General of Wisconsin

BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for Meagan Wolfe

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

*Counsel of Record

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .................................................1

INTRODUCTION .........................................................................1

STATEMENT OF THE ISSUES ...............................................2

STATEMENT OF THE CASE ....................................................3

    I.    Background on the National Voter Registration Act......................3

    II.   Wisconsin's same-day voter registration at the polls. ...................5

    III.  The Wisconsin Elections Commission keeps an official registration list, and state law requires it to charge a fee for copies of the list...................................6

    IV.  The Foundation's requests a copy of the registration list. ......................................................................7

    V.   The Foundation files suit, and the district court dismisses the case. ............................................8

SUMMARY OF ARGUMENT .......................................... 10

STANDARD OF REVIEW .................................................. 12

ARGUMENT ...................................................................... 13

    I.    *Shelby County's* statements about equal sovereignty do not extend to this case. ............................. 13

        A.   *Shelby County*'s concerns with congressional overreach into sensitive areas of state sovereignty does not apply here.......................... 13

        B.   The Foundation's arguments are unpersuasive................ 17

    II.   *City of Boerne* does not apply here................................ 19

    III.  Even if they applied, Wisconsin's exemption would satisfy the standards in *Shelby County* and *City of Boerne.* .................................................. 22

A.   *Shelby County.* ...................................................... 22

B.   *City of Boerne* ...................................................... 26

IV.   The Foundation has no cause of action against Wolfe and no injury-in-fact to support article III standing. .................. 27

V.   A "leveling down" remedy that imposes additional intrusions on state sovereignty does not make sense as a remedy for alleged congressional violation of equal sovereignty. .......................................................... 30

CONCLUSION ................................................................. 32

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................. 12

*Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar,*
  56 F.3d 791 (7th Cir. 1995) ..............................................3, *passim*

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................. 12

*Bond v. Utreras,*
  585 F.3d 1061 (7th Cir. 2009) ......................................... 28

*Burger v. County of Macon,*
  942 F.3d 372 (7th Cir. 2019) ......................................... 12

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ....................................................2, *passim*

*Dahlstrom v. Sun-Times Media, LLC,*
  777 F.3d 937 (7th Cir. 2015) ......................................... 29

*Dinerstein v. Google, LLC,*
  73 F.4th 502 (7th Cir. 2023) ......................................... 28

*Heckler v. Mathews,*
    465 U.S. 728 (1984) ................................................................ 30, 31

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978) ........................................................................ 29

*In re Border Infrastructure Env't Litig.,*
    284 F. Supp. 3d 1092 (S.D. Cal. 2018) ....................................... 16

*In re Border Infrastructure Env't Litig.,*
    915 F.3d 1213 (9th Cir. 2019) ..................................................... 16

*In re Search of Off. of Tylman,*
    245 F.3d 978 (7th Cir. 2001) ....................................................... 13

*Keen v. Helson,*
    930 F.3d 799 (6th Cir. 2019) ....................................................... 27

*Mayhew v. Burwell,*
    772 F.3d 80 (1st Cir. 2014) ......................................................... 16

*McBurney v. Young,*
    569 U.S. 221 (2013) .................................................................... 29

*Medtronic, Inc. v. Mirowski Fam. Ventures, LLC,*
    571 U.S. 191 (2014) .................................................................... 29

*Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey,*
    730 F.3d 208, (3d Cir. 2013) ....................................................... 16

*Ohio v. EPA,*
    98 F.4th 288 (D.C. Cir. 2024) ..................................................... 31

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ..........................................................2, *passim*

*Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Eng'rs, Inc.,*
    755 F.3d 832 (7th Cir. 2014) ....................................................... 12

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................................... 28

*Travis v. Reno,*
    163 F.3d 1000 (7th Cir. 1998) ........................................................ 29

*True the Vote v. Hosemann,*
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ........................................ 24

*United States v. Hallinan,*
    75 F.4th 148 (3d Cir. 2023) ......................................................... 28

**Statutes**

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 2201 ........................................................................... 29

52 U.S.C. § 20501(b) ...................................................................... 3

52 U.S.C. § 20501(b)(1)–(2) .................................................... 23, 24

52 U.S.C. § 20501(b)(4) ........................................................... 23, 24

52 U.S.C. § 20503(b) ...................................................................... 8

52 U.S.C. § 20503(b)(2) ............................................................ 5, 28

52 U.S.C. § 20504(a)(1) .................................................................. 4

52 U.S.C. § 20505 .......................................................................... 4

52 U.S.C. § 20506(a) ...................................................................... 4

52 U.S.C. § 20507(a)(2)–(4) ........................................................... 4

52 U.S.C. § 20507(b) ...................................................................... 4

52 U.S.C. § 20507(i)(1) ............................................................... 4, 8

52 U.S.C. § 20510(b) ................................................................ 1, 28

52 U.S.C. § 20510(b)(1) ............................................................... 28

52 U.S.C. § 20510(b)(2) ............................................................... 29

Wis. Stat. § 6.36(6) .................................................................. 7

Wis. Stat. § 6.33 ...................................................................... 5

Wis. Stat. § 6.33(1) .................................................................. 6

Wis. Stat. § 6.36(1)(a) ............................................................. 6

Wis. Stat. § 6.36(1)(b)(1)(a) ................................................... 6

Wis. Stat. § 6.45(1m) .......................................................... 6, 25

Wis. Stat. § 6.55(2)(a) ...................................................... 5, 6, 23

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1.................................................... 18

## Regulations

Wis. Admin. Code EL § 3.50(4) .............................................. 7

## Other Authorities

185 A.L.R. Fed 155.................................................................. 15

*Election Day Registration and the Limits of Litigation,*
   129 Yale L.J. Forum 185 (2019) ....................................... 24

*Introduction to the Northern Illinois College of Law 2014 Symposium*
   *Shelby County v. Holder: A New Perspective on Voting Rights,*
   34 N. Ill. U. L. Rev. 507 (2014) ...................................... 23

*Responding to Shelby County: A Grand Election Bargain,*
   8 Harv. L. & Pol'y Rev. 71 (2014) ............................... 23, 24

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Public Interest Legal Foundation's jurisdictional statement is not complete and correct. Defendant-Appellee Meagan Wolfe submits the following jurisdictional summary.

