No. 24-3258

IN THE

# United States Court of Appeals
## for the Seventh Circuit

---

**PUBLIC INTEREST LEGAL FOUNDATION**

*Plaintiff-Appellant*

v.

**MEAGAN WOLFE** and **UNITED STATES OF AMERICA,**

*Defendants-Appellees*

---

On Appeal from the United States District Court
for the Western District of Wisconsin, Case No. 3:24-cv-00285-jdp.
The Honorable James D. Peterson Presiding.

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT

---

Noel H. Johnson (*Counsel of Record*)
Kaylan Phillips
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street
Suite 700
Alexandria, VA 22314
(703) 745-5870
njohnson@publicinterestlegal.org

May 14, 2025               *Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT .......................................................................................................................... 1

    I.    The United States Concedes that Elections Clause Legislation Must be Justified ..................................................................................................................... 1

    II.    The *Shelby County* Standard Controls and Applies ................................................ 4

    III.    Election Transparency Is Paramount, Not Secondary ......................................... 8

    IV.    Appellees Must Justify the Transparency Exemption, Not Other, Unchallenged Applications of Section 4(b)(2) .................................................... 9

    V.    The Transparency Exemption Fails Any Level of Scrutiny ............................... 9

    VI.    Controlling Precedent Forecloses the United States's Prudential Standing Arguments ............................................................................................................ 12

CONCLUSION ..................................................................................................................... 17

CERTIFICATE OF COMPLIANCE ................................................................................. 18

CERTIFICATE OF SERVICE ........................................................................................... 19

# TABLE OF AUTHORITIES

*Cases*

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
570 U.S. 1 (2013) .................................................................................................5-6

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ................................................................................................6

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................2

*Ass'n of Cmty. Orgs. for Reform Now v. Miller,*
129 F.3d 833 (6th Cir. 1997) .................................................................................4

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................2

*Bellitto v. Snipes,*
No. 16-cv-61474 (S.D. Fla., Mar. 30, 2018) ...................................................9, 11

*Bond v. United States,*
564 U.S. 211 (2011) .........................................................................................13-14

*Duke Power Co. v. Carolina Envtl. Study Grp.,*
438 U.S. 59 (1978) ................................................................................................15

*Duronslet v. Cty. of L.A.,*
266 F. Supp. 3d 1213 (C.D. Cal. 2017) ..................................................................2

*Gillespie v. City of Indianapolis,*
185 F.3d 693 (7th Cir. 1999) ...........................................................................14-16

*Greater Birmingham Ministries v. Sec'y of State,*
105 F.4th 1324 (11th Cir. 2024) ............................................................................8

*Husted v. A. Philip Randolph Inst.,*
584 U.S. 756 (2018) ................................................................................................8

*Libertarian Party of Ill. v. Scholz,*
872 F.3d 518, 523 (7th Cir. 2017) .........................................................................2

*On-Site Screening, Inc. v. United States,*
    687 F.3d 896 (7th Cir. 2012) ................................................................ 9

*Project Vote/Voting for Am., Inc. v. Long,*
    752 F. Supp. 2d 697 (E.D. Va. 2010) ................................................ 10

*Project Vote/Voting for Am., Inc. v. Long,*
    682 F.3d 331 (4th Cir. 2012) ....................................................... 8, 10

*Pub. Int. Legal Found., Inc. v. Bellows,*
    92 F.4th 36 (1st Cir. 2024) ................................................................ 8

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ................................................................*passim*

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ......................................................................... 3

### Declaration, Constitutions, Statutes, Regulations, and Rules

Elections Clause, U.S. Const. Art. I, § 4, cl. 1 ................................*passim*

52 U.S.C. § 20507(i)(1) ...........................................................*passim*

Wis. Stat. § 6.56(3) ...................................................................... 10

### Other Authorities

The Federalist No. 59 (A. Hamilton) (R. Scigliano, ed. 2000) .............................. 6

United States Census Bureau, Where Do Immigrants Live?, April 09, 2024,
https://www.census.gov/library/stories/2024/04/where-do-immigrants-live.html .......... 7

WEC, Emails from Third Parties, Oct. 3, 2022, https://elections.wi.gov/memo/emails-third-parties ................................................................................. 7

## ARGUMENT

All States should be transparent when they grant and remove voting rights. Yet Wisconsin gets a pass. Such inequality demands justification. Facing about, the United States now agrees. (*See* USA Br. at 34 (explaining that all Elections Clause legislation must pass rational basis review).) On that basis alone, this Court should vacate the dismissal and remand this action. This Court should also find that the Transparency Exemption must satisfy the standard applied in *Shelby County v. Holder*, because the historical and precedential record demonstrates that Congress's Elections Clause powers are qualified by the principle of equal state sovereignty.

