In the

# United States Court of Appeals

for the Seventh Circuit

No. 24-3258

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

*Plaintiff-Appellant*,

*v.*

MEAGAN WOLFE, Administrator of the Wisconsin Elections Commission, and UNITED STATES OF AMERICA,

*Defendants-Appellees*.

Appeal from the United States District Court for the Western District of Wisconsin.
No. 24-cv-285-jdp — **James D. Peterson**, *Chief Judge*.

ARGUED SEPTEMBER 25, 2025 — DECIDED AUGUST 19, 2026

Before BRENNAN, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The National Voter Registration Act requires each state to adopt streamlined procedures for citizens to register to vote in federal elections. *See generally*, 52 U.S.C. § 20503(a). As relevant here, the Act also requires states to "make available for public inspection" and

"photocopying at a reasonable cost" all records pertaining to "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1).

Some states are exempt from the Act—namely, those that have permitted same-day polling-place registration or have not required registration at all since August 1, 1994. *Id.* § 20503(b). Only a few states qualify for the exemption. Wisconsin is one: It has offered same-day polling-place registration continuously since at least that date.

The Public Interest Legal Foundation asked the Wisconsin Elections Commission for a copy of the state's voter registration list. Because Wisconsin is exempt from the Act, the Commission processed the request under the state public-records law. *See* WIS. STAT. §§ 6.36(1)(b)(1), 19.35(1). Wisconsin requires the redaction of voters' birth information and charges a fee to produce the record, up to a maximum of $12,500. Because the statewide voter list is lengthy, the maximum fee applied.

The Foundation objected to the fee and redaction, so it sued to invalidate Wisconsin's exemption and compel the Commission to produce the registration list in accordance with federal law. The suit rests on two novel legal theories. The primary claim is that the Act's exemption violates the principle of equal state sovereignty as recognized in *Shelby County v. Holder*, 570 U.S. 529 (2013). Alternatively, the Foundation alleges that the exemption violates the "congruence and proportionality" requirement for legislation enacted pursuant to Congress's power to enforce the Fourteenth Amendment against the states. *See City of Boerne v. Flores*,

521 U.S. 507 (1997). The district judge rejected these theories and dismissed the case.

We affirm. As a threshold matter, both legal theories concern the rights of the *states*. But the Foundation isn't trying to vindicate states' rights. Quite the contrary: It has deployed these legal theories *against* Wisconsin's interests. We doubt that the prudential doctrine of third-party standing is malleable enough to support this maneuver. But we can bypass that question because the suit is flawed on the merits. *Shelby County* involved a provision in the Voting Rights Act that singled out certain states for onerous regulatory burdens. The exemption at issue here does exactly the opposite: It *relieves* Wisconsin from federal regulatory burdens because its voter-registration laws already align with federal policy. And the "congruence and proportionality" principle announced in *City of Boerne* applies to laws enacted pursuant to § 5 of the Fourteenth Amendment. Congress adopted the Voter Registration Act under its Elections Clause power. U.S. CONST. art. 1, § 4, cl. 1.

## I. Background

The Public Interest Legal Foundation is a nonprofit organization that seeks to promote the integrity of the electoral process. As part of this mission, the Foundation regularly inspects state voter rolls looking for the unlawful inclusion of ineligible voters or the unlawful removal of eligible voters. To that end, in January 2024 the Foundation asked the Wisconsin Elections Commission for a copy of the state's voter registration list pursuant to the National Voter Registration Act, 52 U.S.C. §§ 20501 *et seq.*

The Act was adopted in 1993 to simplify the process for citizens to register to vote in federal elections. *Young v. Fordice*, 520 U.S. 273, 275 (1997). It requires each state to provide at least three methods for voter registration: by mail, in person at designated locations, and as part of an application for a driver's license. § 20503(a); *see* §§ 20504–06. The Act further directs states to ensure that anyone who submits a "valid voter registration form" at least 30 days before an election is in fact "registered to vote" in that election. § 20507(a)(1). And it forbids a state to remove a registered voter from the official list of voters except "at the request of the registrant" (or in cases of criminal conviction, mental incapacity, or death). § 20507(a)(3).

Key here is the Act's public-disclosure provision, which directs each state to maintain, for at least two years, all records pertaining to "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," and to make these records "available for public inspection" and "photocopying at a reasonable cost." § 20507(i)(1).