The district court had federal question jurisdiction over this case under 28 U.S.C. § 1331 because the Foundation brought a claim under 52 U.S.C. § 20510(b).

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because this is the appeal of a final judgment that disposes of all claims in this case. The court entered a judgment dismissing all the Foundation's claims on November 27, 2024. (Dkt. 32.) The Foundation filed a notice of appeal on December 13, 2024. (Dkt. 33.)

## INTRODUCTION

The Wisconsin Elections Commission denied the Foundation's request for a copy of Wisconsin's voter registration list, which the Foundation purported to submit under the National Voter Registration Act. But Wisconsin is expressly exempt from the NVRA because it has had same-day voter registration since passage of the NVRA. The Commission therefore correctly denied the Foundation's request. The Foundation sued, asking a federal court to order Wisconsin not to follow federal law as written because Wisconsin's exemption allegedly violates the principle of equal state sovereignty in *Shelby County v.*

*Holder*, 570 U.S. 529 (2013) and the limits of congressional enforcement of the Fourteenth Amendment in *City of Boerne v. Flores*, 521 U.S. 507 (1997).

These cases do not require the result that the Foundation seeks, nor do the principles underlying them support its claim. Both cases are about congressional overreach in imposing burdens on the states, which caused the Court to remove the respective burdens Congress imposed. The Foundation, on the other hand, wants to impose additional burdens on Wisconsin because Congress exempted it and several other states from the NVRA because of the ease of voter registration in those states. The district court rightly dismissed the Foundation's claim because no precedent supports applying equal state sovereignty in a way to impose greater burdens on states that Congress saw fit to exempt from a statute.

## STATEMENT OF THE ISSUES

1. Does *Shelby County*, which struck down extraordinary intrusions into state sovereignty, allow a court to impose additional intrusions on a state that congress exempted from a statute?

2. Does *City of Boerne*, which set a standard governing when Congress exceeds its powers to implement the Fourteenth Amendment by imposing substantive legislation, apply here?

3. Even assuming *Shelby County* and/or *City of Boerne* apply here, does Wisconsin's exemption satisfy the tests in those cases?

2

4. The NVRA provides a cause of action for violations of the act. Given that Wisconsin is exempt from the NVRA, and thus acted consistently with its terms, does the Foundation have a cause of action in this case?

5. Do the principles underlying equal state sovereignty allow a court to impose a remedy that increases the burdens on exempt states rather than relieving the burdens on covered states?

## STATEMENT OF THE CASE

### I.    Background on the National Voter Registration Act.

The NVRA "is designed to make it easier to register to vote in federal elections." *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 792 (7th Cir. 1995). Its purpose is documented in the NVRA itself, which states that a primary aim is to increase the number of registered voters. Its purposes are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

> (3) to protect the integrity of the electoral process; and

> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).

To carry out these purposes, the NVRA imposes requirements on some states that include, for example: that a driver's license application also serve as an application for voter registration, 52 U.S.C. § 20504(a)(1); that there must be an opportunity to register at offices that provide public assistance, 52 U.S.C. § 20506(a); and that states provide for mail registration, 52 U.S.C. § 20505. The NVRA also provides that a name of a registrant may not be removed unless at the request of the registrant, due to criminal conviction or mental incapacity, or due to death or a change in residence, with certain restrictions. 52 U.S.C. § 20507(a)(2)–(4). It also contains mandates related to maintenance of the voter registration rolls for elections for federal office. 52 U.S.C. § 20507(b).

Most relevant here, the NVRA provides for public disclosure of certain "voter registration activities":

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1).

Lastly, and key to this lawsuit, the NVRA exempts certain states from its coverage. As relevant here, the NVRA does not apply to certain states with laws continuously in place for same-day voter registration at the polls:

This chapter does not apply to . . .

A State in which, under law that is in effect continuously on and after August 1, 1994, or that was enacted on or prior to August 1, 1994, and by its terms is to come into effect upon the enactment of this chapter, so long as that law remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.

52 U.S.C. § 20503(b)(2).

## II.   Wisconsin's same-day voter registration at the polls.

Wisconsin Stat. § 6.55(2)(a), which was in place before August 1, 1994, provides for same-day voter registration at the polls, where the elector provides documentation and information to an election official that they are qualified and signs a corresponding certification. It provides, in part:

any person who qualifies as an elector in the ward or election district where he or she desires to vote, but has not previously filed a registration form, or was registered at another location, may request permission to vote at the polling place for that ward or election district . . . .

The statute also provides that the person is to "execute a registration form" that must contain certain details relevant to voting eligibility pursuant to Wis. Stat. § 6.33:

name; date; residence location; location of previous residence immediately before moving to current residence location; citizenship; date of birth; age; the number of a current and valid operator's license issued to the elector under ch. 343 or the last 4 digits of the elector's social security account number; whether the elector has resided within the ward or election district for the number of consecutive days specified in s. 6.02(1); whether the elector has been convicted of a felony for which he or she has not been pardoned, and if so, whether the elector is incarcerated, or on parole, probation, or extended supervision; whether

the elector is disqualified on any other ground from voting; and whether
the elector is currently registered to vote at any other location.