For her part, the Administrator essentially declares, "*This is not Shelby County,*" as if to say that any divisive scheme other than the Voting Rights Act ("VRA") need not be justified. Not so. *Shelby County* did not invent or circumscribe the equal state sovereignty principle. *Shelby County* enforced a much broader constitutional architecture, which "remains highly pertinent in assessing subsequent disparate treatment of States." *Shelby County*, 570 U.S. at 544 (citations omitted). With the NVRA, we have disparate treatment, and like *Shelby County*, justification is lacking.

I.    **The United States Concedes that Elections Clause Legislation Must be Justified.**

The United States undermines the District Court's opinion by conceding that "all Elections Clause legislation" must satisfy "traditional rational-basis review." (USA Br.

at 34.) Because the District Court demanded *no justification* from Congress, this Court should minimally vacate the District Court's order and remand for fact finding and scrutiny.

Whether the Complaint specifically "assert[s] that Section 4(b)(2) would fail traditional rational-basis scrutiny" is not dispositive. (USA Br. at 54.) For starters, the applicable level of scrutiny is not an element of any cause of action. It is standard by which a law's validity is judged, and it is very often determined after litigation has commenced. *See Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 523 (7th Cir. 2017) (explaining that "the level of scrutiny depends on the regulation at issue"). Therefore, a complaint is not deficient under Rule 12 simply because it does not mention the standard of review that the Court ultimately applies. Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, the Foundation's Complaint plausibly alleges that Wisconsin has more sovereignty than other states. In fact, there is no dispute about that. Under Rule 12, the Foundation's Complaint is sufficient because it plausibly alleges that some form of scrutiny applies. *See Duronslet v. Cty. of L.A.*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017) (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("For now, it is enough for the Court to conclude that Plaintiff

2

has plausibly established that some form of heightened scrutiny might apply to her Equal Protection claim, which shifts the burden to the County to justify its conduct."). Because the United States now concedes that some form of scrutiny applies to the Transparency Exemption, this action should be remanded so that such scrutiny can be applied.

Furthermore, the United States's position can be squared with the Foundation's position that the *Shelby County* standard applies because the *Shelby County* standard is a form of rational basis review. VRA Section 4(b) was upheld in *South Carolina v. Katzenbach* because "the coverage formula [wa]s rational in both practice and theory," 383 U.S. 301 (1966). Section 4(b) was then struck down in *Shelby County v. Holder* because it became "irrational." *See, e.g.*, *Shelby County*, 570 U.S. 529, 556 ("It would have been **irrational** for Congress to distinguish between States in such a fundamental way based on 40-year-old data, when today's statistics tell an entirely different story.") (emphasis added); *see also id*. at 554 ("Viewing the preclearance requirements as targeting such efforts simply highlights the **irrationality** of continued reliance on the §4 coverage formula, which is based on voting tests and access to the ballot, not vote dilution.") (emphasis added). When Congress treats the states differently, the rationality of that decision—and thus its constitutionality—is judged by whether it

"makes sense in light of current conditions," *Shelby County*, 570 U.S. at 553, and is "sufficiently related to the problem that it targets," *id*. at 542.

## II.　The *Shelby County* Standard Controls and Applies.

The historical and precedential record demonstrate that the States did not give Congress *unchecked* power to set different rules in different states. (*See* Doc. 14 at 32-36.) Neither the United States nor the Administrator confronts this narrow inquiry. Instead, the United States sets out to prove that the Elections Clause tolerates disparate treatment, as general matter. The Foundation agrees that it does. But that is not the question posed here nor the one the District Court answered. The question is whether the Elections Clause tolerates disparate treatment *without justification*. That it does not do.