As we've noted, the Act exempts some states: It "does not apply" to states that have permitted same-day polling-place registration or have not required registration at all "under law that is in effect continuously on and after August 1, 1994." § 20503(b). Wisconsin qualifies for the exemption; it has permitted same-day polling-place voter registration since at least that date. *See* WIS. STAT. § 6.55(2)(a) (providing for same-day voter registration). Only a handful of other states are also exempt: North Dakota, which has no registration requirement;

and Idaho, Minnesota, New Hampshire, and Wyoming, which permit same-day polling-place registration.[1]

Because Wisconsin is exempt, the Commission advised the Foundation that it would process the request under the state public-records law. *See* §§ 6.36(1)(b)(1), 19.35(1). Wisconsin law protects the confidentiality of voters' birth dates, so the Commission could not disclose that information. § 6.36(1)(b)(1)(a). Wisconsin also charges a fee to obtain a copy of voting records. Starting at $25 per electronic report, the fee increases by $5 for each set of 1,000 records requested until it reaches a statutory maximum of $12,500. § 6.36(6);[2] WIS. ADMIN. CODE EL § 3.50(4). Given the size of the state's voter roll, the maximum fee of $12,500 applied to the Foundation's request.

The Foundation balked at the fee and nondisclosure of voters' birth information, so it notified the Commission of its

---

[1] *See The National Voter Registration Act of 1993 (NVRA)* Q&A 2, U.S. DEP'T OF JUST., CIV. RTS. DIV., https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

[2] The statute directs the Commission to set the fee based on both the cost to maintain the list and the cost to produce a copy. In relevant part, the statute provides:

> The commission shall establish by rule the fee for obtaining a copy of the official registration list, or a portion of the list, including access to the subscription service established under s. 5.05(14)(b). The amount of the fee shall be set, after consultation with county and municipal election officials, at an amount estimated to cover both the cost of reproduction and the cost of maintaining the list at the state and local level.

WIS. STAT. § 6.36(6).

intent to sue for violation of the Voter Registration Act. *See* § 20510(b) (requiring written notice before filing suit). The Foundation asserted that Wisconsin's exemption from the Act is "no longer effective" after the Supreme Court's decision in *Shelby County*. Commission staff replied by email reiterating that Wisconsin is exempt from the Act and again explaining that the Commission would process the request under Wisconsin's public-records law.

As it had warned, the Foundation responded with this suit challenging the Commission's refusal to produce a complete copy of the state's voter roll—including voters' birth-date information—at a "reasonable cost" as required by the Voter Registration Act. § 20507(i)(1). The complaint alleges that the Act's exemption violates the "equal state sovereignty" principle articulated in *Shelby County* and the "congruence and proportionality" requirement announced in *City of Boerne*. Among other remedies, the suit seeks a declaration invalidating the exemption provision and an order compelling Wisconsin to comply with the terms of the Act.

The Commission moved to dismiss the case, invoking Wisconsin's exemption and arguing that neither *Shelby County* nor *City of Boerne* calls its validity into question. As permitted by 28 U.S.C. § 2403(a), the United States intervened to defend the constitutionality of the exemption, agreeing with the Commission that *Shelby County* and *City of Boerne* do not apply. The government also challenged the Foundation's standing to sue under the prudential doctrine of third-party standing. Because the Foundation's legal theories rest not on its own rights but on those of the *states*, the government argued that the Foundation was improperly asserting "the rights of others." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

The district judge granted the motion. He began his analysis with the question of standing, holding that the Foundation's allegation of an informational injury was sufficient to support Article III standing. He expressed some concern about prudential standing, but he set that issue aside and opted to address the case on the merits. The judge concluded that neither *Shelby County* nor *City of Boerne* casts doubt on the validity of the Voter Registration Act's exemption provision. Both cases, the judge explained, concerned federal statutes that imposed burdens on the states; using them to invalidate Wisconsin's *exemption* from federal burdens would flip them on their heads. The judge accordingly dismissed the case. This appeal followed.