Wis. Stat. § 6.33(1). The form also informs the person that "[f]alsification of
information on this form is punishable under Wisconsin law as a Class I
felony." *Id.* The form has a "space where the clerk shall record an indication of
the type of identifying document submitted by the elector as proof of residence."
*Id.* The person must also sign a certification attesting that they are a qualified
elector, with a qualifying residence, and have not voted yet at the election. Wis.
Stat. § 6.55(2)(a).

Same-day registrants are recorded on "supplemental lists which are
prepared at polling places under s. 6.55," and they "shall be open to public
inspection." Wis. Stat. § 6.45(1m).

## III.   The Wisconsin Elections Commission keeps an official registration list, and state law requires it to charge a fee for copies of the list.

Wisconsin law requires the Commission to "compile and maintain
electronically an official registration list," which includes, for each registrant,
data such as name, address, and date of birth. Wis. Stat. § 6.36(1)(a). The
registration list is open to public inspection by any person, except that the
public may not view certain information, including date of birth information.
Wis. Stat. § 6.36(1)(b)(1)(a).

State law requires the Commission to "establish by rule the fee for obtaining a copy of the official registration list, or a portion of the list." Wis. Stat. § 6.36(6). The Commission promulgated a rule setting "[t]he charge for reports in electronic format" at "$25 base fee per report; plus $5 for the first 1,000 voter registration data records, or up to 1,000 voter registration data records; plus $5 for each additional 1,000 voter registration data records, rounded to the nearest thousand." Wis. Admin. Code EL § 3.50(4). It also provides that the "[m]aximum charge for an electronic report is $12,500." *Id.*

## IV. The Foundation's requests a copy of the registration list.

On January 23, 2024, the Foundation made a request to the Commission for a copy of the registration list but only offered to pay the cost of reproduction. (Dkt. 1 ¶¶ 101–02; Dkt. 1-1.) The Commission responded on February 13, explaining that Wisconsin is exempt from the NVRA, and so it would process the Foundation's request under state law. (Dkt. 1 ¶¶ 103–04; Dkt. 1-2.) The Foundation sent a notice letter the following day contending that the Commission and its Administrator Meagan Wolfe were in violation of the NVRA. (Dkt. 1 ¶¶ 106–14; Dkt. 1-3.) One day later, the Commission confirmed that it would not process the Foundation's request under the NVRA due to Wisconsin's exemption. (Dkt. 1 ¶ 116; Dkt. 1-4.)

## V.    The Foundation files suit, and the district court dismisses the case.

The Foundation filed a suit against Wolfe, in her official capacity as the Administrator of the Commission, seeking a declaratory and injunctive relief on the grounds "Wisconsin's statutory exemption from the NVRA, 52 U.S.C. § 20503(b), is invalid with respect to . . . 52 U.S.C. § 20507(i)(1) under the authority of *Shelby Cty. v. Holder*, 570 U.S. 529 (2013), *City of Boerne v. Flores*, 521 U.S. 507 (1997), and the principles articulated therein." (Dkt. 1 ¶ 1.)

Wolfe moved to dismiss the complaint under Rule 12(b)(1) & (6) for lack of jurisdiction and failure to state a claim on which relief could be granted. (Dkt. 14.) Wolfe argued that the Foundation lacked a cause of action and an injury-in-fact to establish standing (Dkt. 15:8–12), that the doctrines of *Shelby County* and *City of Boerne* did not apply to or support the Foundation's case (Dkt. 15:12–18), and that Wisconsin's exemption satisfied the standards in *Shelby County* and *City of Boerne* even assuming they applied (Dkt. 15:18–23.)

Because the Foundation was challenging the constitutionality of a federal statute, the United States was provided the opportunity to participate in the case. It argued that the Foundation lacked standing to bring an equal sovereignty challenge (Dkt. 26:16–21), that the exemption was a valid exercise of Congress's power under the Elections Clause (Dkt. 26:21–23), that the equal sovereignty principle in *Shelby County* did not apply to the NVRA (Dkt. 26:23–

28), that the exemption did not raise equal sovereignty concerns (Dkt. 26:29–37), and that *City of Boerne* did not apply because the NVRA was enacted under the Elections Clause (Dkt. 26:37–39).

The district court granted the motion to dismiss. (Dkt. 31.) It first rejected the standing arguments because the Foundation suffered an informational injury to give it standing, and it could challenge a statute on federalism grounds after establishing standing. (Dkt. 31:7–10.)

On the merits, the court held that (1) *Shelby County* and *City of Boerne* did not apply because they involved unconstitutional burdens on states, not allegedly unconstitutional exemptions; and (2) the reasoning of the cases did not apply to the NVRA. (Dkt. 31:12–21.)

On the first point, the court said that the Foundation was seeking "to turn *Shelby* and *Boerne* on their head by using them, not to remove a burden, but to *expand* the scope of a statute and impose *additional* burdens on a state by requiring Wisconsin to comply with the NVRA." (Dkt. 31:13.) Any federalism concerns would go to the burdens imposed on the states in the NVRA, not to exemptions that do not impinge on state sovereignty. (Dkt. 31:13.) Further, the Foundation pointed to no cases in which any court invalided a state exemption on federalism principles, and the cases it did cite were distinguishable. (Dkt. 31:14–16.)