In fact, the United States's illustrations support the Foundation's view. *Ass'n of Cmty. Orgs. for Reform Now v. Miller* envisioned a situation where "Congress determines that the voting requirements established by a state do not sufficiently protect the right to vote[.]" 129 F.3d 833, 837 (6th Cir. 1997). Federalist leader Charles Cotesworth Pinckney envisioned a situation where a "state should attempt to fix a very inconvenient time for the election." (USA Br. at 46 (citation omitted).) And the Act of November 15, 1941 "set different federal rules for redistricting based on whether the State had gained or lost representatives (or neither)[.]" (USA Br. at 51 (citation

4

omitted).) In each case, Congress has a factual basis upon which it may justifiably single out states for disparate treatment. The Transparency Exemption demands the same.

Congress may have believed the Transparency Exemption made sense in 1993. *Shelby County* instructs that when Congress treats the States differently, its reasoning must continue to hold up "in light of current conditions." *Shelby County*, 570 U.S. at 553. Congress "cannot rely simply on the past." *Id*.

History and precedent also foreclose the argument that Congress may deny equal treatment to the States with respect to any aspect of government created by the Constitution. (*See* USA Br. at 39-40.) The States were inherently sovereign *and* equal when they formed this Union. (*See* Opening Br. at Section I.B.) The historical record indicates that both proponents and opponents of the Elections Clause were concerned about giving government—state and federal—unchecked power to set election rules. (*See* Opening Br. at Section II.B.) Furthermore, proponents—who ultimately got their way—intended the Elections Clause to establish *uniformity* and secure the peoples' *equal* rights of election. (*See id*.) It is therefore illogical to believe the States intended to give Congress *unconditional* enforcement power. And *Shelby County* confirms that.

The United States also ignores that the States, not the federal government, are the "default" policymakers under the Elections Clause. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) ("*ITCA*"). In other words, the States retained for

5

themselves mandatory ("shall"), regulatory authority over *all* elections (local, state, and federal), giving Congress only the power to alter federal-election regulations "in the last resort," The Federalist No. 59, at 378 (A. Hamilton) (R. Scigliano, ed. 2000), when necessary to preserve the Federal Congress, *ITCA*, 570 U.S. at 8, or prevent "manipulation of electoral rules" by state officials intent on entrenching themselves by elevating their own interests above the people's interests. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015). The States did not give Congress a mandate to act without reason.

Furthermore, if the equal state sovereignty principle did not apply to the regulation of federal elections, as the United States believes, VRA Section 4(b) would still be valid as applied to federal elections. But it is not. The Supreme Court struck it down as applied to all elections on the grounds that it denied equal sovereignty to covered states without justification. For that reason, the Transparency Exemption cannot be excused solely because the NVRA textually regulates federal elections, especially when it also reaches state and local elections in most states be default. (*See* Opening Br. at 36 n.6.)

The United States insists that the District Court's interpretation will not permit Congress to pick and choose winners and losers because the desire to harm a political opponent is not a "legitimate government interest." (USA Br. at 53.) That makes no

6

difference because the District Court required *no justification* when Congress sets different election rules for different states. In other words, Congress will not have to demonstrate any interest, much less a legitimate one.

The Administrator meanwhile embraces Congress's power to discriminate, stating "there is no reason why Congress could not alter some states' regulations that do not align with its goals while exempting states whose regulations do align with its goals." (Admin. Br. at 18.) In other words, partisan actors may rearrange electoral systems in only some states merely to satisfy policy preferences, without regard for the justification or tailoring of the policy. By that logic, Congress could lawfully impose a documentary proof-of-citizenship requirement only on states with the highest foreign-born populations. *See* United States Census Bureau, Where Do Immigrants Live?, April 09, 2024, https://www.census.gov/library/stories/2024/04/where-do-immigrants-live.html (last accessed May 11, 2025).

The Administrator counters that such a thing could never happen because affected voters could pursue claims under the Equal Protection Clause or the First and Fourteenth Amendments. (Admin Br. at 18-19.) The fact that other, unknown plaintiffs may have completely different legal claims does not determine whether States have equal sovereignty. Nor can unconstitutional behavior be excused on the chance that it will be stopped later, in a different proceeding.