**II. Discussion**

We review the judge's dismissal order de novo. *Milchtein v. Milwaukee County*, 42 F.4th 814, 821 (7th Cir. 2022). To survive a motion to dismiss, a federal complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007); *see* FED. R. CIV. P. 12(b)(6). A plaintiff's factual allegations are taken as true at the pleadings stage, but the same presumption does not apply to legal conclusions. *Nobles v. Mullin*, 177 F.4th 886, 896 (7th Cir. 2026). A claim that lacks the support of a cognizable legal theory cannot proceed, so we evaluate the viability of the Foundation's claim under "the governing sources of law" on which it is based. *Id.*

We start with a few words on the Foundation's standing to sue. Like the district judge, we're satisfied that the complaint adequately alleges Article III standing, though our reasoning is somewhat different. Setting aside whether the allegations are sufficient to support a cognizable informational

injury, the Foundation has alleged a traditional pocketbook injury—specifically, the $12,500 fee that Wisconsin charges for a copy of the state's voter roll. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023) (A "classic pocketbook injury" suffices to establish Article III standing.). That alleged financial harm differentiates this case from those in which other circuits have concluded that the Foundation lacked Article III standing to sue for access to state voting records. *E.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 631–32 (6th Cir. 2025); *Pub. Int. Legal Found. v. Sec'y of Pennsylvania*, 136 F.4th 456, 469 (3d Cir. 2025).

We're not so sure about prudential standing, however. As a general matter, a party "must assert his own legal rights and interests" and "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). That rule poses a problem for the Foundation's claim, which is largely premised on the rights and prerogatives of the states in our system of federalism. The Foundation obviously has no claim to sovereignty—let alone the right of equal state sovereignty as described in *Shelby County*, 570 U.S. at 544. A similar problem affects the Foundation's theory based on *City of Boerne*. Simply put, the Foundation cannot accuse Congress of intruding into its regulatory authority or usurping its police powers; it has none. *See City of Boerne*, 521 U.S. at 534.

But a general rule requiring a party to assert his own interests is just that—a general rule. And a claim rooted in principles of federalism may implicate individual rights that aren't immediately apparent. As the Supreme Court recognized in *Bond v. United States*, our federal balance is in one sense "an end in itself": It ensures that the "States function as

political entities in their own right." 564 U.S. 211, 221 (2011). But in another sense, it "secures to citizens the liberties that derive from the diffusion of sovereign power." *Id.* (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)). "When government acts in excess of its lawful powers," those liberties are "at stake." *Id.* at 222. Accordingly, citizens have a "direct interest in objecting to laws" that upset this federal balance—at least in some cases. *Id.* Put another way, "[f]idelity to principles of federalism is not for the States alone to vindicate." *Id.*; *see Gillespie v. City of Indianapolis*, 185 F.3d 693, 703–04 (7th Cir. 1999).

The Foundation leans heavily on *Bond*, but there are reasons to doubt its application here. To start, *Bond* involved a *defensive* challenge to a statute on federalism grounds. Carol Anne Bond was criminally charged with violating 18 U.S.C. § 229, which prohibits the possession of chemical weapons; she moved to dismiss the charges, arguing that the statute as applied to her exceeded Congress's powers in violation of the federalism principles secured by the Tenth Amendment. *Bond*, 564 U.S. at 214. The Supreme Court concluded that the prudential rules of standing permitted her to raise this challenge as a defense to the criminal charges. *Id.* at 220–26. The Court relied in part on *I.N.S. v. Chadha*, which likewise involved a defensive constitutional challenge to a statute authorizing a so-called legislative veto in the context of deportation proceedings. 462 U.S. 919, 925–28 (1983).

In both *Bond* and *Chadha*, the challengers' constitutional interests were clear: The statutes in question were being used to prosecute or deport them. This case is different. The Foundation has raised federalism principles *offensively*; it seeks to invalidate the Voter Registration Act's exemption provision

and force Wisconsin's compliance with the Act's public-disclosure requirements. Unlike in *Bond* and *Chadha*, the Foundation is not invoking federalism principles as a shield against congressional encroachment on states' rights and individual liberty. It is instead deploying *Shelby County* and *City of Boerne* to *impose* federal regulatory burdens on Wisconsin. That strikes us as a misapplication of the principle recognized in *Bond.*

But we do not need to decide. The general rule against asserting the interests of third parties is prudential: "It does not involve the Constitution's 'case-or-controversy requirement'" and thus does not inform our jurisdiction. *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 317 (2020) (quoting *Kowalski*, 543 U.S. at 128–29). So like the district judge, we set it aside and focus on the merits of the Foundation's constitutional claim.