On the second point, the district court noted that the Supreme Court has not held that equal sovereignty is an independent basis to strike down a statute. (Dkt. 31:16.) And *Shelby County* involved the limits on Congress's power under the Fifteenth Amendment, which requires Congress to show past racial discrimination to justify burdening states. (Dkt. 31:17.) In contrast, the Elections Clause did not have such a test and instead gave Congress plenary power over federal elections. (Dkt. 31:17.) In addition, *Shelby County* dealt with extraordinary intrusions on the states by requiring federal approval to make any changes to election laws, which simply does not apply to the NVRA. (Dkt. 31:18–19.) Further, other courts had refused to extend *Shelby County* to new contexts. (Dkt. 31:19–20.)

The district court entered judgment (Dkt. 32), and the Foundation then appealed to this Court (Dkt. 33).

## SUMMARY OF ARGUMENT

*Shelby County* is the only case that has struck down legislation on equal state sovereignty grounds, and its reasoning does not extend to this case. It involved exceptional intrusions into state sovereignty, which the Court held were not justified because they were based on well-outdated events. The Court therefore prevented Congress from imposing those burdens on the limited group of states that were covered; it did not propose to solve the problem by imposing the burden on all states. *Shelby County* does not support imposing

burdens on states that Congress saw fit to exempt; instead, it allows targeted states to free themselves of those burdens.

*City of Boerne* does not apply here either. That case involved Congress's power under section 5 of the Fourteenth Amendment to "enforce" the Amendment, which the Court held did not include "the power to decree the substance of the Fourteenth Amendment's restrictions on the States." 521 U.S. at 519. The NVRA is not attempting to define the substance of any constitutional provision, and it was concerned with protecting states from congressional overreach.

Even if these cases did apply here, Wisconsin's exemption would satisfy their standards. *Shelby County* requires that current burdens must meet current needs and that disparate geographic coverage is sufficiently related to the problem that it targets. Same-day registration obviates the core concerns that the NVRA seeks to address, which is making it easier to register to vote in federal elections. Even if there are errors in the registration list, voters can always re-register on election day if they were mistakenly unregistered. For the same reasons, exempting Wisconsin is congruent and proportional to the aim of the NVRA.

A federal statute only provides a cause of action if the statute provides for one. While the NVRA provides a cause of action against a defendant that violates the act, Wisconsin cannot violate the NVRA because it is exempt. The

11

Foundation therefore has no cause of action under the NVRA. And to the extent the Foundation has a statutory cause of action, it lacks a recognized injury-in-fact to support standing.

The Foundation seeks to impose additional burdens on Wisconsin so that all states are subject to the same burdens. Such a "leveling down" remedy does not make sense when the alleged constitutional violation is based on a doctrine that has only been applied to stop congressional intrusion into state sovereignty. A court imposing additional intrusions therefore runs contrary to the principle underlying the doctrine.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to grant a motion to dismiss de novo." *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Eng'rs, Inc.*, 755 F.3d 832, 836 (7th Cir. 2014). "In order to survive a 12(b)(6) motion to dismiss, a complaint must allege facts that 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This Court "take[s] all well-pled facts as true and then determine whether those factual assertions 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). This Court, however, is not "bound to accept legal conclusions as true." *Burger v. County of Macon*, 942 F.3d 372, 374 (7th Cir. 2019).

### ARGUMENT

This Court should affirm the district court. "[F]ederal statutes enjoy a strong presumption of constitutionality." *In re Search of Off. of Tylman*, 245 F.3d 978, 981 (7th Cir. 2001). "Striking down an Act of Congress is the 'gravest and most delicate duty'" that a court performs and is not done "lightly." *Shelby County*, 570 U.S. at 556 (citation omitted). The Foundation does not meet that high bar here.

## I.     *Shelby County's* statements about equal sovereignty do not extend to this case.

### A.     *Shelby County*'s concerns with congressional overreach into sensitive areas of state sovereignty does not apply here.

The Foundation's case is based on the mistaken theory that there is a free-floating "equal state sovereignty" principle that plaintiffs can use to invalidate any legislation that treats states differently. The only case it cites that has struck down legislation on equal state sovereignty grounds is *Shelby County*, which held that Congress had intruded into certain states' sovereignty in an extraordinary way without a sufficient basis to do so under the Fifteenth Amendment.

There, the Court characterized the Voting Rights Act's preclearance requirement for certain states and localities as "extraordinary." *Shelby County*, 570 U.S. at 534. These covered jurisdictions needed to obtain federal

permission before changing voting procedures, which was "a drastic departure from basic principles of federalism." *Id.* at 535. The Court explained that "the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions" and the question therefore became whether the Act's "extraordinary measures" could still be justified; in that context, the Court asked whether its "current burdens" are "justified by current needs." *Id.* at 536 (citation omitted). In so doing, the Court emphasized that the preclearance requirement was not "just like any other piece of legislation;" it was "exceptional" and "unique." *Id.* at 555.

The continued burden imposed by the Voting Rights Act and its "extraordinary" preclearance provision is not remotely similar to the NVRA's exemption for Wisconsin from public disclosure of voter registration rolls. As the Court made clear in *Shelby County*, preclearance imposed extraordinary burdens on certain states and was enacted under a provision—the Fifteenth Amendment—that allowed Congress to enforce its terms, but only "on a basis that makes sense in light of current conditions." *Id.* at 553. The analysis in *Shelby County* cannot simply be imported into the NVRA context.