### III.    Election Transparency Is Paramount, Not Secondary.

The weight of authority rejects the United States's view of the Public Disclosure Provision as insignificant. For starters, the Supreme Court has described the NVRA's voter list maintenance requirements—the object of the transparency requirements— as a "main objective." *Husted v. Philip Randolf Inst.*, 584 U.S. 756, 761 (2018). Furthermore, the Fourth Circuit Court of Appeals views the NVRA's transparency as paramount, admonishing other courts that might diminish its importance. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339-40 (4th Cir. 2012) ("Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections."). The First Circuit Court of Appeals explains that the Public Disclosure Provision "evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024). Public dissemination of Section 8(i) data is also "necessary," the court continued, in order "identify, address, and fix irregularities in states' voter rolls[.]" *Id*. Similarly, the Eleventh Circuit Court of Appeals recognizes that the Public Disclosure Provision "increase[s] both voter participation and election integrity … by granting voters transparency into a state's voter registration practices." *Greater Birmingham Ministries v. Sec'y of State*, 105 F.4th 1324, 1326 (11th Cir. 2024).

To be sure, the NVRA's "mandatory public inspection right is designed to preserve the right to vote[.]" *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *13 (S.D. Fla. Mar. 30, 2018). To the Foundation's knowledge, no court has ever viewed that design as "secondary." (USA Br. at 13.)

## IV.  Appellees Must Justify the Transparency Exemption, Not Other, Unchallenged Applications of Section 4(b)(2).

The United States is also wrong when it argues that this Court cannot scrutinize the Transparency Exemption alone. (USA Br. at 61.) That is all this Court can do. The Foundation is not challenging Wisconsin's exemption from other parts of the NVRA. Whether Congress was justified in relieving Wisconsin from the NVRA's "motor voter" requirements or its voter list maintenance requirements is not just irrelevant, it is off limits. *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 900 (7th Cir. 2012) ("[F]ederal courts do not give advisory opinions on claims not before them.").

## V.  The Transparency Exemption Fails Any Level of Scrutiny.

EDR is not a substitute for the transparency Congress intended. For example, take the Administrator's belief that EDR ensures accurate voter rolls because it allows voters to update or correct registrations on Election Day. (Admin. Br. at 24.) The Administrator appears to be saying that errors, mistakes, and even discrimination in the voter list maintenance process are acceptable because registrants can allegedly fix those

problems at their polling place. In other words, registrants who suffer discrimination just need to be patient and trust that their rights will be restored on Election Day.

Imagine election officials refusing to process registration applications for students at a historically black college or university and refusing to provide the records that were part of the decision to deny voter registration. Those were the facts in *Project Vote v. Long*. *See Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 699 (E.D. Va. 2010). "No need to be concerned," the Administrator essentially says. "Show up on Election Day and fix it all." Fortunately, the Public Disclosure Provision applies in Virginia and an advocacy group was able to use it to make the eligibility-determination process transparent. *See id*. at 340. That is not possible in Wisconsin.

EDR is a voter list maintenance activity and Wisconsin has enacted specific procedures to govern EDR. Wis. Stat. Ann. § 6.56(3). EDR registrants who fail address verification are made ineligible to vote and are referred to the district attorney. *Id*. The EDR process is also not immune from discriminatory application, inefficiency, error, or mistake. *See Project Vote*, 682 F.3d at 339. Like all mechanisms that grant and remove voting rights, the EDR process needs the NVRA's transparency—especially when criminal penalties are attached. Wis. Stat. Ann. § 6.56(3). Why then is the Administrator fighting to preserve secrecy?

Furthermore, Wisconsin is statutorily mandated to conduct voter list maintenance throughout the year, and is thus constantly granting, preserving, and removing voting rights. (ECF 1 ¶¶ 28-42.) The Public Disclosure Provision exists so that the public can *always* monitor these activities. *See, e.g.*, *Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12-13 (explaining that the Public Disclosure Provision "convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs"). The public cannot do so in Wisconsin. In fact, the Wisconsin Election Administration ("WEC") admits that public evaluation of its voter list maintenance activities is impossible because the public does not have access to date of birth information. *See* WEC, Emails from Third Parties, Oct. 3, 2022, https://elections.wi.gov/memo/emails-third-parties (last accessed May 9, 2025) ("Third parties do not have access to birth date data or to the current registration list.  As a result, they falsely identify non-duplicates and also flag records previously reported to clerks through the Registration List Alert process."). Congress envisioned constant transparency so that errors, mistakes, and discrimination can be discovered and corrected, whenever those things may occur. That kind of transparency does not exist in Wisconsin.