We can be brief. The Foundation's main contention is that the Voter Registration Act's exemption provision is invalid under the principle of equal state sovereignty articulated in *Shelby County*. That case involved a constitutional challenge to the "preclearance" requirement in § 5 of the Voting Rights Act. Applicable to only nine states in full and several others in part, § 5 required that covered jurisdictions "obtain federal permission before enacting any law related to voting." *Shelby County*, 570 U.S. at 535; *see* 52 U.S.C. § 10304(a). The Supreme Court observed that requiring a state to obtain federal approval before pursuing its own legislative objectives was "a drastic departure from basic principles of federalism." *Shelby County*, 570 U.S. at 535. And singling out certain states for the preclearance requirement marked "an equally dramatic departure from the principle that all States enjoy equal

sovereignty." *Id.* Both features of the preclearance regime were "extraordinary and unprecedented." *Id.* at 549.

As the Court explained, our constitutional structure preserves the "broad autonomy" of each state to structure its own government, to legislate for the health and welfare of its citizens, and "to regulate elections"—all without "beseech[ing] the Federal Government for permission." *Id.* at 543–44 (quotation omitted). Each state likewise retains "sovereignty under the Constitution" and is entitled to equality "in power, dignity[,] and authority." *Id.* at 544 (quotation omitted).

Because § 5's preclearance requirement "sharply depart[ed]" from these principles, and did so without sufficient justification, the Court invalidated the statutory formula specifying which jurisdictions were subject to preclearance. *Id.*; *see* 52 U.S.C. § 10303(b). The coverage formula swept in states "by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s"—in other words, "decades-old data relevant to decades-old problems." *Shelby County*, 570 U.S. at 551, 553. And because Congress had failed to update the formula to reflect modern-day conditions, the Court declared the formula unconstitutional; without an operative coverage formula, there was no "basis for subjecting jurisdictions to preclearance." *Id*. at 557.

With this background in mind, the problems with the Foundation's reliance on *Shelby County* are hard to miss. To start, the preclearance requirement imposed onerous burdens on certain states for their past behavior. The statutory exemption at issue here does precisely the opposite: It *relieves* certain states from generally applicable regulatory burdens.

Recall, too, that the exemption applies to states that since August 1, 1994, have had no registration requirement at all or have offered same-day registration at the polls. In substance, then, the Act's exemption functions more like an equalizer. The Act requires *all* states to provide ample opportunity for their citizens to register to vote in federal elections and exempts the states whose registration laws have consistently aligned with this federal policy since the Act's adoption. The Act thus does not "sharply depart[]" from basic federalism and equal-sovereignty principles; it conforms to them. *Id.* at 544.

Moreover, the Voting Rights Act—the law at issue in *Shelby County*—was enacted pursuant to Congress's Fifteenth Amendment enforcement power. *Louisiana v. Callais*, 146 S. Ct. 1131, 1144 (2026). That authority is not all-encompassing: It extends only to legislation that "effectuate[s] by '*appropriate*' measures" the Fifteenth Amendment's prohibition on discriminatory voting practices. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966) (emphasis added) (quoting U.S. CONST. amend. XV, § 2). To be considered "appropriate," legislation must at a minimum be "consist[ent] with the letter and spirit of the [C]onstitution." *Shelby County*, 570 U.S. at 555 (first alteration in original) (quotation omitted). That includes basic federalism and equal-sovereignty principles, which are at the core of the Constitution's letter and spirit.

In contrast, Congress enacted the Voter Registration Act pursuant to its power under the Elections Clause. *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021). That clause authorizes Congress to alter or supplant state regulations prescribing the "Times, Places and Manner of holding Elections for Senators and Representatives."

U.S. CONST. art. I, § 4, cl. 1. Unlike Congress's Fifteenth Amendment enforcement power, its Elections Clause power "is paramount"; Congress may exercise it "at any time[] and to any extent which [Congress] deems expedient." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). And because the role of the states in regulating federal elections has always been subject to Congress's preemptive Elections Clause authority, the federalism concerns that animated *Shelby County* "are somewhat weaker here." *Id.* at 14.

That brings us back to the fundamental mismatch between this case and *Shelby County*. The Foundation's requested remedy would entail the *imposition* of federal regulatory burdens on Wisconsin and the other states exempt from the Act—not, as in *Shelby County*, the *elimination* of such burdens. As the district court correctly observed, that result would turn *Shelby County* on its head. Indeed, for all the reasons we've discussed, the Foundation's reliance on *Shelby County* is clearly misplaced; the case has no application here.