In addition, the principles underlying *Shelby County* stand for the opposite of what the Foundation wants here. The Court there was skeptical of the preclearance requirement due to its encroachment on the "broad autonomy" afforded states in their "residual sovereignty." *Id.* at 543–44. The case was

concerned with "retain[ing] sovereignty" and, in that context, the Court noted the principle of "equal sovereignty." *Id.* Restated, the Court was concerned with "federal intrusion into sensitive areas of state and local policymaking," which was an "extraordinary departure" from the normal state-federal relationship. *Id.* at 545 (citation omitted). The Court ultimately asked whether "exceptional conditions" still existed that might justify that "extraordinary departure;" it answered no. *Id.* at 557 (citation omitted).

In contrast, the exemption at issue here is an example of congressional *restraint*: it absolves certain states from federal requirements based on same-day voter registration at the polls. Congress sought to make registering to vote easier in states and exempted states with a procedure, same-day registration, that Congress saw as sufficient. *Shelby County* was just the opposite: it was concerned with imposing additional burdens on certain states and localities that encroached on traditional state sovereignty. Given this, the Foundation's reliance on *Shelby County* is incoherent. Applying *Shelby County* to the NVRA would relieve the non-exempt states from the NVRA's burdens; it would not impose additional burdens on states that Congress saw fit to exempt.[1] The

---

[1] Not that such an argument would likely succeed. The NVRA has been upheld as constitutional and as a proper exercise of Congress's power. *See, e.g., Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791 (7th Cir. 1995); 185 A.L.R. Fed 155 (collecting cases) ("the courts have uniformly found that Congress acted within its power under article I, § 4").

Foundation is trying to use a doctrine that serves to protect against encroachment on state sovereignty to produce greater encroachment on state sovereignty. *Shelby County* offers no support for invalidating an exemption.

To the contrary, courts have refused to extend the *Shelby County* ruling into other areas. The First Circuit declined to extend it to a Medicaid law that supposedly treated states differently because "[f]ederal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system." *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014). It characterized *Shelby County* as involving "an 'extraordinary' departure from basic principles of federalism because it intruded into a realm (regulation of state and local elections) that has traditionally been the exclusive province of the states." *Id.* (quoting *Shelby County*, 570 U.S. at 534). Other courts have likewise declined to extend *Shelby County. Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 238–9, (3d Cir. 2013) (declining to extend *Shelby County* to PASPA's allowance of sports gambling in Nevada), *abrogated by Murphy v. Nat'l Collegiate Athletic Ass'n* (2018); *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1144–46 (S.D. Cal. 2018) (declining to extend *Shelby County* to waivers under section 102 of IIRIRA to border states), *aff'd,* 915 F.3d 1213 (9th Cir. 2019). The absence of any other examples of courts striking down federal law under a free-floating equal state sovereignty theory speaks to why the Foundation's argument fails.

16

### B.     The Foundation's arguments are unpersuasive.

Some of the Foundation's arguments are based on a mischaracterization of the district court's holding, and it also offers unpersuasive arguments that the NVRA was unconstitutionally coercive and that the district court's decision will allow for. The district court held that a plaintiff cannot use *Shelby County* to challenge exemptions from burdens. (Dkt 31:12–16.) It further held that *Shelby County* was distinguishable due to Congress acting under the Fifteenth Amendment rather than the NVRA, the extraordinary nature of preclearance under the Voting Rights Act, and states had been singled out without a way to get out of preclearance while all states could have been exempt from the NVRA if they enacted same-day registration. (Dkt. 31:16–19.)

The district court's reasoning would not stop singled-out states from challenging burdens placed on them if they rose to the level seen in *Shelby County*. The court merely recognized that the principles underlying *Shelby County* do not support imposing *additional* burdens on states that have been exempted from certain requirements and that the level of intrusion. It also recognized there were other significant differences between *Shelby County* and this case, including the constitutional provision under which Congress acted, the nature of the intrusion into state sovereignty, and states' ability to secure the exemption.

And the district court was right—there are substantial differences between the claim here and that in *Shelby County*. The NVRA applies to federal elections, which are not a core element of state sovereignty. The constitution contains the elections clause, which provides that "Congress may at any time by law make or alter such [state] Regulations" regarding the elections for Senators and Representatives. U.S. Const. art. I, § 4, cl. 1. Thus, the States gave up their sovereignty over federal elections in the constitution. Given that Congress can alter state regulations, there is no reason why Congress could not alter some states' regulations that do not align with its goals while exempting states whose regulations do align with its goals.

In addition, the Foundation admits that States were able to (1) gain the exemption by offering same-day registration by the date stated in the NVRA or (2) maintain their sovereignty over state and local elections by applying the NVRA only to federal elections. (Foundation Br. 39.) While the Foundation claims this was a Hobson's choice, to the extent that this choice was unconstitutionally coercive, it would invalidate the entire NVRA rather than just the exemptions for the states with same-day registration that Congress thought did not need additional procedures to make it easier to register.

The Foundation also offers a parade of horribles that will supposedly result from the district court's decision, such as Texans only being able to vote on one day and Californians being able to vote for a much longer time. (Foundation

18

Br. 11.) The notable thing about these examples is that they involve voters exercising their right to vote. And those voters would be able to bring claims that would more directly target the problem with these laws—equal protection claims under the reverse incorporation doctrine or right to vote claims under the First and Fourteenth Amendments. This case, in contrast, involves ease of access to a registration list, for which the Foundation would like to pay less than required under Wisconsin law. But the intent of the NVRA was to make it easier to vote, and Wisconsin voters can always register on election day.