In any event, the Administrator ignores that under "current conditions[,]" at least thirteen states and the District of Columbia[1] now offer the same EDR opportunities that supposedly justified Wisconsin's Transparency Exemption. (Doc. 1 ¶ 72.) Yet only some of those states, like Wisconsin, are exempt from the NVRA's Public Disclosure Provision. It irrational that Wisconsin is exempt, while Iowa and Illinois are not.

## VI.     Controlling Precedent Forecloses the United States's Prudential Standing Arguments.

There are no prudential standing concerns (USA Br. at 15) because the Foundation is asserting its own legal rights, not the rights of third parties.

The Supreme Court and the Seventh Circuit hold that a private party may raise constitutional principles, including principles embodied in the Tenth Amendment, in suits seeking relief from personal injuries. In other words, the sovereignty of America's states does not depend on the identity of the plaintiff, nor does the Foundation lose

---

[1] The United States quibbles with the Foundation's acknowledgement that 19 states and the District of Columbia permit registration on Election Day, noting that "only 13 states and the District of Columbia currently allow *Polling-Place* Registration." (USA Br. at 65 n. 7.) The United States cites to its District Court brief, which listed 14 states plus the District of Columbia. (ECF 26 at 25 n.14 ("*See* Cal. Elec. Code § 2170; D.C. Code § 1-1001.07(g)(5); Haw. Rev. Stat. § 11-15.2; Idaho Code § 34-408A; 10 Ill. Comp. Stat. 5/5-50; Iowa Code § 48A.7A; Md. Code, Elec. Law §§ 3-305, -306; Minn. Stat. § 201.061; Nev. Rev. Stat. §§ 293.5842, .5847; N.H. Rev. Stat. § 654:7-a; Utah Code § 20A-2-207; 17 Vt. Stat. § 2144(b); Va. Code § 24.2-420.1; Wis. Stat. § 6.55(2)(a); Wy. Stat. § 22-3-104(h)(i).").) Anyway you look at it, it is more than double the number of states that are exempted from the NVRA.

standing because its injury is caused more directly by something other than the constitutional principle invoked. The District Court therefore got it right when it held that the Foundation has standing to pursue relief for injuries under the NVRA.

In *Bond v. United States*, 564 U.S. 211 (2011), the Supreme Court considered "whether a person indicted for violating a federal statute has standing to challenge its validity on grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States." *Id*. at 214. The Court answered that question "yes." *Id*.

An *amicus* appointed to defend the contrary decision of the court of appeals claimed, like United States here, that "to argue that the National Government has interfered with state sovereignty in violation of the Tenth Amendment is to assert the legal rights and interests of States and States alone," which is forbidden by the "prudential rule" that a party "cannot rest his claim to relief on the legal rights or interests of third parties." *Id*. at 220. "[N]ot so," ruled the Supreme Court. *Id*. "The individual, in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines. Her rights in this regard do not belong to a State." *Id*. The Supreme Court continued,

> The limitations that federalism entails are not therefore a matter of rights belonging only to the States. States are not the sole intended beneficiaries of federalism. *See New York*, *supra*, at 181, 112 S. Ct. 2408, 120 L. Ed. 2d 120. An individual has a direct interest in objecting to laws that upset the

13

constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. **Fidelity to principles of federalism is not for the States alone to vindicate.**

*Bond*, 564 U.S. at 222 (emphasis added).

The Supreme Court is clear: "[W]here the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the federal structure of our Government." *Id*. 225-26. That is precisely the case here. The Foundation's injury, or case, is premised on a violation of the NVRA. That injury "results from disregard of the federal structure of our Government," *id*., namely, the equal state sovereignty principle embodied in the Tenth Amendment. Under *Bond*, that Foundation may invoke that principle to secure relief for its statutory injury, which is a personal injury.

Before *Bond*, the Seventh Circuit reached a similar conclusion in *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999). *Gillespie* involved a private citizen's challenge to a federal gun statute that made him unable to possess a firearm, circumstances that caused him to lose his job as a police officer. *Id*. at 697.