We turn, then, to the Foundation's argument under *City of Boerne*, which it essentially treats as an afterthought. Understandably so. *City of Boerne* is similarly irrelevant. That case concerned the scope of Congress's authority under § 5 of the Fourteenth Amendment to "enforce" the Amendment "by appropriate legislation." U.S. CONST. amend. XIV, § 5. Because that authority is limited to enforcing the provisions of the Fourteenth Amendment, the Supreme Court held that Congress may not enact legislation that "alters the meaning" of the constitutional right. 521 U.S. at 519. In other words, Congress's § 5 authority is remedial; it may impose "measures

that remedy or prevent unconstitutional actions," but it may not "make a substantive change in the governing law." *Id.*

To mark the boundaries of this distinction, the Court announced what has come to be known as the "congruence and proportionality" test for § 5 legislation: "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. Without this connection, "legislation may become substantive in operation and effect." *Id.* The Court held that although Congress has "wide latitude" to draw the substantive/remedial line, the "distinction exists and must be observed." *Id.*

The statute at issue in *City of Boerne*, the Religious Freedom Restoration Act ("RFRA"), attempted to change the substance of the free-exercise right. *Id.* at 532. And that, the Court said, was "broader than is appropriate if the goal is to prevent and remedy constitutional violations." *Id.* at 535. Accordingly, the Court held that RFRA "reflect[ed] a lack of proportionality or congruence" and was "a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens." *Id.* at 533–34.

There are several reasons why *City of Boerne* doesn't help the Foundation here. We've already noted the most obvious one: Congress adopted the Voter Registration Act pursuant to its Elections Clause power—*not* its authority under § 5 of the Fourteenth Amendment—so the "congruence and proportionality" test does not apply. And as the district judge aptly observed, a case about Congress's authority to curtail the states' traditional regulatory power says little (if anything) about Congress's authority to *exempt* certain states from an

otherwise valid federal regulatory regime. In short, *City of Boerne* is simply inapposite.

The Foundation tries to shore up its case with what is essentially a political argument, warning that Congress might wield its Elections Clause power to benefit partisan allies and punish foes. Whatever can be said about that prospect—and we note that other constitutional provisions would likely stand in the way—the Voter Registration Act's exemption provision does not fit the bill. The exemption did not open the door to partisan mischief or tit-for-tat retaliation. Quite the opposite. The exemption, along with the rest of the Act, simply made it "easier to register to vote in federal elections." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 792 (7th Cir. 1995).

AFFIRMED

BRENNAN, *Chief Judge*, concurring. The majority opinion persuasively explains why this suit fails on the merits, and I agree with that analysis in full. I write separately to highlight another fundamental problem with this case: the Public Interest Legal Foundation may lack Article III standing to bring this suit.

Though "we cannot reach the merits of a case" without satisfying this "bedrock constitutional requirement," *Wis. Voter All. v. Millis*, 166 F.4th 627, 632 (7th Cir. 2026) (per curiam), the Foundation's theory of standing is challenging to evaluate because it implicates multiple unresolved circuit splits. In fact, there is now a split about whether the Foundation itself has standing to bring suits like this one. *Compare Pub. Int. Legal Found. v. Sec'y Commw. of Pa.*, 136 F.4th 456, 461–70 (3d Cir. 2025), *cert. denied*, 146 S. Ct. 1785 (2026) (dismissed for lack of standing), and *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 629–32 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026) (dismissed for lack of standing), *with Pub. Int. Legal Found., Inc. v. Wooten*, 164 F.4th 362, 365–66 (4th Cir. 2026) (remanding to evaluate standing), and *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 670–77 (9th Cir. 2026) (standing).

Unique features of this case make it a poor vehicle for addressing these questions. But this action highlights the need to clarify the test for identifying informational injuries and organizational standing after *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), and *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

## I

In its quest to apply the National Voter Registration Act to the state of Wisconsin, the Foundation's principal argument

for standing is that it suffered an "informational injury." The Supreme Court has recognized that "a plaintiff suffers an 'injury in fact'" sufficient for Article III standing "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (citing *Pub. Citizen v. Dep't of Just.*, 491 U.S. 440, 449 (1989)). It appears this rule has survived recent developments in standing jurisprudence. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016) (citing *Akins* and *Pub. Citizen*). The Foundation files lawsuits around the country based on a theory that it suffers an informational injury every time a state declines to produce voter records in the exact format it desires.

Wisely, my colleagues have declined to decide whether the Foundation has suffered an informational injury. *Accord Sec'y Commw. of Pa.*, 136 F.4th at 459; *Benson*, 136 F.4th at 629. And though a close call, I am less persuaded that the Foundation has done enough to allege a "classic pocketbook injury." *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023). I have found no evidence in the record that the Foundation spent any money. And there may be another way for the Foundation to obtain the information it seeks without imposing federal law on Wisconsin or paying the $12,500 fee for electronic access.