## II.     *City of Boerne* **does not apply here.**

Like *Shelby County*, *City of Boerne* has nothing to say about the NVRA or access to information, and its principles again support the opposite of how the Foundation attempts to use it here.

*First*, *City of Boerne* involved a different clause of the constitution and different issues. It concerned the Religious Freedom Restoration Act (RFRA) and whether Congress exceeded its authority under the Fourteenth Amendment by attempting to substantively change what the Constitution required. *City of Boerne*, 521 U.S. at 511. As the Court explained, RFRA attempted to codify what was essentially a strict scrutiny standard that would apply any time there was a "substantial[ ] burden" on a person's exercise of religion. *Id.* at 515–16. The question posed was whether this went beyond

19

Congress's power under section 5 of the Fourteenth Amendment, which allows Congress to "enforce" the Amendment. *Id.* at 517.

The Court explained that the power to enforce did not include "the power to decree the substance of the Fourteenth Amendment's restrictions on the States." *Id.* at 519. In that context, the Court stated that legislation seeking to enforce the Fourteenth Amendment must display "congruence and proportionality" or else the "legislation may become substantive in operation and effect." *Id.* at 520.

Once again, none of this has anything to do with the NVRA and information disclosure. *City of Boerne* was concerned with Congress's enforcement power under the Fourteenth Amendment. In contrast, NVRA primarily derives from a different constitutional provision: article I, section 4, which provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." *See ACORN*, 56 F.3d at 793, 795. That "provision is broadly worded and has been broadly interpreted." *Id.* at 794. There is no relevant parallel between *City of Boerne*'s analysis of Congress going too far under the "enforce[ment]" provision in section 5 of the Fourteenth Amendment and article I, section 4, which broadly allows Congress to impose

20

election-related proscriptions on the states. *See id.* at 795 (explaining that article I, section 4, provides "a general supervisory power" (citation omitted)).

*Second*, the principles underlying *City of Boerne* do not support the Foundation's theory. Rather, they again point in the opposite direction—against congressional intrusion. *City of Boerne* was concerned with the line where legislation turns from remedial to substantive under the Fourteenth Amendment. *Id.* at 520. Crossing that line implicated "the traditional separation of powers" between the legislative and judicial branches. *Id.* at 523–24. The Court also was concerned with RFRA's "[s]weeping coverage" that "displac[ed]" laws "at every level of government." *Id.* at 532. It was "a considerable congressional intrusion into the States' traditional prerogatives and general authority." *Id.* at 534. In light of the separation of powers and "the federal balance," the Court concluded that the Act's "substantial-burden" test was an improper effort to substantively change what the Constitution meant and impose it on the states. *Id.* at 535–36.

As with *Shelby County*, these principles offer no support for invalidating Wisconsin's exemption. The NVRA's exemption, of course, is not a substantive change to the constitution, which was *City of Boerne*'s concern. And further animating the Court's decision in *City of Boerne* was the sweeping intrusion into states' affairs. The Foundation again turns the precedent on its head by relying on *City of Boerne* to support *more* intrusion. Even at their most

abstract, that is the opposite of what the principles in *City of Boerne* stand for. Rather, the principles there might be fodder for invalidating burdens on states, not adding to them.

### III. Even if they applied, Wisconsin's exemption would satisfy the standards in *Shelby County* and *City of Boerne*.

#### A.    *Shelby County.*

To the extent that *Shelby County* applies here, the Foundation contends that it requires a showing that a statute's "disparate geographic coverage" must be "sufficiently related to the problem that it targets." (Foundation Br. 41 (quoting *Shelby County*, 570 U.S. at 551).) In addition, the test focuses on whether a statute's "current burdens" are justified by "current needs." *Shelby County*, 570 U.S. at 551. *Shelby County* did not hold that it standard was particularly demanding or akin to strict scrutiny where being slightly overinclusive or underinclusive can doom a law.

As an initial matter, there are no "current burdens" on Wisconsin and the "current needs" in Wisconsin are the same as when the NVRA was passed: Wisconsin then and now has same-day voter registration at the polls. (Dkt. 1 ¶ 21.) Unlike in *Shelby County*, nothing has changed over time vis-à-vis Wisconsin and same-day voter registration. *See Shelby County*, 570 U.S. at 556.

Then and now, same-day registration obviates the core concerns that the NVRA seeks to address: making "it easier to register to vote in federal elections." *ACORN*, 56 F.3d at 792. Wisconsin already has "procedures that will increase the number of eligible citizens who register to vote" and that "enhance[ ] the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)–(2). As commentators have noted, "same-day registration is the gold standard" as it "lowers the barriers to participation by combining two steps, registration and voting." Daniel P. Tokaji, *Responding to Shelby County: A Grand Election Bargain*, 8 Harv. L. & Pol'y Rev. 71, 91–92 (2014). States with same day registration have "historically boasted turnout rates ten to twelve percentage points higher than states that do not offer" it. Marissa Liebling, *Introduction to the Northern Illinois College of Law 2014 Symposium Shelby County v. Holder: A New Perspective on Voting Rights*, 34 N. Ill. U. L. Rev. 507, 524 (2014).