Gillespie argued on appeal that the federal gun statute violated multiple constitutional principles, including "the Tenth Amendment's guarantee of state sovereignty." *Id*. at 700. As it does again here, the United States argued that Gillespie had no standing to make that argument because "any aspect of state sovereignty

14

impinged upon by the Gun Control Act is one that the State, rather than an individual, must assert." *Id*. The United States claimed "[i]t is particularly inappropriate to allow a private individual to raise such concerns … where … the state or local government whose Tenth Amendment interests are being advocated is a party to the case and takes a contrary position." *Id*. The Seventh Circuit disagreed.

The Seventh Circuit held that the Supreme Court's decision in *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59 (1978), "rejects any categorical requirement that there be a logical nexus between the plaintiff's injury and the nature of the constitutional right he asserts[.]" *Gillespie*, 185 F.3d at 701-02. In other words, it made no difference for standing purposes that Gillespie's injuries—the loss of the ability to carry a gun and loss of employment—were not rights protected by the constitutional principles he invoked, namely, the Tenth Amendment. Applying *Gillespie* here means it makes no difference that the Foundation's injuries—information deprivation and related adverse effects—are not rights guaranteed by the equal state sovereignty principle. The United States's arguments must again fail.

Like *Bond*, *Gillespie* also forecloses the argument that a party raising state sovereignty principles is asserting rights of third parties not before the Court. *Gillespie*, 185 F.3d at 703. Indeed, the Seventh Circuit was clear: "Gillespie, in making Tenth

15

Amendment claims, actually is asserting his own rights." *Id.* (citing *New York v. United States*, 505 U.S. 144 (1992)).

The Seventh Circuit summarized its decision:

> We are therefore satisfied that Gillespie has standing to pursue a Tenth Amendment challenge to section 922(g)(9). He has suffered a concrete injury—the loss of the ability to carry a firearm, and the consequent loss of his job as a police officer. That injury can also fairly be traced to the constitutional violation that he attributes to Congress in enacting the amendments to the statute, for if we declared the statute unconstitutional, the firearms disability would be nullified and Gillespie would regain his right to carry a firearm. *See Duke Power*, 438 U.S. at 74-77, 98 S. Ct. at 2631-32. Finally, as *New York* explains, the Tenth Amendment, although nominally protecting state sovereignty, ultimately secures the rights of individuals. Gillespie consequently has standing to raise the Tenth Amendment violation notwithstanding what state or local officials themselves may have to say about the propriety of the statute.

*Gillespie*, 185 F.3d at 703-04. To say that summary is "on point" here would be putting it mildly. The District Court deemed the prudential standing question "unnecessary" (USA Br. at 11), because controlling precedent makes the question irrelevant.

Neither the United States nor the Administrator challenge the Foundation's Article III standing under the NVRA. Such challenges would fail, even if made, because the Foundation plausibly alleges informational injuries and multiple downstream consequences caused by those informational injuries.

**CONCLUSION**

If Congress treats the States differently, it must adequately justify its actions. The

District Court erred when it concluded otherwise and dismissed the complaint.

Dated: May 14, 2025.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:

/s/ Noel H. Johnson
Noel H. Johnson (*Counsel of Record*)
Kaylan Phillips
PUBLIC INTEREST LEGAL FOUNDATION, INC.
107 S. West Street
Suite 700
Alexandria, VA 22314
(703) 745-5870
njohnson@publicinterestlegal.org
kphillips@publicinterestlegal.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. Rule

32(a)(7)(B)(i) and Circuit Rule 32(c)because, excluding the parts of the brief exempted

by Rule 32(f), this brief contains 3,856 words.

This brief also complies with the typeface requirements Fed. R. App. P.

32(a)(5)(A) and Circuit Rule 32(b) because this brief has been prepared in a

proportionally spaced type face using Microsoft Word in 12-point Palatino Linotype

font.


    /s/ Noel H. Johnson
    Noel H. Johnson
    Counsel for Public Interest Legal Foundation

Dated: May 14, 2025.

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2025, I electronically filed the foregoing using the

Court's ECF system, which will serve notice on all parties.


  /s/ Noel H. Johnson
Noel H. Johnson
Counsel for Public Interest Legal Foundation