At least in this case, the Foundation may lack standing three times over. It supplied no evidence that it was denied any of the requested information; it identified no downstream consequences from the alleged denial; and it did not discuss whether it could assert standing for its own injuries. Several circuits have held that an advocacy organization cannot sue to redress informational injuries in federal court without making these three showings. The allegations in the Foundation's

complaint are "rather thin gruel" for standing, no matter how the test is defined. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 964 (7th Cir. 2019) (Brennan, J., concurring). Because this case comes to us at the motion to dismiss phase, though, the unusual allegations here might cross the threshold. *Wis. Voter All.*, 166 F.4th at 632 (plaintiff's burden is lower at the pleading stage).

**A**

To start, the record suggests that the Foundation has not actually been "deni[ed] … information subject to public disclosure." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 337–38 (7th Cir. 2019) (Barrett, J.); *accord TransUnion*, 594 U.S. at 441 (citing *Casillas* with approval for this proposition). This is the central requirement for finding an informational injury. But after comparing the materials covered by the National Voter Registration Act's disclosure provision, the documents requested by the Foundation, and the information made available under Wisconsin law, the Foundation may not have been denied the information it requested.

Consider first the terms of the federal Act. It requires states to "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Many kinds of records come into this statute's ambit. *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012) ("the word 'all' … suggests an expansive meaning").

But there are also limits to that disclosure. For one, the statute "does not require electronic production" of documents "at all." *Greater Birmingham Ministries v. Sec'y of State*,

105 F.4th 1324, 1335 (11th Cir. 2024). The phrase "make available for public inspection" is a term of art drawn from the Freedom of Information Act context, and it does not encompass digital disclosure of documents. *Id.* at 1332–35. Congress amended FOIA to provide for electronic disclosure; it has not done the same for this Act, which has not been amended since it was enacted in 1993. *Id.* at 1333.

For another, no appellate court has held that the Act requires states to disclose certain kinds of sensitive information about voters along with the requested documents. *Project Vote*, 682 F.3d at 339–40 (appropriate to redact Social Security Numbers from voter rolls released under the Act); *Pub. Int. Legal Found. v. N.C. State Bd. of Educ.*, 996 F.3d 257, 267 (4th Cir. 2021) (A "district court can order redaction of 'uniquely sensitive information' in otherwise disclosable documents."). Therefore, the Act subjects information to public disclosure in a specific, constrained way.

The Foundation requested two kinds of records—the official list of voters registered in Wisconsin and several years' worth of "Deceased Reports" produced by the Electronic Registration Information Center, a national voting database. Both records fall into the Act's broad disclosure provision.

The critical question is whether Wisconsin denied the Foundation access to these documents. On my reading of the record, it did not. Following a statutory requirement, the state makes its voter rolls "open to public inspection" and "electronically accessible." WIS. STAT. § 6.36(1)(b); WIS. ADMIN. CODE EL 3.50(2). This law both encompasses and exceeds the disclosure required under the federal Act. There is also no reason to think "Deceased Reports" are not "records" open to public inspection under Wisconsin's Freedom of Information

Act, at least according to the record in this case. WIS. STAT. § 19.35(1)(a), (2). In other words, Wisconsin's current public disclosure laws may permit access to all desired documents.

Even more, when the Foundation requested these documents, Wisconsin did not turn it away. As to its first request, the officials directed the Foundation to the online voter registration list, which is the state's preferred means for disseminating this information. As to its second request, the record does not speak either way about whether it was denied. The election officials said that they "hope[d] to provide a response to the second part of your request soon." In the final email exchange recorded in the record, the officials said they would continue to "process requests" like this one under state law. The Foundation supplied neither allegation nor evidence of whether the state complied with or formally rejected this request.

Whether these allegations show a "deni[al]" of requested documents is questionable. *Casillas*, 926 F.3d at 338. That is especially so if all the information the Foundation requested could be obtained under state law. At the least, the Foundation has not made a strong effort to show an informational injury. *Wis. Voter All.*, 166 F.4th at 632.

The Foundation also complains that state officials did not provide the requested documents for free, in the desired format, and without releasing certain pieces of redacted information. But this does not change whether there is an informational injury. And I am not sure this qualifies as a pocketbook injury without further allegations of compelled spending.