As to the NVRA's concern with currentness and accuracy, same day registration also helps "to ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4), as it allows voters, when face-to-face with election workers, to provide the details for voting on the spot— proof of residence, age, an attestation that they have not voted already in the same election, etc., *see* Wis. Stat. §§ 6.55(2)(a), 6.33. It also provides the opportunity for voters to change details of their registration that might be in

23

error: election-day registration "allows voters to update or correct their registrations on Election Day, which enables those who may have recently moved to vote without having to re-register in advance of the election." Dale E. Ho, *Election Day Registration and the Limits of Litigation*, 129 Yale L.J. Forum 185, 190 (2019). Further, "some voters are erroneously purged or left off the rolls due to administrative error, and [election day registration] allows these voters to correct their registration information on Election Day, ensuring that they are not disenfranchised." *Id.*; *see also* Tokaji, 8 Harv. L. & Pol'y Rev. at 101 ("Same-day registration also has the advantage of allowing for errors to be corrected . . . .").

As the Foundation recognizes in its complaint (Dkt. 1 ¶ 19), the public disclosure provision is read in conjunction with the overriding purpose of the NVRA: to increase successful voter registration that is "accurate and current." 52 U.S.C. § 20501(b)(1)–(2), (4); *see True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 721 (S.D. Miss. 2014) ("The Public Disclosure Provision thus helps 'to ensure that accurate and current voter registration rolls are maintained.'" (citation omitted)).[2] The ability to correct registration on-the-spot helps obviate the need for public disclosure of voting registration rolls, as errors can be

---

[2] On the other hand, the "NVRA was not designed as a tool to root out voter fraud, 'cross-over voting,' or any other illegal or allegedly illegal activity associated with casting a ballot on election day." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014).

caught in real time and can be corrected with the voter in the flesh—nothing is more "current" then at-the-polls error correction.

The Foundation raises complaints that certain organizations have made about voters being erroneously removed from the registration list. (Foundation Br. 42–43.) However, same-day registration allows for those voters to cast votes even if they have been mistakenly removed from the list. The "supplemental poll lists" referenced in the Brennan Center report cited by the Foundation are for voters who used same-day registration to re-register and cast votes. *See* Wis. Stat. § 6.45(1m) (referencing "supplemental lists which are prepared at polling places under s. 6.55"). And the Yale study cited similarly documents voters who were able to cast votes, just that they had been flagged as people who might have moved. The same-day registration system allows people to re-register easily even if they were mistakenly unregistered, lessening the need for outside groups to monitor the registration list on their behalf.

In sum, Wisconsin's NVRA exemption still makes sense today, and the Foundation cannot come close to showing that the NVRA's exemption is similar to a law "based on 40–year–old facts having no logical relation to the present day." *Shelby County*, 570 U.S. at 554. Wisconsin's registration system still allows for easy registration and for anyone wrongly unregistered to re-register on election day.

**B.**    *City of Boerne*

The Foundation would fare no better under the language that it extracts from *City of Boerne*. The Foundation says that, based on *City of Boerne*, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." (Dkt. 1 ¶ 77.) The next sentence in *City of Boerne* explains what this test is for: "Lacking such a connection, legislation may become substantive in operation and effect." *City of Boerne*, 521 U.S. at 520.

There is no coherent way to apply a test about when legislation becomes substantive (and thus usurps the courts' role) to an exemption from a statutory burden, but the following gives it a try. As for "congruence," and as summarized above, there is a fit between exempting Wisconsin from the NVRA and the fact that Wisconsin's same-day registration at the polls already forwards the goals that the NVRA promotes. As for "proportionality," the Supreme Court explained that it was concerned with laws that go too far, with "[s]weeping coverage" "displacing laws" in a way that is out of synch with the ill being addressed. *Id.* at 532. The opposite is true here: the exemption for Wisconsin creates no coverage and displaces no law; rather, the Foundation seeks to displace Wisconsin law. It follows that a provision that has *no* effect cannot be disproportionate or "substantive in operation and effect," which is what the *City of Boerne* language potentially captures.

The only arguably coherent way to apply the *City of Boerne* to the NVRA would be to contend that the obligations the NVRA imposed on *covered* states go too far. The argument might go that the NVRA's registration and informational burdens are not "proportional" to Congress's goal of increased voter registration. That effort would almost certainly fail, but it is the only theory that even begins to make sense. And that, again, is the opposite of what the Foundation seeks here.

## IV.  The Foundation has no cause of action against Wolfe and no injury-in-fact to support article III standing.

While the district court did not rule on this basis, this Court could also affirm on the alternative grounds that the Foundation has no cause of action and no injury-in-fact to support article III standing. This is a strange case. The Foundation sued Wolfe for violating the NVRA when Wolfe faithfully applied the NVRA as written. To the extent anyone did something wrong, it was Congress in enacting the NVRA, not Wolfe for complying with binding federal and state laws.

It is fundamental that, "[t]o sue someone, you must have a cause of action. And you only have a cause of action under a federal statute if the statute's text provides you one." *Keen v. Helson*, 930 F.3d 799, 800 (6th Cir. 2019). More generally, it is a given that a plaintiff must have a "cause of action giving a plaintiff the right to sue over a defendant's legal infraction" "[t]o sue in federal

court." *Dinerstein v. Google*, LLC, 73 F.4th 502, 519 (7th Cir. 2023). The present scenario also can be framed in terms of standing: "the Supreme Court's standing doctrine requires litigants to establish an injury to an interest 'that the law protects when it is wrongfully invaded.'" *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) (emphasis omitted) (citation omitted); *see also United States v. Hallinan*, 75 F.4th 148, 151 (3d Cir. 2023) ("To sue in federal court, a plaintiff must have both constitutional standing and a cause of action.").[3]

Here, the Foundation asserts that it is entitled to information under the NVRA, but it expressly exempts Wisconsin. *See* 52 U.S.C. § 20503(b)(2); (Dkt. 1 ¶¶ 23–24). The Foundation thus is seeking something under a statute that makes clear the Foundation is not entitled to. The Foundation purports to bring its claim under 52 U.S.C. § 20510(b), (Dkt. 1 ¶ 2), but this provision provides that "[a] person who is aggrieved by a violation of this chapter," 52 U.S.C. § 20510(b)(1), "may bring a civil action in an appropriate district court for declaratory and injunctive relief with respect to the violation."