Assume that the Foundation succeeded on the merits and the National Voter Registration Act was applied to the State

of Wisconsin. It would still not be entitled to obtain the desired documents for free. Rather, the Foundation must pay for "photocopying at a reasonable cost." 52 U.S.C. § 20507(i)(1). That language is identical to the state-law analog. *See* WIS. STAT. §§ 6.45(2) & 19.35(3)(a) ("An authority may impose a fee upon the requester of a copy of a record which may not exceed the actual, necessary and direct cost of reproduction and transcription of the record.") And in its initial records request, the Foundation made clear that it was willing and able to pay such costs to obtain the documents it desired.

Even though accessing voter rolls online incurs a cost of $5 per thousand voters, then, the Foundation might have acquired these documents for its desired price. It is not apparent to me that the reproduction costs qualify as a pocketbook injury. After all, the Foundation did not actually pay a dime to the state. It instead proceeded straight to federal court. To allege a denial of information or a pocketbook injury under these circumstances, the Foundation must supply at least some evidence that other "pathways are [not] viable" if it wants to show a cognizable injury. *Wis. Voter All.*, 166 F.4th at 637 n.5; *see also id.* at 636 n.4. The record does not answer these questions, which means the Foundation may not have discharged its burden to identify facts supporting Article III standing. *Id.* at 632.

In sum, the Foundation had an avenue to obtain the information it sought without recourse to federal court. It has not suffered an informational injury if it did not engage in a genuine effort to procure the desired documents through state-law procedures. The Act it seeks to invoke is narrower than the state laws—it does not provide for electronic disclosure of documents at all, while Wisconsin law does. A plaintiff does

not normally face an informational or financial harm that is "certainly impending" when it disregards a cost-effective alternative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). At the least, it is questionable whether the Foundation has adequately alleged Article III standing, even at the motion to dismiss stage. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (sufficient allegations needed for court to "presum[e] … specific facts … to support the claim").

**B**

The Foundation may lack Article III standing for two further reasons: it has "identified no 'downstream consequences' from failing to receive" access to the voter rolls, *TransUnion*, 594 U.S. at 442 (citation omitted), and it has not explained whether it can assert standing for its own injuries. Both grounds are implicated in the circuit split over whether the Foundation can assert an informational injury.

*Downstream Consequences.* In *TransUnion*, the Supreme Court said, "An asserted informational injury that causes no adverse effects cannot satisfy Article III." *Id.* (citation modified). This formulation of the test could be in tension with *Spokeo*. In the latter case, the Court cited informational injuries as examples of cases in which "a plaintiff … need not allege any *additional* harm beyond the one Congress has identified" in a statute to have standing. 578 U.S. at 342. And *Spokeo* seems more consistent with the cases supplying a foundation for the informational injury doctrine. Both *Akins* and *Public Citizen* seem to treat the denial of information sought through a sunshine statute as a cognizable harm in its own right. *Akins*, 524 U.S. at 20–21; *Pub. Citizen*, 491 U.S. at 448–50.

Over the past five years, the circuits have split over whether *TransUnion* added a new requirement to the test for informational injuries. *Compare, e.g., Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022) ("Even assuming that [plaintiff] can allege that he was deprived of information to which he [was] entitled … he must also allege 'downstream consequences from failing to receive the required information.'"), *with Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 170 (4th Cir. 2023) (holding that *TransUnion* did not change the requirements outlined in *Akins*). A few years ago, the Supreme Court granted certiorari in *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1 (2023), a case involving a related circuit split. But the Court opted to dismiss *Acheson Hotels* as moot without addressing standing, leaving the question open. *Id.* at 3–5.

The Foundation's litigation has deepened this split. When the Third Circuit denied the Foundation standing in a similar case, that court relied explicitly on the fact that the organization had not alleged any downstream harm. *Sec'y Commw. Pa.*, 136 F.4th at 464–69. So too for the Sixth Circuit's decision. *Benson*, 136 F.4th at 630. But the Ninth Circuit recently broke from this consensus, concluding that *TransUnion* did not change *Public Citizen* and *Akins* by implication and requiring no showing of downstream consequences. *Nago*, 174 F.4th at 670–74. Now, there are circuit splits about whether *TransUnion* changed the informational injury test and about whether the Foundation itself has standing.

To my knowledge, we have not considered an informational injury case since *TransUnion* was decided. *See Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624–26 (7th Cir. 2020); *but see Wis. Voter All.*, 166 F.4th at 633 n.2 (observing that the plaintiff in another election-related case could have raised

informational injury, but that argument would have failed). In this case, the majority opinion declines to choose a side in this ongoing split. That means future cases must still consider whether "downstream consequences" are necessary to allege an informational injury as a matter of first impression.