---

[3] As this Court has observed, the U.S. Supreme Court in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021), "emphasized the distinction between (1) the cause of action giving a plaintiff the right to sue over a defendant's legal infraction and (2) the injury, if any, that he suffered as a result." *Dinerstein v. Google, LLC*, 73 F.4th 502, 519 (7th Cir. 2023). Put another way, just because a statutory cause of action is created by Congress doesn't automatically mean there is an article III injury in fact. Here, the Foundation's complaint is deficient under either framing: there is no "injury in law" and, necessarily, no injury to a legally protected interest. *See TransUnion LLC*, 594 U.S. at 427.

52 U.S.C. § 20510(b)(2). Here, there is no violation of "this chapter" (the NVRA) because Wisconsin is exempt under the statute's express language.[4]

Lacking a statutory right, the Foundation would need to point to some other source of a right to come to court—namely, a constitutional one. It fails to do that, either. "The Constitution itself is [not] a Freedom of Information Act." *McBurney v. Young*, 569 U.S. 221, 232 (2013) (alteration in original) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978) (plurality opinion)). As the plurality in *Houchins* further explained, there "is no constitutional right to have access to particular government information, or to require openness from the bureaucracy." 438 U.S. at 14 (citation omitted). The Seventh Circuit recognizes this, as well. For example, in *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998), the Seventh Circuit applied that rule to a case about the Driver's Privacy Protection Act and rejected a constitutional claim premised on a right of access to information. *See also Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 947 (7th Cir. 2015) (same, applying *Houchins* and *McBurney*).

And while the district court held that the Foundation had suffered an information injury, this would not grant them a statutory cause of action

---

[4] The Foundation's complaint cited 28 U.S.C. § 2201, the declaratory judgment statute, (Dkt. 1 ¶ 2), but that statute is procedural only and does not grant substantive rights. *See, e.g., Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014).

because the NVRA has not been violated. Nor would it provide standing when the interest is not recognized in the law; in fact, the law says the Foundation has no right to the information it seeks.

## V.    A "leveling down" remedy that imposes additional intrusions on state sovereignty does not make sense as a remedy for alleged congressional violation of equal sovereignty.

The Supreme Court has only applied equal sovereignty principles to remedy congressional overreach into state sovereignty. *Shelby County* specifically turned on relieving "burdens" on state sovereignty. 570 U.S. at 536, 543–45. Here, the Foundation seeks to impose additional burdens on Wisconsin. But, even if the Foundation could show some problem under *Shelby County*, the proper remedy for congressional intrusion into state sovereignty would be to relieve states of those unconstitutional burdens, not to spread those intrusions even further.

The Foundation cites *Heckler v. Mathews*, 465 U.S. 728 (1984), which addressed gender-based classifications in the Social Security Act. But that was not an "equal sovereignty" case, and its discussion concerned standing vis-à-vis benefits, explaining that the possibility of "withdrawal" or "extension" of "benefits" meant standing was present. *Id.* at 740. Further, *Heckler* involved a federal statute that specifically stated that, if the challenged provision were to be invalidated as to some people, then its application "to any other persons or circumstances shall be considered invalid." *Id.* at 734 (quoting the statute).

None of this has any bearing on whether it would make sense, under the NVRA and *Shelby County*'s rationale, to "level down."[5]

The Foundation also cites *Ohio v. EPA*, 98 F.4th 288 (D.C. Cir. 2024), which cuts against the Foundation's theory in two ways: it supports (1) that the proper parties to raise equal sovereignty are states or political subdivisions and (2) that equal sovereignty does not generally apply to laws classifying states but rather is limited to extraordinary encroachments into traditional state powers under the Fifteenth Amendment. *Id.* at 293, 309. In addressing the standing of the plaintiff states, *Ohio v. EPA* commented that the possibility of a leveling down remedy supported a finding of redressability; the court, however, ultimately ruled that the waiver at issue was valid. *Id.* at 307. Overall, if anything, this citation shows why the Foundation's resort to "equal sovereignty" holds no water—it is neither the right party to raise an "equal sovereignty" claim nor can that concept simply be imported into legislation enacted under the Elections Clause.

In sum, it makes no sense to impose more federal intrusion upon a state when applying a principle concerned about protecting against excessive federal intrusion upon the states.

---

[5] In addition, *Heckler* upheld the classification at issue there—it had no occasion to "level down." *Heckler v. Mathews*, 465 U.S. 728, 750–51 (1984).

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.[6]

Dated this 23rd day of April 2025.

<div style="margin-left: 40%">

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Brian P. Keenan*
BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for Meagan Wolfe

</div>

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

*Counsel of Record*

---

[6] Defendant-Appellee would like to recognize Assistant Attorney General Anthony Russomanno for his work on this case in the district court, which formed much of the basis for this brief. AAG Russomanno sadly passed away after the decision in the district court and the filing of this brief.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

This brief contains 7576 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 23rd day of April 2025.

s/ Brian P. Keenan
BRIAN P. KEENAN
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I certify that on April 23, 2025, I electronically filed the foregoing Brief of Defendant-Appellee Megan Wolfe with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 23rd day of April 2025.

s/ Brian P. Keenan
BRIAN P. KEENAN
Assistant Attorney General