If it is true that plaintiffs need to show downstream consequences from the denial of information, the Foundation has not cleared that bar. Its complaint highlights three possible harms: the cost of obtaining the information through the electronic disclosure portal; the Foundation's inability to ensure state officials are complying with state and federal election law; and the lack of information to support its advocacy and educational efforts. "As actual harm for Article III purposes," these reasons are weak. *Common Cause*, 937 F.3d at 964 (Brennan, J., concurring). Add to this that the Foundation might be able to obtain the requested information in other ways at a lower cost, and it becomes apparent that the Foundation's allegations of downstream consequences may be neither concrete nor cognizable.

*Organizational Standing.* If the Foundation used any of these harms to justify "downstream consequences," it might face another hurdle: these injuries cannot supply standing to a public-interest advocacy group. In *Hippocratic Medicine*, the Supreme Court made clear that an interest group cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394. Based on its complaint, the Foundation has indicated it may be spending its way into standing.

*Hippocratic Medicine* changed the law governing organizational standing and rendered some of this court's caselaw obsolete. *See Wis. Voter All.*, 166 F.4th at 638–44 (Brennan, C.J.,

concurring). Some uncertainties remain about how far the holding of that case extends. *Id.* at 641–42. But two things are certain: public-education expenses and harms regarding internal operations are "now foreclose[d]" as a means for advocacy groups to secure standing. *Id.* at 640. The Foundation raises these exact harms in its complaint.

It is not immediately clear how *Hippocratic Medicine* fits with the informational injury test. The Third Circuit added *Hippocratic Medicine*'s language on organizational injury to its discussion of the "downstream consequences" prong of the informational injury test. *Sec'y Commw. Pa.*, 136 F.4th at 469. But the Ninth Circuit kept the two separate, treating them as alternate theories of standing. *Nago*, 174 F.4th at 676.

I observed in *Wisconsin Voter Alliance* that the Supreme Court invoked an information-based framework when it modified the organizational standing test. *Hippocratic Medicine* explicitly cabined *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the seminal organizational standing case, to its facts. *Wis. Voter All.*, 166 F.4th at 639–40, 644 (Brennan, C.J., concurring). In the process, the Court "redefined the injury in [*Havens*] as an *informational*, rather than a financial, harm." *Id.* at 639 (emphasis added). Though not the same as the classic informational injury of *Akins*, the new "paradigmatic *Havens* injury" is an intangible injury to "the organization's 'core business activities' … not a self-inflicted harm caused by redirecting resources." *Id.* at 640 (quoting *Hippocratic Med.*, 602 U.S. at 395); *see also Az. All. for Retired Ams. v. Mayes*, No. 22-16490, 2026 WL 2277101, at *14–22 (9th Cir. 2026) (en banc) (Bress, J., concurring). That view comports with *Akins*, which cited *Havens Realty* for the proposition that a "deprivation of information about housing availability constitutes 'specific

injury' permitting standing." *Akins*, 524 U.S. at 21 (quoting *Havens Realty*, 455 U.S. at 374).

If an informational injury is just a type of intangible injury, as our precedent suggests, these two lines of cases may be closer than they first appear. *See Casillas*, 926 F.3d at 337–38. And the Foundation's disregard of state-law means for obtaining the documents sought, along with its alleged financial harms, might be the same kind of "self-inflicted" financial injuries now forbidden by *Hippocratic Medicine*. *Wis. Voter. All.*, 166 F.4th at 640 (Brennan, C.J., concurring).

The Foundation made no effort to explain how the state official's actions "directly affected and interfered with the group's core business activities." *Id.* at 629 (citation modified). If an advocacy organization asserting an informational injury must also satisfy this test, that would be another reason why the Foundation lacks standing to sue.

**II**

To me, this case presents justiciability issues from the beginning. An interest group sued to impose a burdensome federal law onto a state—against that state's expressed wishes and interests—by asserting the state's "equal sovereignty" rights on its behalf. The majority opinion correctly observes the prudential standing issues raised here; it also cogently explains why the Foundation cannot succeed on the merits.

I respectfully concur because I believe an organizational plaintiff may need to do more to allege an informational injury. It cannot just say it was "denied" information that it could access through other means. Still, I join the majority opinion because ambiguities in the law obscure the proper test for evaluating standing here. I hope the Supreme Court

will step in and address both circuit splits implicated by the Foundation's main theory of Article III standing.